# 14-0036-cv(L), 14-0037-cv(XAP)

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

WILLIAM NOJAY, THOMAS GALVIN, ROGER HORVATH, BATAVIA
MARINE & SPORTING SUPPLY, NEW YORK STATE RIFLE AND PISTOL
ASSOCIATION, INC., WESTCHESTER COUNTY FIREARMS OWNERS
ASSOCIATION, INC., SPORTSMEN'S ASSOCIATION FOR FIREARMS
EDUCATION, INC., NEW YORK STATE AMATEUR TRAPSHOOTING
ASSOCIATION, INC., BEDELL CUSTOM, BEIKIRCH AMMUNITION
CORPORATION, BLUELINE TACTICAL & POLICE SUPPLY, LLC,

*Plaintiffs-Appellants-Cross-Appellees,*

*(For Continuation of Caption See Inside Cover)*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS-CROSS-APPELLEES

STEPHEN P. HALBROOK, ESQ.
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia 22030
(703) 352-7276

GOLDBERG SEGALLA LLP
11 Martine Avenue, Suite 750
White Plains, New York 10606
(914) 798-5400

COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
(202) 220-9600

*Attorneys for Plaintiffs-Appellants-Cross-Appellees*

― v. ―

ANDREW M. CUOMO, Governor of the State of New York, ERIC T.
SCHNEIDERMAN, Attorney General of the State of New York, JOSEPH A.
D'AMICO, Superintendent of the New York State Police,

*Defendants-Appellees-Cross-Appellants,*

FRANK A. SEDITA, III, District Attorney for Erie County,
GERALD J. GILL, Chief of Police for the Town of Lancaster, New York,
LAWRENCE FRIEDMAN,

*Defendants-Appellees.*

# CORPORATE DISCLOSURE STATEMENT

Plaintiff New York State Rifle and Pistol Association, Inc. is a New York not-for-profit corporation. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Plaintiff Westchester County Firearms Owners Association, Inc. is a New York not-for-profit corporation. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Plaintiff Sportsmen's Association for Firearms Education, Inc. is a New York not-for-profit corporation. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Plaintiff New York State Amateur Trapshooting Association, Inc. is a New York not-for-profit corporation. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Plaintiff Bedell Custom is a New York sole proprietorship. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Plaintiff Beikirch Ammunition Corporation is a New York corporation. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Plaintiff Blueline Tactical & Police Supply, LLC is a New York limited liability corporation. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Plaintiff Batavia Marine & Sporting Supply is a New York corporation. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated: April 29, 2014          s/ Charles J. Cooper
                               Charles J. Cooper
                               *Attorney for Plaintiffs-Appellants-Cross-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................v

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES..............................................................1

INTRODUCTION .................................................................................1

STATEMENT OF THE CASE................................................................4

I.    COURSE OF PROCEEDINGS.........................................................4

II.   STATUTORY BACKGROUND.........................................................6

      A.    Prohibitions on Rifles, Handguns, and Shotguns..................6

      B.    Prohibitions on Magazines ................................................8

SUMMARY OF THE ARGUMENT ........................................................9

ARGUMENT .....................................................................................10

I.    STANDARD OF REVIEW .............................................................10

II.   NEW   YORK'S   BAN   ON   COMMON   FIREARMS   AND
      MAGAZINES VIOLATES THE SECOND AMENDMENT ......................10

      A.    The SAFE Act Bans "Arms" that Are Protected by the Second
            Amendment ....................................................................10

      B.    *Heller* Establishes the Test for Determining Which Weapons
            Are Constitutionally Protected "Arms" ...............................14

      C.    The Semiautomatic Firearms Singled Out by New York Cannot
            Be Banned .....................................................................16

D.     Magazines Capable of Holding More than 10 Rounds of Ammunition Cannot Be Banned ..........................................................23

E.     New York's Semiautomatic "Assault Weapons" and "Large Capacity" Magazine Bans Are Flatly Unconstitutional .....................29

F.     New York's Ban Fails Any Potentially Applicable Standard of Scrutiny ...............................................................................34

III.     PROVISIONS OF THE ACT ARE UNCONSTITUTIONALLY VAGUE .......................52

A.     Provisions of the Act Are Void to the Extent that Vagueness Permeates Their Text............................................................53

B.     Certain Provisions of the Act that the District Court Upheld Are Unconstitutionally Vague.................................................................58

1.     "Can Be Readily Restored or Converted To Accept" ..............58

2.     Capacity of Tubular Magazines ................................................59

CONCLUSION .........................................................................................61

# TABLE OF AUTHORITIES

**Cases**                                                                               **Page**

*Arriaga v. Mukasey*, 521 F.3d 219 (2d Cir. 2008) ................................... 52

*Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir. 1999) ....................................................................................................... 57

*Bowen v. Kendrick*, 487 U.S. 589 (1988) ............................................... 56

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ............................... 53, 57

*Colautti v. Franklin*, 439 U.S. 379 (1979) .............................................. 55

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................... *passim*

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) ............... 56

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ......... 13, 14, 37, 38

*Fyock v. City of Sunnyvale*, -- F. Supp.2d --, 2014 WL 984162 (N.D. Cal. Mar. 5, 2014) ................................................................. 30, 31

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................ 59

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ...... *passim*

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) ..... *passim*

*Kolender v. Lawson*, 461 U.S. 352 (1983) ......................................... 52, 53

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013) ................................ 35

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) .................... *passim*

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ............................. 13, 52

*National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ...................... 37

*Novella v. Westchester County*, 661 F.3d 128 (2d Cir. 2011) ................. 10

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ........................... 41

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ............. 12

*People v. Aguilar*, 2 N.E.3d 321 (Ill. 2013) ........................................... 37

*People v. Ford*, 66 N.Y.2d 428 (1985) .................................................... 54

*People v. Marino*, 212 A.D.2d 735 (N.Y. App. Div. 1995) .................... 54

*People v. Wood*, 58 A.D.3d 242 (N.Y. App. Div. 2008) ................... 54, 55

*Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998)......................................................................10, 58, 60

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ..............................13

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) ..............................56

*Shew v. Malloy*, -- F. Supp.2d --, 2014 WL 346859 (D. Conn. Jan. 30, 2014) ........................................31

*Staples v. United States*, 511 U.S. 600 (1994) ..................................................17, 18

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ..............................................................17

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ....................................42, 44

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)..................................37

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)..........................................42

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013)........................................38

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012) ..................................34, 35

*United States v. Grace*, 461 U.S. 171 (1983) .........................................................40

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).....................................37

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) ...........................................56

*United States v. Salarno*, 481 U.S. 739 (1987).......................................................53

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ...........................................38

*United States v. Stevens*, 559 U.S. 460 (2010) .......................................................53

*United States v. Virginia*, 518 U.S. 515 (1996) ..........................................39, 41, 42

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)..............................................................................53, 57

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989).........................................40, 43

*White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163 (2d Cir. 2007) ............................................................................................................44

## Constitutional and Legislative Materials

U.S. CONST. amend. II....................................................................*passim*

28 U.S.C. § 1291 ..........................................................................................................1

28 U.S.C. § 1331 ..........................................................................................................1

CAL. PENAL CODE § 30600 .........................................................................................19

Cal. Penal Code § 30605 ....................................................19

Cal. Penal Code § 32310 ....................................................29

Colo. Rev. Stat. § 18-12-301 ...........................................29

Conn. Gen. Stat. § 53-202b ..............................................19

Conn. Gen. Stat. § 53-202c ..............................................19

Conn. Gen. Stat. § 53-202x ..............................................29

D.C. Stat. § 7-2502.02 (2008) ..........................................33

Haw. Rev. Stat. § 134-8 ...................................................19

Haw. Rev. Stat. § 134-8(c) ...............................................29

Mass. Gen. Laws ch. 140, § 131M ...........................19, 29

Md. Code, Crim. Law § 4-303 .........................................19

Md. Code, Crim. Law § 4-305 .........................................29

N.J. Stat. § 2C:39-1(y) .....................................................29

N.J. Stat. § 2C:39-5(f) ......................................................19

N.J. Stat. § 2C:39-9(g) .....................................................19

N.Y. Penal Law § 265.00(21) ...........................................18

N.Y. Penal Law § 265.00(22) ...................................6, 7, 17

N.Y. Penal Law § 265.00(22)(b)(iv) ......................9, 10, 59

N.Y. Penal Law § 265.00(22)(g)(iii) ................................29

N.Y. Penal Law § 265.00(23)(a) .................................8, 9, 58

N.Y. Penal Law § 265.00(g)(v) ...........................................8

N.Y. Penal Law § 265.00(h) ...............................................8

N.Y. Penal Law § 265.02 ..................................................54

N.Y. Penal Law § 265.02(7) ..........................................8, 54

N.Y. Penal Law § 265.02(8) .......................................8, 9, 54

N.Y. Penal Law § 265.10(1)-(3) .......................................8, 9

N.Y. Penal Law § 265.36 ............................................9, 54

N.Y. Penal Law § 400.16-a ................................................8

## Other

ANTHONY J. PINIZZOTTO ET AL., VIOLENT ENCOUNTERS (U.S. Dep't of Justice 2006)..................................................................................45

ARTHUR PIRKLE, 1 WINCHESTER LEVER ACTION REPEATING FIREARMS: THE MODELS OF 1866 (1994) ......................................................................28

David B. Kopel, "*Assault Weapons*," *in* GUNS: WHO SHOULD HAVE THEM (David B. Kopel ed., 1995)................................................................27

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994) ..........................................18, 20, 21

Eric R. Poole, *Ready To Arm: It's Time To Rethink Home Security*, *in* GUNS & AMMO, BOOK OF THE AR-15 (Eric R. Poole ed., 2013)...................23

*Expanded Charge on Knowingly*, www.nycourts.gov/judges/ cji/1-General/CJI2d.Knowingly.pdf ...................................................55

GARY KLECK, TARGETING GUNS (1997) .....................................23, 50, 51

Gary Kleck & Marc Gertz, *Armed Resistance to Crime*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)............................................................26, 51

GUN DIGEST 2013 (Jerry Lee ed., 67th ed. 2013) .....................................24

HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST (1952) .............................................................................................28

INSTITUTE OF MEDICINE OF THE NATIONAL RESEARCH COUNCIL, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF FIREARM-RELATED VIOLENCE (Alan I. Leshner et al. eds., 2013).................................................51, 52

JAMES D. WRIGHT & PETER H. ROSSI, ARMED & CONSIDERED DANGEROUS (2d ed. 2008) .................................................................................45

JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION (2012) .......................28

JOSH SUGARMANN, ASSAULT WEAPONS AND ACCESSORIES IN AMERICA, Conclusion (Violence Policy Center 1988), *available at* www.vpc.org/studies/awaconc.htm .......................................17, 33, 34

Journal of Convention: Wednesday, February 6, 1788, *reprinted in* DEBATE AND PROCEEDINGS IN THE CONVENTION OF THE COMMONWEALTH OF MASSACHUSETTS (1856) ...............................................................38, 39

Laura Ly, *New York City's Biggest Gun Bust Ever Yields 254 Weapons, 19 Arrests,* CNN.COM (Aug. 20, 2013), www.cnn.com/2013/08/19/justice/new-york-illegal-guns/. ................47

Market Data Center, Auto Sales, *Sales and Share of Total Market by Manufacturer*, WSJ.COM, http://online.wsj.com/mdc/public/page/2_3022-autosales.html................................................................................22

MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS (2013)........................25, 26

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford et al. eds., 2005)....................................................48

NEW YORK CITY POLICE DEPARTMENT, ANNUAL FIREARMS DISCHARGE REPORT 2011 (2012), www.nyc.gov/html/nypd/downloads/pdf/analysis_and_planning/nypd_annual_firearms_discharge_report_2011.pdf ..................26

NICHOLAS J. JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2012)..............................................................................................................19

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285 (2009) ............................................22

NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES (9th ed. 2007)......................................................28

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To Bear Arms*, 49 L. & CONTEMP. PROBS. 151 (1986) ......................46

Thomas J. Aveni, *Officer Involved Shootings: What We Didn't Know Has Hurt Us* (Police Policy Studies Council 2003), at http://www.theppsc.org/Staff_Views/Aveni/OIS.pdf (showing NYPD "hit ratios" of 38% at 0-2 yards and 17% at 3-7 yards)......................................26

U.S. DEP'T OF ARMY, RIFLE MARKSMANSHIP, M16-/M4-SERIES WEAPONS (2008), http://armypubs.army.mil/doctrine/DR_pubs/dr_a/pdf/fm3_22x9.pdf ..............................................................................................18

*What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (2013), *available at* www.judiciary.senate.gov/imo/media/doc/1-30-13KopelTestimony.pdf.......................................................20, 21, 27, 50, 51

## JURISDICTIONAL STATEMENT

Plaintiffs allege that provisions of New York law violate the United States Constitution.  The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  The district court entered judgment on January 2, 2014, and Plaintiffs noticed their appeal on January 3, 2014.  The appeal is from a final judgment that disposes of all parties' claims.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether New York's ban on commonly possessed firearms that the State labels "assault weapons" violates the Second Amendment.

2.      Whether New York's ban on standard capacity ammunition magazines that the State labels "large capacity" magazines violates the Second Amendment.

3.      Whether certain provisions of the SAFE Act are unconstitutionally vague.

## INTRODUCTION

The State of New York bans its law-abiding citizens from protecting themselves, their families, and their homes with semiautomatic firearms it deems to be "assault weapons" and ammunition magazines it deems to be of "large capacity."  Under the Supreme Court's decision in *District of Columbia v. Heller*,

New York can justify its ban only if it can prove that the banned items are "not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. 570, 625 (2008).

That is a hopeless task. The semiautomatic firearms the State inaccurately dubs "assault weapons" include some of the nation's most popular firearms. At a bare minimum, "there can be little dispute that tens of thousands of Americans own these guns and use them exclusively for lawful purposes." SPA21. They are no more powerful than firearms that are not banned, and they fire at the same rate as all semiautomatics—one round per each pull of the trigger. To the extent the features that make a firearm an "assault weapon" make a functional difference at all, they promote accuracy and hence make a firearm safer and more effective to use.

Magazines capable of holding more than ten rounds of ammunition are even more ubiquitous. There are tens of millions in the United States, and they come standard with many of the nation's most popular firearms. The defensive appeal is obvious: a gun owner who runs out of ammunition before an assailant does is likely to become a crime victim, and it is more likely that this will happen if the gun owner is stuck with a substandard capacity magazine.

The district court was unable to find that the banned firearms and magazines are atypical and thus unprotected by the Second Amendment but

nevertheless uphold the State's ban. *Heller* forecloses this result. As the Court explained in *McDonald v. City of Chicago*, *Heller* "found that [the Second Amendment] right *applies* to handguns," and it thus concluded that "citizens *must* be permitted to use" them. 130 S. Ct. 3020, 3036 (2010) (emphases added) (quotation marks omitted). The same result should obtain here, and it is unnecessary for this Court to apply a levels-of-scrutiny analysis to strike down New York's ban.

While the district court held that New York's ban satisfies intermediate scrutiny, *Heller* forecloses this result as well. Handguns "are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting). Yet the Supreme Court held that the District of Columbia's law banning them "would fail constitutional muster" under any standard of heightened scrutiny. *Id*. at 629. The same must be true for New York's ban on firearms and magazines less favored by armed criminals.

Because laws banning protected firearms are "off the table," *id.* at 636, the district court's contrary ruling must be reversed. The district court also erred in rejecting parts of Plaintiffs' vagueness challenge.

## STATEMENT OF THE CASE

### I.  COURSE OF PROCEEDINGS

Plaintiffs filed this action for declaratory and injunctive relief on March 21, 2013, and they filed an amended complaint on April 11.  JA43; JA89.  They claimed that several provisions of the New York Secure Ammunition and Firearms Enforcement Act of 2013, as amended (the "SAFE Act" or the "Act"), violate the United States Constitution.  In particular, Plaintiffs contended that the Act's ban on semiautomatic "assault weapons" and "large capacity" ammunition feeding devices violates the Second Amendment (Plaintiffs hereafter refer to ammunition feeding devices as "magazines"), that the Act's ban on loading more than seven rounds into a magazine violates the Second Amendment and the Equal Protection Clause, that several provisions of the Act are unconstitutionally vague, and that the Act's requirement that ammunition sales be conducted in person violates the Commerce Clause.

On April 15, 2013, Plaintiffs moved for a preliminary injunction.  JA134. The State filed a motion to dismiss and for summary judgment on June 21, JA264, and Plaintiffs filed a cross-motion for summary judgment on August 19, JA1745.

On December 31, 2013, Chief Judge William M. Skretny granted in part and denied in part Plaintiffs' motion for summary judgment, did the same for the State's motion to dismiss and for summary judgment, and denied as moot

Plaintiffs' motion for a preliminary injunction.  SPA1 (citation not yet available).

Specifically, the district court granted the State's motion for summary judgment

with respect to Plaintiffs' claim that the State's ban on "assault weapons" and

"large capacity" magazines violates the Second Amendment.  The district court

"assume[d]" that the banned firearms "are commonly used for lawful purposes."

SPA25.  "Given their popularity in the assumably law-abiding public," the district

court likewise "proceed[ed] under the premise that [the banned] magazines are

commonly owned for lawful purposes."  *Id*.  And the district court found that the

State's ban on these commonly possessed firearms and magazines "impose[s] a

substantial burden on Plaintiffs' Second Amendment rights."  *Id*.  The district court

nevertheless applied intermediate scrutiny to uphold the State's ban, concluding

that it is substantially related to the State's interest in public safety and crime

prevention.  SPA30-37.

The district court granted Plaintiffs' motion for summary judgment with

respect to the State's ban on loading more than seven rounds into a magazine.

Again applying intermediate scrutiny, the district court found that this limit,

"which appears to be largely arbitrary," violates the Second Amendment,

reasoning that "it stretches the bounds of ... deference to the predictive judgments

of the legislature to suppose that those intent on doing harm ... will load their

weapon with only the permitted seven rounds."  SPA38.  The limit thus

"present[ed] the possibility of a disturbing perverse effect, pitting the criminal with a fully-loaded magazine against the law-abiding citizen limited to seven rounds." SPA38. Because the court found that the seven-round limit violates the Second Amendment, it did not reach Plaintiffs' equal protection claim. SPA40.

With respect to Plaintiffs' vagueness claims, the district court granted summary judgment for Plaintiffs with respect to several provisions and for the State with respect to several others. SPA40-49.

Finally, the district court dismissed Plaintiffs' Commerce Clause claim. SPA49-55.

On January 3, 2014, Plaintiffs noticed their appeal and the State noticed its cross-appeal. JA2410&2414.

## II. STATUTORY BACKGROUND

On January 15, 2013, the day after the bill was introduced, Governor Cuomo signed the SAFE Act into law. The Act was amended on March 28, 2013. As relevant here, the Act creates new offenses with severe criminal penalties for previously lawful activities involving the acquisition and possession of rifles, handguns, shotguns, and magazines.

### A. Prohibitions on Rifles, Handguns, and Shotguns

The Act defines "assault weapons" to include semiautomatic rifles, handguns, and shotguns with specified features. The Act broadens the definition

of "assault weapon" in N.Y. PENAL LAW § 265.00(22) from a two-feature test in

prior law to a one-feature test:

*Rifles*

> (a) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of the following characteristics:
> (i) a folding or telescoping stock;
> (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
> (iii) a thumbhole stock;
> (iv) a second handgrip or a protruding grip that can be held by the non-trigger hand;
> (v) a bayonet mount;
> (vi) a flash suppressor, muzzle break, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator;
> (vii) a grenade launcher ....

*Shotguns*

> (b) a semiautomatic shotgun that has at least one of the following characteristics:
> (i) a folding or telescoping stock;
> (ii) a thumbhole stock;
> (iii) a second handgrip or a protruding grip that can be held by the non-trigger hand;
> (iv) a fixed magazine capacity in excess of seven rounds;
> (v) an ability to accept a detachable magazine ....

*Pistols*

> (c) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the following characteristics:
> (i) a folding or telescoping stock;
> (ii) a thumbhole stock;

(iii) a second handgrip or a protruding grip that can be held by the non-trigger hand;

(iv) capacity to accept an ammunition magazine that attaches to the pistol outside of the pistol grip;

(v) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

(vi) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the non-trigger hand without being burned;

(vii) a manufactured weight of fifty ounces or more when the pistol is unloaded;

(viii) a semiautomatic version of an automatic rifle, shotgun or firearm ....

It generally is a Class D felony to possess, manufacture, transport, or dispose of an "assault weapon." N.Y. PENAL LAW §§ 265.02(7), 265.10(1)-(3). Pre-ban owners of firearms with these prohibited features were given until April 15, 2014, to register them and have them exempted from the Act's definition of an "assault weapon." *Id*. §§ 265.00(g)(v), 400.16-a. Such grandfathered firearms may only be transferred "to a purchaser authorized to possess such weapons or to an individual or entity outside of the state …." *Id*. § 265.00(h).

### B.     Prohibitions on Magazines

The Act defines a "large capacity ammunition feeding device" as a magazine or similar device "that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition." *Id*. § 265.00(23)(a). Prior law had excluded any magazine manufactured before September 13, 1994, from the definition. It generally is a felony to possess, manufacture, transport, or

dispose of such a device.  *Id*. §§ 265.02(8), 265.10(1)-(3).  It is not a felony to

possess a "large capacity" magazine manufactured before September 13, 1994, *id*.

§ 265.02(8), but the Act elsewhere makes it unlawful to possess such a magazine,

followed by a clause beginning "and if" which fails to complete the sentence.  *Id*. §

265.36.

## SUMMARY OF THE ARGUMENT

1.    The Second Amendment guarantees law-abiding citizens the right to

possess and use firearms.  New York infringes this right by prohibiting its citizens

from possessing popular semiautomatic firearms that it labels "assault weapons"

and standard capacity magazines that it labels "large capacity magazines."  Like

the District of Columbia's handgun ban, New York's ban would fail any standard

of heightened constitutional scrutiny.  The district court thus erred by finding that

New York's ban does not violate the Second Amendment.

2.    The district court erred in declining to hold that certain provisions of

the SAFE Act are void for vagueness.  In particular, the Act defines a "large

capacity" magazine to include a magazine that "can be readily restored or

converted to accept, more than ten rounds of ammunition."  N.Y. PENAL LAW §

265.00(23)(a).  It fails, however, to supply information about the knowledge, skill,

or tools available to the person doing the restoration or conversion.  The Act also

defines as an "assault weapon" a semiautomatic shotgun with "a fixed magazine

capacity in excess of seven rounds," while excluding one "that cannot hold more than five rounds of ammunition in a fixed ... magazine." *Id*. §§ 265.00(22)(b)(iv) & (g)(iii).  Shotgun shells, however, vary in length, and the Act fails to specify the length of the shells to be used in applying these provisions.  The Sixth Circuit has struck down similar provisions as unconstitutionally vague, *see Peoples Rights Organization, Inc.*, *v. City of Columbus*, 152 F.3d 522 (6th Cir. 1988), and this Court should do the same.

## ARGUMENT

### I.  STANDARD OF REVIEW

The standard of review on all issues is de novo because the district court resolved the case on cross-motions for summary judgment.  *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011).

### II.  NEW YORK'S BAN ON COMMON FIREARMS AND MAGAZINES VIOLATES THE SECOND AMENDMENT

#### A.  The SAFE Act Bans "Arms" that Are Protected by the Second Amendment

The Second Amendment issue at the heart of this case turns on a simple question:  Are the semiautomatic firearms and magazines banned by New York "Arms" protected by the Second Amendment?  If they are, New York's flat ban on their possession is unconstitutional.

1.    The text of the Second Amendment provides that "the right of the people to keep and bear *Arms*, shall not be infringed." U.S. CONST. amend. II (emphasis added). It follows that there are certain "instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, that law-abiding, responsible, adult citizens have an inviolable right to acquire, possess, and use.

*Heller* confirms this implication of the constitutional text. There, the Supreme Court held that the Second Amendment "*elevates above all other interests* the right of law-abiding, responsible citizens to use *arms* in defense of hearth and home." *Id*. at 634-35 (emphases added). Thus, all that needs to be done to resolve a challenge to a flat ban on possession of certain weapons is to determine whether they are "arms" protected by the Second Amendment. Any further evaluation of allegedly competing public-policy considerations is foreclosed by the constitutional text. That text is the "very *product* of an interest-balancing by the people," and "[t]he very enumeration of the right [to keep and bear arms] takes out of the hands of government ... the power to decide on a case-by-case basis whether the right is *really worth* insisting on." *Id*.

The government cannot justify a ban on some protected arms by pointing to the availability of other protected arms that are not banned. "It is no answer," *Heller* held, "to say ... that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Id*. at 629.

11

As the decision affirmed by *Heller* put it, the District of Columbia's attempt to justify its handgun ban on the grounds that " 'residents still have access to hundreds more' " types of firearm was "frivolous." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007).

*McDonald* confirms this understanding of *Heller*. There, the Court explained that

> in *Heller*, we held that individual self-defense is the central component of the Second Amendment right. Explaining that the need for defense of self, family, and property is most acute in the home, we found that this right applies to handguns because they are the most preferred firearm in the nation to keep and use for protection of one's home and family. Thus, we concluded, citizens must be permitted to use handguns for the core lawful purpose of self-defense.

130 S. Ct. at 3036 (citations, emphasis, quotation marks, and brackets omitted). In short, because the Court found that the Second Amendment "*applies* to handguns," it concluded that "citizens *must* be permitted to use" them. *Id*. (emphasis added).

2. While this Court has rejected the view that "courts must look solely to the text, history, and tradition of the Second Amendment to determine whether a state can limit the right without applying any sort of means-end scrutiny," *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 n.9 (2d Cir. 2012) (citing, *inter alia*, *Heller v. District of Columbia*, 670 F.3d 1244, 127174 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (hereafter, "*Heller II*")), it need not revisit that decision to hold that laws banning the possession of protected arms are flatly

unconstitutional.[1]  Indeed, this Court has expressly recognized that *Heller* at a minimum "stands for the ... proposition that where a state regulation is entirely inconsistent with the protections afforded by an enumerated right ... it is an exercise in futility to apply means-ends scrutiny."  *Id.*  As *Heller* demonstrates, a law banning possession of protected arms is the paradigmatic example of a law entirely inconsistent with the Second Amendment.

Other circuits that typically apply a levels-of-scrutiny inquiry to Second Amendment claims recognize that certain laws are so antithetical to the Second Amendment that they are "categorically unconstitutional."  *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011).  The Seventh Circuit, for example, held that the State of Illinois's "flat ban on carrying ready-to-use guns outside the home" was flatly unconstitutional.  *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012).  The Ninth Circuit likewise found that "applying heightened scrutiny was unnecessary" to strike down San Diego's limitation of concealed-carry permits to citizens who demonstrate "a unique risk of harm."  *Peruta v. County of San Diego*, 742 F.3d 1144, 1168-70 (9th Cir. 2014).  While *Kachalsky*'s ultimate holding is in tension with these decisions, the source of that tension is not in the recognition that some laws are wholly inconsistent with the Second Amendment, but rather in

---

[1] Plaintiffs reserve the right to argue before the en banc Court and the Supreme Court that that decision was error.

*Kachalsky*'s insistence that Second Amendment "core" protection is limited to the home. *Kachalsky*, 701 F.3d at 94. That "critical difference" is not implicated here, as New York's bans extend into the home. *Id.*

> **B.** *Heller* **Establishes the Test for Determining Which Weapons Are Constitutionally Protected "Arms"**

*Heller* holds that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. The burden thus falls on the government to demonstrate that a particular type of bearable arm falls outside the Second Amendment's scope. *See Ezell*, 651 F.3d at 702-03 (The government bears the burden to "establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right.").

To meet this burden, the government must show that a weapon is "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. *See also id.* at 627 (weapons "highly unusual in society at large" are not protected). This standard is based on historical practices and "the historical understanding of the scope of the right." *Id.* at 625. On the one hand, "[t]he traditional militia" that the Second Amendment was designed to protect "was formed from a pool of men bringing arms in common use at the time for lawful purposes like self defense." *Id.* (quotation marks omitted). On the other hand, the right to bear arms coexisted with a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 627.

Courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms they have chosen to possess. While *Heller* did identify several "reasons that a citizen may prefer a handgun for home defense," the Court held that "*[w]hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id*. at 629 (emphasis added). Thus, if the government cannot show that a certain type of weapon is "not typically possessed by law-abiding citizens for lawful purposes," *id*. at 625, that is the end of the matter—weapons of that type are protected "arms" and cannot be banned.

*McDonald* underscores this point. In dissent, Justice Breyer argued against incorporation of the Second Amendment right because "determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make," such as, "What sort of guns are necessary for self-defense? Handguns? Rifles? Semiautomatic weapons? When is a gun semi-automatic?" *McDonald*, 130 S. Ct. at 3126 (Breyer, J., dissenting). Justice Alito's controlling opinion squarely rejected this argument: "Justice BREYER is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions .... [W]hile his opinion in *Heller* recommended an interest-balancing test, the Court

specifically rejected that suggestion." *Id*. at 3050. When determining which weapons are protected, it is the choices commonly made by the American people that matter, not judges' or legislators' assessments of those choices.

It is likewise irrelevant that criminals may prefer to use a certain firearm for the same reasons that law-abiding citizens do. Justice Breyer emphasized that "the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous." *Heller*, 554 U.S. at 711 (Breyer, J., dissenting). The *Heller* majority, by contrast, focused on the choices of law-abiding citizens, not the choices of criminals or the reasons why criminals make those choices.

Finally, the inquiry focuses on the choices commonly made by *contemporary* law-abiding citizens. *Heller* emphasized that the District of Columbia's "handgun ban amounts to a prohibition of an entire class of 'arms' that *is* overwhelmingly chosen by American society" for self-defense, *id*. at 628 (emphasis added), and it rejected as "bordering on the frivolous" "the argument ... that only those arms in existence in the 18th century are protected," *id*. at 582.

## C. The Semiautomatic Firearms Singled Out by New York Cannot Be Banned

New York bans semiautomatic rifles, shotguns, and handguns with certain features. N.Y. PENAL LAW § 265.00(22). The semiautomatic AR-15 rifle "is representative of the type of weapon the SAFE Act seeks to regulate." SPA22.

Both of these facts—that New York targets semiautomatic firearms and that the AR-15 is representative of those firearms—demonstrate that New York's ban targets arms protected by the Second Amendment.

1.      There is no class of firearms known as "semiautomatic assault weapons."  "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms.  It is a political term, developed by anti-gun publicists ...."  *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).  Indeed, according to New York's own evidence "assault weapon" is a "political term[]."  JA1284.  Anti-gun publicists promoting "assault weapons" bans have sought to exploit "the public's confusion over fully automatic machine guns versus semi-automatic assault weapons" to "increase the chance of public support for restrictions on these weapons."  JOSH SUGARMANN, ASSAULT WEAPONS AND ACCESSORIES IN AMERICA, Conclusion (Violence Policy Center 1988), *available at* www.vpc.org/studies/awaconc.htm.

While "semiautomatic assault weapons" is not a recognized category of firearms, "semiautomatic" is.  And it is semiautomatic firearms that New York's "assault weapons" ban targets.  The "automatic" part of "semiautomatic" refers to the fact that the user need not manipulate the firearm to place another round in the chamber after each round is fired.  But unlike an automatic firearm, a semiautomatic firearm will *not* fire continuously on one pull of its trigger; rather, a

17

semiautomatic firearm requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994); N.Y. PENAL LAW § 265.00(21). There is a significant practical difference between a fully automatic and a semiautomatic firearm. According to the United States military, for example, the maximum effective rates of fire for various M4- and M16-series firearms is between 45-65 rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. U.S. DEP'T OF ARMY, RIFLE MARKSMANSHIP, M16-/M4-SERIES WEAPONS 2-1 (2008), *at* http://armypubs.army.mil/doctrine/DR_pubs/dr_a/pdf/fm3_22x9.pdf.

There is a venerable tradition in this country of lawful private ownership of semiautomatic firearms. The Supreme Court has held as much, concluding in *Staples* that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic firearms have been commercially available for over a century. *See Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994). Yet apart from the now-expired 10-year federal "assault weapons" ban they have not been banned at the federal level. And currently over 85% of the states do not ban semiautomatic "assault weapons." (In addition to New York, only California, Connecticut, Hawaii, Maryland, Massachusetts, and New Jersey have enacted bans

on "assault weapons," with varying definitions of the prohibited firearms.  *See* CAL. PENAL CODE §§ 30600, 30605; CONN. GEN. STAT. §§ 53-202b, 53-202c; HAW. REV. STAT. § 134-8; MD. CODE, CRIM. LAW § 4-303; MASS. GEN. LAWS ch. 140, § 131M; N.J. STAT. §§ 2C:39-5(f), 2C:39-9(g).)

What is more, ownership of semiautomatic firearms is exceedingly common among law-abiding citizens.  For example, statistics indicate that in 2011 82% of the three million handguns manufactured for the domestic market were semiautomatic, JA143, and that in 2010 about 40% of the rifles sold in the United States were semiautomatic, NICHOLAS J. JOHNSON ET AL., FIREARMS LAW & THE SECOND AMENDMENT 11 (2012).

2.     It is no answer to say that New York bans only a subset of semiautomatic firearms.  Indeed, this line of argument is foreclosed not only by *Heller* but also by *Staples*, which identified the AR-15 rifle—the "archetypal" "assault weapon," SPA22—as a traditionally lawful firearm.

The firearms that New York bans are no more dangerous than firearms that the State does not ban.  Indeed, "wounds caused by common civilian hunting rifles and shotguns like those in use for the past 150 years or so are typically far more severe and destructive to tissue than many so-called 'assault weapons.' "  JA2051; *see also* JA2309-10.  The firearms New York bans also fire at the same rate as all

other semiautomatics—one round for each pull of the trigger. The features banned by New York do not increase the rapidity with which a firearm can be fired.

To the extent the features singled out by New York's "assault weapons" ban make any functional difference, they tend to *improve* a firearm's utility and safety for self-defense and other lawful purposes. Indeed, the district court acknowledged that "there is not (and cannot be) a dispute that the outlawed features make semiautomatic weapons easier to use." SPA34. For example:

- A pistol grip makes it easier to hold and stabilize a rifle when fired from the shoulder and therefore promotes accuracy. JA239; *see also* Kopel, 20 J. CONTEMP. L. at 396 ("The defensive application is obvious, as is the public safety advantage in preventing stray shots."). A pistol grip can also assist with retention, making it more difficult for an assailant to wrest a firearm away from a law-abiding citizen. JA239. It does not promote firing from the hip; indeed, a rifle with a straight grip and no pistol grip would be more conducive to firing from the hip. JA240.

- A thumbhole stock is a hole carved into the stock of a firearm through which a user inserts his or her thumb. It promotes accuracy by improving comfort and stability in handling a firearm. *Id*.

- A telescoping stock promotes accuracy by allowing the stock to be adjusted to fit the individual user's physique, thickness of clothing, and shooting

position.  JA238; *see also What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. 8 (2013), *available at* www.judiciary.senate.gov/imo/media/doc/1-30-13KopelTestimony.pdf (written testimony of David B. Kopel) ("Kopel Testimony").

- A muzzle compensator, according to the district court, "reduces recoil and muzzle movement caused by rapid fire."  SPA34.  Since recoil and muzzle movement result from the discharge of each shot, they are also reduced with slow fire.  Making the "muzzle and the shooter ... less likely to move out of position" results in a firearm that is both "more accurate ... and more comfortable to shoot."  Kopel, *Rational Basis Analysis*, 20 J. CONTEMP. L. at 397.

- A flash suppressor is a "common accessory" that "reduces the flash of light" from a firearm shot and thus "decreases shooter's blindness—the momentary blindness caused by the sudden flash of light from the explosion of gunpowder."  *Id*.

3.     These are all legitimate safety-improving features that law-abiding citizens may prefer to have incorporated in their semiautomatic firearms.  But under *Heller*, of course, the key point is that millions of law-abiding citizens choose to possess firearms with those features.  This is demonstrated by the AR-15

rifle which, again, "is representative of the type of weapon the SAFE Act seeks to regulate." SPA22. "Generally, it is a semiautomatic rifle that has a detachable magazine, has a grip protruding roughly four inches below the action of the rifle, and is easily accessorized and adapted." SPA23.

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). By a conservative estimate, nearly four million have been manufactured in the United States for the commercial market since 1986. JA140. In 2011, AR-15s represented 18 percent of the rifles and seven percent of all firearms made in the United States for the domestic market. JA141-42. For comparison sake, at 17.4 percent General Motors had the largest share of the American auto market as of March 2014. *See* Market Data Center, Auto Sales, WSJ.COM, http://online.wsj.com/mdc/public/page/2_3022-autosales.html. Honda and Volkswagen had market shares of 8.7% and 2.3%, respectively. *Id.*

AR-15s are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes. For example, a survey of owners of AR-platform rifles found that the top reasons for owning the firearms include self-defense, hunting, and recreational and competitive target shooting—lawful purposes all.

JA185.  Indeed, AR-15s are "likely the most ergonomic, safe, and effective firearm ... for civilian self-defense."  JA2053; *see also, e.g.*, Eric R. Poole, *Ready To Arm: It's Time To Rethink Home Security*, *in* GUNS & AMMO, BOOK OF THE AR-15 15-22 (Eric R. Poole ed., 2013).

The fact that "assault weapons" form only a small fraction of guns used in crime underscores that AR-15s and other banned firearms are commonly possessed by law-abiding citizens for lawful purposes.  *See, e.g.*, JA261; JA464-65.  Indeed, evidence indicates that "well under 1% [of crime guns] are 'assault rifles.' "  GARY KLECK, TARGETING GUNS 112 (1997).  Rounding up to 1% and assuming that all such rifles used in crimes are AR-15s results in an estimate that AR-15s were used in 4,784 gun crimes in 2011.  *See* JA1910 (478,400 victims of gun crime in 2011).  Even if all of these crimes involved different AR-15s (and they plainly did not, as many incidents involved multiple victims), that would mean that *more than 99.8%* of the (conservatively) estimated 3.3 million AR-15s in the United States through 2011, *see* JA140, were not used in a gun crime that year and thus were owned for lawful purposes.

### D.   Magazines Capable of Holding More than 10 Rounds of Ammunition Cannot Be Banned

While ammunition magazines are not themselves firearms, they are an integral part of the firearms that are equipped with them.  The fact that New York attacks the magazines directly rather than firearms equipped with them does not

change the constitutional analysis: if magazines capable of holding more than ten rounds are typically possessed for lawful purposes, they cannot be banned.

1.    Magazines capable of holding more than ten rounds of ammunition are common to the point of ubiquity among the law-abiding gun owners of this country. Indeed, calling these devices "large capacity" magazines is an utter misnomer—they are a standard feature on many of this nation's most popular firearms.

For example, in the 2013 edition of Gun Digest, a standard reference work that includes specifications of currently available firearms, about two-thirds of the distinct models of semiautomatic centerfire rifles are normally sold with standard magazines that hold more than ten rounds of ammunition. GUN DIGEST 2013 455-64, 497-99 (Jerry Lee ed., 67th ed. 2013). This is consistent with the fact that the AR-15, one of this nation's most popular rifles, typically comes standard with a 20- or 30-round magazine. JA144; *see also* JA178 (survey data indicating that AR-platform rifle owners most commonly use 20- and 30-round magazines).

Magazines capable of holding more than ten rounds are also standard on many of this nation's most popular handgun models. For example, annual ATF manufacturing and export statistics indicate that in 2011 about 61.5% of the 2.6 million semiautomatic handguns made in the United States were in calibers typically using magazines that hold over ten rounds. JA143.

Although precise figures are not available, the total number of magazines capable of holding more than ten rounds in this country is at least in the tens of millions. A 2004 report to the Department of Justice by Christopher Koper (an expert for New York in this case) indicates that (a) as of 1995 there were 25 million such magazines available; (b) nearly 4.8 million were imported for commercial sale between 1994 and 2000; and (c) by 2000 importers had received permission to import an additional 42 million. JA514.

2.　There are many reasons why a law-abiding citizen would not want to be limited to substandard capacity ammunition magazines. The most obvious is to decrease the risk of running out of ammunition before being able to repel a criminal attack. It is no answer to say that the average gun owner is unlikely to need to fire more than ten rounds to protect himself. The average gun owner often will not need to fire a *single* round in self-defense, but that does not justify banning guns altogether. And if a gun owner is attacked, there is a good chance he will be attacked by multiple offenders. According to survey data, for example, in 2008 nearly 800,000 violent crimes (17.4% of the total) involved multiple offenders. JA257.

Police department practices make clear that standard capacity magazines holding more than ten rounds have defensive benefits. Police departments typically issue handguns with magazines that hold more than ten rounds. *See*

JA143; MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS 50, 87-90 (2013).

And they do so for good reason. For example, in 2011 New York City police

officers fired more than ten rounds in 29% of incidents in which they fired their

weapons to defend themselves and others. JA2048; NEW YORK CITY POLICE

DEPARTMENT, ANNUAL FIREARMS DISCHARGE REPORT 2011 17, 23 (2012),

www.nyc.gov/html/nypd/downloads/pdf/analysis_and_planning/nypd_annual_fire

arms_discharge_report_2011.pdf. This is based partly on the fact that police

officers often miss their targets. *See* JA257; Thomas J. Aveni, *Officer Involved*

*Shootings: What We Didn't Know Has Hurt Us* at 7 (Police Policy Studies Council

2003), www.theppsc.org/Staff_Views/Aveni/OIS.pdf (showing NYPD "hit ratios"

of 38% at 0-2 yards and 17% at 3-7 yards). When police officers are not around,

of course, law-abiding citizens are left to defend themselves. Indeed, "defensive

gun use" is very common, with a leading study estimating that "each year in the

U.S. there are about 2.2 to 2.5 million [defensive gun uses] of all types by civilians

against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime*, 86 J.

CRIM. L. & CRIMINOLOGY 150, 164 (1995). And statistics such as those discussed

above demonstrate why citizens may prefer to have standard capacity magazines

holding more than ten rounds in the event they need to use a gun defensively.

   Standard capacity magazines are superior for defensive purposes than the

alternatives. Numerous tests conducted by law enforcement and the military have

documented that the most reliable magazines are the magazines a firearm was designed to use; reduced capacity magazines have been shown to have more malfunctions than standard magazines in several types of firearms. JA2048. Furthermore, the most obvious alternatives—carrying multiple firearms or multiple magazines—are poor substitutes for equipping a firearm with a standard capacity magazine. Criminals, not their targets, choose when and where to attempt a crime. While criminals can ensure that they are equipped with whatever weapons they deem necessary, it is implausible to expect citizens to have multiple firearms available at all times in the event they are attacked. And while carrying multiple magazines may be less burdensome than carrying multiple firearms, the need to replace an empty magazine—particularly when under the stress of a criminal attack—can significantly impair a person's capacity for self-defense. *See* JA240-45.

Standard-capacity magazines may be preferable for other lawful purposes. Target shooting is one example. Indeed, some nationally established shooting competitions are designed for firearms capable of holding more than ten rounds. JA237. Hunting is another. *See id*.; Kopel Testimony at 15 (explaining that hunters often need to take multiple shots); David B. Kopel, "*Assault Weapons*," *in* GUNS: WHO SHOULD HAVE THEM 193 (David B. Kopel ed., 1995) (same).

3. Magazines capable of holding more than ten rounds have been in existence for a long time and, like semiautomatic firearms, they traditionally have been regarded as lawful possessions. Indeed, such magazines are at least as old as the Second Amendment. The Girandoni air rifle was in existence at the time, and it had a magazine capable of holding twenty rounds; Merriweather Lewis carried one on the Lewis and Clark expedition. *See* JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION 95-96, 99-100 (2012). Many lever-action rifles with magazines capable of holding more than ten rounds were introduced around the time of the adoption of the Fourteenth Amendment, including models produced by the Volcanic Repeating Arms Company in the 1850s, Henry in the 1860s, and Winchester in the 1860s and 1870s. *See* HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 13 (1952); NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 304-06 (9th ed. 2007); ARTHUR PIRKLE, 1 WINCHESTER LEVER ACTION REPEATING FIREARMS: THE MODELS OF 1866, 1873 & 1876 44 (1994).

Magazine bans like New York's are extremely rare. Magazine capacity has been unregulated at the federal level with the exception of the 1994-2004 federal ban, which applied to post-enactment magazines capable of holding more than ten rounds. *See* JA702. Of the small minority of states with magazine bans, New York's is the strictest, even setting aside the seven-round load limit that the district

court struck down.  Two states (Colorado and New Jersey) generally limit magazine capacity to 15 rounds rather than 10 rounds.  *See* COLO. REV. STAT. § 18-12-301; N.J. STAT. § 2C:39-1(y).  Four others (California, Connecticut, Maryland, and Massachusetts) make some allowance for possession of pre-ban magazines.  *See* CAL. PENAL CODE § 32310; CONN. GEN. STAT. § 53-202x(a); MD. CODE, CRIM. LAW § 4-305; MASS. GEN. LAWS ch. 140, § 131M.  Hawaii's ten-round magazine limit applies only to handguns.  *See* HAW. REV. STAT. § 134-8(c).  While these laws are themselves unconstitutional, it is telling that New York's goes further than all of them.

## E.    New York's Semiautomatic "Assault Weapons" and "Large Capacity" Magazine Bans Are Flatly Unconstitutional

New York cannot show that the semiautomatic firearms and ammunition magazines it bans are "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.  Indeed, the evidence conclusively shows that law-abiding citizens do commonly own the banned firearms and magazines for lawful purposes.  For this reason alone, under *Heller*, the State's ban is unconstitutional.  Period.  "The Constitution leaves [New York] a variety of tools for combating [gun violence]." *Id*. at 636.  But banning arms protected by the Second Amendment is not one of them.  The Second Amendment takes that option "off the table." *Id*.

The district court departed from *Heller* in reaching the opposite conclusion. The court accepted that the semiautomatic firearms and standard-capacity magazines banned by New York are constitutionally protected. With respect to the former, it found that "there can be little dispute that tens of thousands of Americans own these guns and use them exclusively for lawful purposes such as hunting, target shooting, and even self-defense." SPA24-25. With respect to the latter, it found that they "are also popular, and Defendants concede they are in common use nationally." SPA25. The district court did express some uncertainty regarding whether these arms are typically possessed for lawful purposes, but that uncertainty was unwarranted. For the reasons explained above, there is ample evidence demonstrating that so-called "assault weapons" and "large-capacity" magazines are commonly owned by law-abiding people for lawful purposes. At any rate, given the widespread public ownership of these items, New York cannot bear its burden to prove otherwise.

The district court's conclusion that "assault weapons" and "large-capacity" magazines are in common use is consistent with the findings of several other federal courts. *See Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use' ...."); *Fyock v. City of Sunnyvale*, -- F. Supp.2d --, 2014 WL 984162, at *4 (N.D. Cal. Mar. 5, 2014) ("[M]agazines having a capacity to

accept more than ten rounds are in common use .... [I]t is safe to say that whatever the actual number of such magazines in the United States consumers' hands is, it is in the tens-of-millions, even under the most conservative estimates."); *Shew v. Malloy*, -- F.Supp.2d --, 2014 WL 346859, at *5 (D. Conn. Jan. 30, 2014) ("The Connecticut legislation here bans firearms in common use. Millions of Americans possess the firearms banned by this act .... Additionally, millions of Americans commonly possess firearms that have magazines which hold more than ten cartridges.").

Under *Heller*, that should be the end of the analysis. The district court disagreed, attempting to distinguish *Heller* on the grounds that the SAFE Act "does not totally disarm New York's citizens" and "applies only to a subset of firearms with characteristics New York State has determined to be particularly dangerous and unnecessary for self-defense." SPA29. Other courts have employed similar reasoning. *See Heller II*, 670 F.3d at 1261-62; *Fyock*, 2014 WL 984162, at *6; *Shew*, 2014 WL 346859 at *7. But this does not distinguish *Heller* in the least. Indeed, the District of Columbia attempted to defend its handgun ban on the same grounds: "The Council had a manifestly reasonable basis to conclude that handguns are unusually dangerous," the District argued, and "[i]t adopted a focused statute that continues to allow private home possession of shotguns and rifles, which some gun rights' proponents contend are actually the weapons of

31

choice for home defense."  Brief for Petitioners at 49-50, 54, *Heller*, No. 07-290

(Jan. 4, 2008).  The Supreme Court rejected this argument and found the handgun

ban flatly unconstitutional.

Attempting to bolster its argument that "New Yorkers can still purchase,

own, and sell all manner of semiautomatic weapons that lack the features outlawed

by the SAFE Act," the district court insisted that "Plaintiffs themselves concede

that attributes of the banned weapons are 'present in easily substituted unbanned,

counterpart firearms.' "  SPA29.  Again, the fact that unbanned firearms are

available is irrelevant under *Heller*.  Furthermore, this statement reflects a

misunderstanding of Plaintiffs' arguments.  The district court was quoting from

Plaintiffs' preliminary injunction brief.  What Plaintiffs said was that the attributes

of "assault weapons" that "make them more useful *for criminal purposes* … are

present in easily-substituted, unbanned, counterpart firearms."  Doc.23-1 at 28

(emphasis added).  And this is true—because the features that New York bans do

not affect the mechanics of how a firearm operates, a criminal who wants to obey

the SAFE Act will be able to find a substitute firearm that suits his needs.  But this

does not mean that there are not valid reasons for law-abiding citizens to prefer the

firearms New York bans.  Indeed, the next sentence of Plaintiffs' preliminary

injunction brief emphasized that "these same attributes increase the utility of

['assault weapons'] for *lawful* self-defense or various sporting uses."  *Id*.  And as

explained above, law-abiding citizens may prefer firearms with features like a pistol grip, a thumbhole stock, and a telescoping stock because they promote accuracy and are therefore *safer*.

Finally, the district court attempted to distinguish *Heller* with respect to "assault weapons" by pointing out that "[c]urrent owners of the now-regulated weapons may lawfully possess them so long as they register the weapons with the State." SPA29. But again, this only serves to demonstrate that this case is on all fours with *Heller*. While the District of Columbia generally prohibited registration (and hence possession) of handguns, there was an exception for handguns "validly registered to the current registrant in the District prior to September 24, 1976," D.C. STAT. § 7-2502.02 (2008), the ban's effective date. In striking down the District of Columbia handgun ban, the Supreme Court expressly found the exceptions to it irrelevant, *Heller*, 554 U.S. at 575 n.1, demonstrating that grandfathering provisions like New York's cannot save a ban of protected arms from categorical invalidation.

In the final analysis, there is no principled distinction between the ban at issue in *Heller* and the ban at issue here. While they aim at different weapons, they both make it unlawful for law-abiding citizens to possess "arms" that the Second Amendment guarantees them the right to keep and bear. Indeed, early advocates of "assault weapons" bans expressly insisted that a focus on "assault

33

weapons" would "strengthen the handgun restriction lobby." SUGARMANN, ASSAULT WEAPONS AND ACCESSORIES IN AMERICA, Conclusion. Under *Heller*, both types of bans are equally and categorically unconstitutional.

### F. New York's Ban Fails Any Potentially Applicable Standard of Scrutiny

Because New York's "assault weapon" and "large capacity" magazine ban is "directly at odds with" the Second Amendment, it would be "an exercise in futility to apply means-ends scrutiny." *Kachalsky*, 701 F.3d at 88 & n.9. And at any rate, the ban would fail that analysis.

1.      Under the law of this Circuit, "heightened scrutiny is triggered ... by those restrictions that ... operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." *Id*. at 93. The district court correctly found that the restrictions at issue meet this requirement. SPA26-27. Indeed, they foreclose altogether the ability of law-abiding citizens to use banned firearms and ammunition magazines, and "there are no alternative options" available for possessing them. *Kachalsky,* 701 F.3d at 93.

New York's ban is unlike other laws this Court has found not to impose a substantial burden on Second Amendment rights. In *United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), for example, this Court found that federal law banning transportation of firearms acquired out of state into a person's state of

residence did not substantially burden Second Amendment rights. But the law challenged in *Decastro* did not ban outright the possession of protected arms. Instead, it simply placed "minor limitations on the channels through which" a particular firearm could be acquired. *Id.* at 170 (Hall, J., concurring). And in *Kwong v. Bloomberg*, this Court suggested that New York City's pistol permit fee imposed an insubstantial burden upon plaintiffs who had produced "no evidence ... that the fee [was] prohibitively expensive." 723 F.3d 160, 167 (2d Cir. 2013) (emphasis deleted). The Court expressly distinguished "the hypothetical situation where a plaintiff was unable to obtain a residential handgun license on account of an inability to pay" the fee. *Id*. at 167 n.12.

2.     Because New York's ban substantially burdens Second Amendment rights, "the question becomes how closely to scrutinize New York's statute to determine its constitutional mettle." *Kachalsky*, 701 F.3d at 93. *Heller* and *Kachalsky* demonstrate that strict scrutiny applies. Like the District of Columbia's handgun ban, New York's ban on protected semiautomatic firearms and ammunition magazines extends into the home. *Heller* rejected Justice Breyer's "interest-balancing" approach, 554 U.S. at 634-35, which Justice Breyer expressly based on "First Amendment cases applying intermediate scrutiny," *id*. at 704 (Breyer, J., dissenting). Thus, even if it allows for a levels-of-scrutiny analysis,

*Heller* forecloses application of intermediate scrutiny to bans on protected arms in the home.

*Kachalsky* is to similar effect. There, this Court applied intermediate scrutiny because the case did not concern "the 'core' protection of self-defense in the home." *Kachalsky*, 701 F.3d at 93. While the Court did not reach the question whether strict scrutiny applies to laws that do extend into the home, it strongly signaled that it does. In discussing what standard to apply, the Court reasoned that it did "not believe ... that heightened scrutiny must *always* be akin to strict scrutiny when a law burdens the Second Amendment," *id.* (emphasis added)—implying that strict scrutiny *sometimes* applies. And if strict scrutiny *ever* is to apply, the Court's language demonstrates that it applies to laws that restrict Second Amendment rights in the home. To wit: "Second Amendment guarantees are at their zenith within the home"; "the Second Amendment's core concerns are strongest inside hearth and home"; and "the state's ability to regulate firearms is circumscribed in the home." *Id.* at 89, 94, 96.

The district court's rationales for applying intermediate scrutiny are unconvincing. First, the district court stated that "courts throughout the country have nearly universally applied some form of intermediate scrutiny in the Second Amendment context." SPA26. But courts generally have held that the level of scrutiny depends on the law being challenged and on whether the plaintiff is a law-

abiding citizen, not that intermediate scrutiny applies in every case. And like this Court, several other courts have suggested that strict scrutiny applies to laws that ban the right of law-abiding citizens to keep and bear protected arms in the home. *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (applying "intermediate, rather than strict, scrutiny" because the challenged law "was neither designed to nor has the effect of prohibiting the possession of any class of firearms"); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny"); *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012) ("A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny." (citations omitted)).

And courts have not always applied intermediate scrutiny in Second Amendment cases. As explained above, both the Seventh and Ninth Circuits struck down restrictions on carrying firearms in public as categorically inconsistent with the Second Amendment. The Illinois Supreme Court did the same. *People v. Aguilar*, 2 N.E.3d 321, 327-28 (Ill. 2013). And the Seventh Circuit applied a standard "more rigorous" than intermediate scrutiny "if not quite 'strict scrutiny'"

to order Chicago's ban on shooting ranges preliminarily enjoined. *Ezell*, 651 F.3d at 708. The Ninth and Seventh Circuit's approach is particularly noteworthy because both courts have applied intermediate scrutiny to other Second Amendment challenges. *See United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013); *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010). That courts have applied intermediate scrutiny in other cases does not mean that it should apply here.

Second, the district court reasoned that applying strict scrutiny "would appear to be inconsistent with" *Heller* and *McDonald*'s recognition of "extant, presumptively valid [firearm] restrictions." SPA27. But there is no inconsistency. "The traditional restrictions go to show the scope of the right." *McDonald*, 130 S. Ct. at 3056 (Scalia, J., concurring). They do not rule out strict scrutiny for laws restricting activities *within* the scope of the Second Amendment right, especially for laws that burden the right to keep and bear arms in the home, any more than "exceptions for obscenity, libel, and disclosure of state secrets" rule out strict scrutiny for content-based speech restrictions under the First Amendment. *Heller*, 554 U.S. at 635. Thus, for example, in light of traditional understandings about possession of firearms by violent criminals, *see, e.g.*, Journal of Convention: Wednesday, February 6, 1788, *reprinted in* DEBATES AND PROCEEDINGS IN THE CONVENTION OF THE COMMONWEALTH OF MASSACHUSETTS 86 (1856) (proposal by

Samuel Adams that "the said Constitution be never construed to authorize Congress … to prevent the people of the United States, who are peaceable citizens, from keeping their own arms"), violent felons have no rights under the Second Amendment, and no level of scrutiny (other than rational basis) applies to any restrictions on their ability to possess a firearm.

Furthermore, the district court's reasoning proves too much. Laws are not "presumptively valid" under *any* standard of heightened scrutiny. Even under intermediate scrutiny "[t]he burden of justification is demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Thus, if the district court's reasoning were sound, the Supreme Court's recognition of "presumptively valid" firearms restrictions would rule out any form of heightened scrutiny for Second Amendment claims, not just strict scrutiny. But *Heller*'s rejection of rational basis review for rights within the scope of the Second Amendment, 554 U.S. at 628 n.27, demonstrates that this cannot be right.

Third, while the district court reasoned that First Amendment jurisprudence supports application of intermediate scrutiny, it in reality *undermines* it. Because restrictions on law-abiding citizens possessing protected arms in their homes strike at the very core of the Second Amendment right, they are akin to content-based restrictions on speech that strike at the very core of the First Amendment right and therefore, as the district court acknowledged, "trigger[]" strict scrutiny. SPA28.

New York's ban also is dissimilar to laws that trigger only intermediate scrutiny under the First Amendment. Following *Heller II*, the district court likened New York's ban on certain semiautomatic firearms and standard-capacity magazines to a "content-neutral ... time, place, and manner" restriction on speech. SPA28. But New York's ban is a ban—it is a complete ban on possession of the affected firearms *at all times* and *in all places*. Intermediate scrutiny is reserved for content-neutral laws that "leave open ample alternative channels for communication of the information" in question. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quotation marks omitted). "Additional restrictions such as *an absolute prohibition on a particular type of expression*" are subject to strict scrutiny. *United States v. Grace*, 461 U.S. 171, 177 (1983) (emphasis added). By analogy, New York's absolute prohibition on particular types of firearms and ammunition magazines is subject to strict scrutiny.

Nor is New York's ban "content neutral." In the First Amendment context, "[t]he principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791. The analogous inquiry in this context is whether New York has adopted the challenged regulations because of disagreement with law-abiding citizens possessing certain firearms for lawful purposes like self-defense. There can be no question that New York fails this

test—indeed, the Legislative Memorandum accompanying the SAFE Act argues that the banned firearms and magazines are too "dangerous" and "lethal." JA676. There is nothing "neutral" about this view, which runs directly counter to that of millions of law-abiding American gun owners.

Additional First Amendment doctrines likewise rule out intermediate scrutiny by analogy here. For example, intermediate scrutiny applies to regulations of commercial speech, which "occurs in an area traditionally subject to government regulation" and occupies a "subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). This case, by contrast, concerns possession of protected "arms" in the home, where the state's authority to regulate firearms traditionally is very narrowly "circumscribed" and where "Second Amendment guarantees are at their zenith." *Kachalsky*, 701 F.3d at 89, 94.

3.      The district court's error in applying intermediate scrutiny, however, ultimately is immaterial, for New York cannot satisfy intermediate scrutiny, much less strict scrutiny. In order to meet intermediate scrutiny, the State must prove that its law is "substantially related to the achievement of an important government interest." *Id*. at 96. As explained above, "*[t]he burden of justification is demanding and it rests entirely on the State*." *Virginia*, 518 U.S. at 533 (emphasis added). While this Court has held that "[i]n making this determination,

41

'substantial deference to the predictive judgments of [the legislature]' is warranted," *Kachalsky*, 701 F.3d at 97 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (second set of brackets in original)), this does not mean that the State is relieved of its burden to justify the law. To the contrary, the State must offer "sufficient evidence to establish a substantial relationship between [its ban] and an important governmental goal." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (emphasis deleted). And this Court must "assure that, in formulating its judgments, [New York] has drawn reasonable inferences based on substantial evidence." *Turner*, 520 U.S. at 195.

New York's ban on certain semiautomatic firearms and standard-capacity magazines fails intermediate scrutiny. As with much else in this case, this is the only conclusion consistent with *Heller*. New York, of course, attempts to justify the ban solely on the basis of public safety, as did the District of Columbia with its handgun ban. Yet, the Supreme Court held that the ban would fail "any of the standards of scrutiny [the Court has] applied to enumerated constitutional rights," *Heller*, 554 U.S. at 628—including intermediate scrutiny. Again, handguns are "the overwhelmingly favorite weapon of armed criminals." *Id*. at 682 (Breyer, J., dissenting). Indeed, even in the context of mass public shootings New York's own evidence indicates that "[b]y far the most common weapons used in [mass shootings] are semi-automatic handguns ...." JA1285. If banning handguns is not

substantially related to advancing public safety, it follows *a fortiorari* that neither

is New York's ban on arms that are less popular with criminals.

The district court's focus on mass shootings, *see, e.g.*, SPA36-37, highlights

another way in which *Heller* underscores the unconstitutionality of New York's

ban. Justice Breyer argued in dissent that the District of Columbia's handgun ban

was "tailored to the urban crime problem in that it is local in scope and thus affects

only a geographic area both limited in size and entirely urban." *Heller*, 554 U.S. at

682 (Breyer, J., dissenting). While this was not enough to save the District of

Columbia's ban, the fit between the problem of mass shootings and New York's

ban on certain semiautomatic firearms and standard-capacity magazines is not even

as tight. Mass shootings, of course, generally occur in public. Indeed, part of the

*definition* of a mass shooting in a principal data source relied on by New York's

experts is that the incident occurs "in a public place." JA616. Yet, New York bans

semiautomatic "assault weapons" and "large capacity" magazines *even in the*

*home*. This alone demonstrates that New York's "complete ban" cannot be

justified unless "each activity within the proscription's scope is an appropriately

targeted evil." *Ward*, 491 U.S. at 800. The problem of violence that takes place in

public is not remedied by targeting possession of arms in the home.

4.    New York's ban thus fails intermediate scrutiny as a simple doctrinal matter.  But New York cannot meet its burden to prove that its ban is substantially related to public safety in any event.

As an initial matter, there is no basis for concluding that New York's legislature drew "reasonable inferences based on substantial evidence" in passing the SAFE Act the day after its introduction.  *Turner*, 520 U.S. at 195.  At a minimum, the legislature plainly did not have before it the expert declarations prepared for use in this litigation.  *Cf. White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 171 (2d Cir. 2007) (holding that government is limited to "pre-enactment evidence" when attempting to justify law under intermediate scrutiny in First Amendment "secondary effects" context).

At any rate, there is no empirical evidence for the proposition that semiautomatic "assault weapon" and "large capacity" magazine bans advance public safety.  As New York's expert Professor Koper recently acknowledged, his research for the Department of Justice on the 10-year federal ban "showed no discernable reduction in the lethality or injuriousness of gun violence" while the ban was in effect.  JA569.  Professor Koper's initial report for the Department of Justice "found no statistical evidence of post-ban decreases in either the number of victims per gun homicide incident, the number of gunshot wounds per victim, or the proportion of gunshot victims with multiple wounds."  JA339.  His final report

concluded that the ban could not be "clearly credit[ed] ... with any of the nation's recent drop in gun violence" and that "[s]hould it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement." JA451-52. Professor Koper also acknowledged "studies suggest[ing] that state-level [assault weapon] bans have not reduced crime." JA530 n.95.

The lack of evidence that bans like New York's have improved public safety should not be surprising. It is highly unlikely that such prohibitions will deter any violent criminal from using a banned firearm or magazine. *See, e.g.*, JAMES D. WRIGHT & PETER H. ROSSI, ARMED & CONSIDERED DANGEROUS xxxv (2d ed. 2008) ("[M]ost of the methods through which criminals acquire guns and virtually everything they ever do with those guns are *already* against the law."); ANTHONY J. PINIZZOTTO ET AL., VIOLENT ENCOUNTERS 50 (U.S. Dep't of Justice 2006) (97% of handguns used to assault law enforcement officers participating in study were acquired illegally). This is borne out by New York's own evidence, which indicates that "large capacity" magazines were used in 53.3% (8 out of 15) of mass shootings between September 1994 and September 2004, when the federal ban was in place. JA620-21. This is *higher* than the overall percentage of "large capacity" magazine use in mass shootings from 1982 to 2013, which was 51.5% (34 out of 66). JA617. Unlike criminals, of course, law-abiding citizens, by

definition, will obey the law.  This means that New York's ban will actually impair public safety to the extent it deprives law-abiding citizens of accuracy enhancing features and ammunition capacity that criminals will continue to employ.  This is not a novel proposition.  In a passage Thomas Jefferson copied into his personal quotation book, the influential Italian criminologist Cesare Beccaria reasoned that laws forbidding the

> wear[ing] of arms … disarm[] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance?  … [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended:  A Linguistic Analysis of the Right To Bear Arms*, 49 L. & CONTEMP. PROBS. 151, 153-54 (1986).

Because criminals will not obey the law, New York argues that the SAFE Act will make the banned firearms and magazines more difficult for criminals to acquire.  Professor Koper cites data suggesting that criminal use of "assault weapons" and "large capacity" magazines decreased during the federal ban.  *See* JA297-300.  And he reasons that New York's law may be more effective than the federal ban by eliminating grandfathering for pre-ban "large capacity" magazines and by expanding the definition of "assault weapons."  *See* JA304-05.

But there are at least two major flaws with this analysis. First, the public safety rationale for New York's ban is undermined if the federal ban actually did decrease criminal use of "assault weapons" and "large capacity" magazines because despite any such decrease "the ban did not appear to have a measureable effect on overall gun crime." JA301. In other words, requiring criminals to substitute different weapons for the banned ones did not improve public safety.

Second, Professor Koper's reasoning ignores an obvious reason why New York's law necessarily will be *less* effective than the federal ban in curtailing criminal access to "assault weapons" and "large capacity" magazines: the banned items continue to be legal in the vast majority of the states that do not have laws similar to New York's. As Professor Koper has acknowledged, "the impact of [state 'assault weapons'] laws is likely undermined to some degree by the influx of ['assault weapons'] from other states." JA530 n.95. Indeed, former New York City Mayor Bloomberg recently stated that 90% of crime guns are brought into New York from other states. Laura Ly, *New York City's Biggest Gun Bust Ever Yields 254 Weapons, 19 Arrests,* CNN.COM (Aug. 20, 2013), www.cnn.com/2013/08/19/justice/new-york-illegal-guns/.

The most likely and logical result of the SAFE Act is to deprive law-abiding citizens of firearms and magazines that criminals will continue to use. But even if this were not the case New York *still* would not be able to show that it

47

would be reasonable to expect its ban to advance public safety to any appreciable

degree.  As an initial matter, what was true of the federal ban is also true of New

York's: "the maximum potential effect of the ban on gun violence outcomes [is]

very small ...."  NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A

CRITICAL REVIEW 97 (Charles F. Wellford et al. eds., 2005).  As Professor Koper

has acknowledged, "assault weapons" "were used in only small fraction of gun

crimes prior to the ban: about 2% according to most studies and no more than

8%."  JA451; *see also* JA261 (Kleck Declaration).  And consistent with

criminals' general preferences, most of the "assault weapons" used in crimes

were handguns, not rifles like the AR-15.  JA451.  While New York has

expanded the definition of "assault weapon" in certain respects, there is no

evidence suggesting that the firearms banned by the SAFE Act are used in any

more than a small fraction of gun crimes.  Magazines holding more than ten

rounds of ammunition are also irrelevant for most gun crimes.  As Professor

Koper has acknowledged, "available studies on shots fired show that assailants

fire less than four shots on average ..., a number well within the 10-round

magazine limit."  JA539 (citation omitted); *see also* JA258 (Kleck Declaration).

The district court focused its analysis on mass shootings.  Mass shootings

are, as Professor Koper acknowledges, "particularly rare events."  JA570.

Indeed, "[a]ccording to a Bureau of Justice statistics review, homicides that

claimed at least three lives accounted for less than 1% of all homicide deaths from 1980 to 2008." JA1851. Focusing on mass shootings thus highlights the minimal impact New York's ban is likely to have on the vast majority of violent crime.

But as rare as mass shootings are, much rarer still are mass shootings that would be affected by criminals obeying New York's ban (itself a farfetched proposition). The ban would not prevent the incidents from happening. As Professor Koper acknowledged in the context of the federal ban, "[b]ecause offenders can substitute non-banned guns and small magazines for banned [guns and magazines], there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns." JA530. The same is true of New York's ban.

There also is not a clear rationale for expecting the ban to reduce the lethality of mass shootings. According to Professor Koper, it is New York's "large capacity" magazine ban that "particularly ... [has] the potential to prevent and limit shootings in the State, particularly those involving high numbers of shots and victims." JA306. The theory, of course, is that mass shooters with larger magazines are able to fire more shots than mass shooters with smaller magazines. To support this proposition Professor Koper and the district court cited data indicating that mass shooters using "large capacity" magazines kill and injure more victims than other mass shooters. *See* JA292; SPA36-37. But even if

this is true (but as Professor Koper acknowledges, shortcomings in available data make studying mass shootings particularly challenging, JA570), it does not show that these mass shooters were able to commit their atrocities *because* they used "large capacity" magazines. The more likely explanation is that these shooters *chose* such magazines because they intended to shoot a lot of people. And if that is the case, had these shooters been thwarted in obtaining "large capacity" magazines they could have compensated by carrying additional smaller magazines or additional guns. *See, e.g.*, JA258-59.

Empirical evidence supports this proposition. For example, a study of incidents from 1984 to 1993 in which "six or more victims were shot dead with a gun, or twelve or more total were wounded" found that "[f]or those incidents where the number of rounds fired and the duration of the shooting were both reported, the rate of fire never was faster than about one round every two seconds, and was usually much slower than that." KLECK, TARGETING GUNS 124-25. "None of the mass killers maintained a sustained rate of fire that could not also have been maintained—even taking reloading time into account—with either multiple guns or with an ordinary six-shot revolver and the common loading devices known as 'speedloaders.'" *Id*. at 125. Furthermore, as more recent incidents demonstrate, a mass shooter may simply change magazines each time one is spent. *See* Kopel Testimony at 19 ("At Newtown, the murderer changed

magazines many times, firing only a portion of the rounds in each magazine....  In the Virginia Tech murders, the perpetrator changed magazines 17 times.").  Finally, a criminal with multiple guns can avoid the need to reload by changing guns when the first gun runs out of ammunition. The perpetrators of a majority of mass shootings between 1984 and 1993 carried multiple firearms.  KLECK, TARGETING GUNS at 125, 144 (table 4.2).  New York's evidence indicates that the same is true for mass shootings since 1993.  JA618.

Of course, defensive gun uses "are about three to five times as common as criminal uses, even using generous estimates of gun crimes."  Kleck & Gertz, *Armed Resistance to Crime*, 86 J. CRIM. L. & CRIMINOLOGY at 170.  And, as explained above, there are valid reasons why law-abiding citizens may prefer to possess firearms and magazines banned by New York for self-defense, and millions of Americans have indeed chosen to possess them.  Under *Heller*, it must be the choices of these law-abiding citizens that govern, not speculation about the effects of a ban on a small subset of gun crimes.

In the final analysis, then, New York is left with nothing but speculation to support its ban.  "Regarding interventions for public mass shootings, there is no conclusive information about which policies and enforcement and prevention strategies might be effective."  INSTITUTE OF MEDICINE OF THE NATIONAL RESEARCH COUNCIL, PRIORITIES FOR RESEARCH TO REDUCE THE THREAT OF

FIREARM-RELATED VIOLENCE 47 (Alan I. Leshner et al. eds., 2013). This is highlighted by Professor Koper's repeated use of terms like "tentative," "potential," "seems likely," and "conceivably" in his expert report, *see, e.g.*, JA285, 293, 299 n.21, 301, 306, as well as his research for the Department of Justice, which recognized the need for "further research validating the dangers of ['assault weapons'] and ['large-capacity'] magazines." JA549. Under any standard of heightened review, this is not enough. New York "had to provide ... more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety. It has failed to meet this burden," and its ban must be struck down. *Moore*, 702 F.3d at 942.

## III.    PROVISIONS OF THE ACT ARE UNCONSTITUTIONALLY VAGUE

A statute is void for vagueness under the Due Process Clause if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *accord Arriaga v. Mukasey*, 521 F.3d 219, 224 (2d Cir. 2008). Certain of the Act's provisions defining "assault weapons" and "large capacity" magazines run afoul of that standard.

## A. Provisions of the Act Are Void to the Extent that Vagueness Permeates Their Text

1. In most facial challenges the plaintiff's burden is to show that "no set of circumstances exists under which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or perhaps that "the statute lacks any plainly legitimate sweep," *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quotation marks omitted). But the Supreme Court "has, at times, … invalidate[d] a criminal statute on its face even when it could conceivably have had some valid application." *Kolender*, 461 U.S. at 358 n.8. And in *City of Chicago v. Morales*, a three-Justice plurality reasoned that a more permissive standard should apply when the plaintiffs challenge a statute that (1) burdens a constitutional right (2) by imposing criminal liability (3) without a *mens rea* requirement. 527 U.S. 41, 55 (1999).

Those factors identify the statutes that are most suspect under the void for vagueness doctrine, *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982), and the *Morales* plurality said that such statutes are susceptible to attack "[w]hen vagueness permeates [their] text," 527 U.S. at 55.

2. All three factors are present in this case. New York argued below that the ban does include a *mens rea* requirement, but the district court did not resolve the issue. There is no such requirement on the face of the statute, which provides that a person generally commits the felony offense of criminal possession of a

53

weapon in the third degree when he "possesses an assault weapon" or "possesses a large capacity ammunition feeding device." N.Y. PENAL LAW § 265.02(7)-(8). And unlike the misdemeanor offense of possessing a "large capacity" magazine manufactured before September 13, 1994, no provision is made for "[a]n individual who has a reasonable belief that such device is of such a character that it may lawfully be possessed ...." *Id.* § 265.36.

The state-court cases cited by New York indicate that a person would have to know that he possessed a firearm or a magazine to be convicted of a felony offense under § 265.02, not that he would have to know that the firearm or magazine had attributes that would make it a banned "assault weapon" or "large capacity" magazine. *See People v. Ford*, 66 N.Y.2d 428, 440 (1985) ("Possession third requires only that defendant's possession be knowing, and there is evidence in the record to indicate that Ford knew that Ladson possessed the weapon ...." (citation omitted)); *People v. Marino*, 212 A.D.2d 735, 736 (N.Y. App. Div. 1995) (reversing conviction for possession third because jury not instructed that prosecution "had to prove that the defendant had knowingly possessed a weapon"); *People v. Wood*, 58 A.D.3d 242, 249, 253 & n.5 (N.Y. App. Div. 2008) (acknowledging cases holding "that in order to satisfy the element of knowing possession under [possession fourth], the prosecution must prove that the defendant knew he possessed … some … weapon, but not that he knew the

weapon met the statutory definition of the prohibited object," and requiring more only because item at issue (a switchblade disguised as a cigarette lighter) may have been believed not to be a weapon at all).

The pattern jury instructions submitted by the State do not provide otherwise. *See* JA2304 ("A person KNOWINGLY possesses an assault weapon when that person is aware that he or she is in possession of such weapon."). Indeed, those instructions refer to "[a]n expanded definition of 'knowingly' ... in the General Charges section under Culpable Mental States." *Id.* There, the instructions provide that "the act of possession of property by a person permits the inference that such person knows what he or she possesses. Thus, if you find beyond a reasonable doubt that the defendant was in possession of (*specify*), then you may ... infer from that fact that he/she knew that he/she possessed (*specify*)." *Expanded Charge on Knowingly*, www.nycourts.gov/judges/ cji/1-General/CJI2d.Knowingly.pdf. Thus, under the pattern jury instructions, possession alone establishes an inference of knowing possession.

To whatever extent knowledge is required for a conviction, it is not knowledge that would assuage vagueness concerns about the provisions challenged here. *See Colautti v. Franklin*, 439 U.S. 379, 394-95 (1979) (*mens rea* requirement associated with one element of crime did not cure vagueness of another).

3.     Although this Court has not decided whether and when the *Morales* standard governs, *see United States v. Rybicki*, 354 F.3d 124, 131 (2d Cir. 2003) (en banc), it should apply that standard here.  Doing so best comports with the decisions of the Supreme Court, which often decline to apply the *Salerno* standard when considering challenges to laws that threaten constitutional rights.  Thus, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the Court held a statute facially invalid on the ground that it posed a "substantial obstacle" to the exercise of the fundamental right to abortion in a "large fraction" of cases.  505 U.S. 833, 895 (1992).  *See also id.* at 972-73 (Rehnquist, C.J., concurring in judgment in part and dissenting in part) (arguing that *Salerno*'s "no circumstance" standard required different result).  And in *Bowen v. Kendrick*, the Court said that a statute is facially invalid under the Establishment Clause if its "primary effect" is the advancement of religion.  487 U.S. 589, 602 (1988).  *See also id.* at 627 n.1 (Blackmun, J., dissenting) (noting and agreeing with majority's failure to apply *Salerno*'s "no circumstances" standard); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124-25 (10th Cir. 2012) (collecting numerous other Supreme Court cases).  The teaching of those cases is that at least where a statute threatens a fundamental right, courts should entertain facial challenges more willingly than *Salerno*'s dictum suggests.

4.　　The same considerations that justify invalidating provisions of the Act "permeate[d]" by vagueness, *Morales*, 527 U.S. at 55, also compel the conclusion that those provisions can satisfy due process only if they speak with particular clarity. "[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights," *Village of Hoffman Estates*, 455 U.S. at 499, and the SAFE Act does so by burdening the fundamental right to keep and bear arms. Thus, the provisions at issue here can only survive if they are especially clear. *See Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) ("An enactment imposing criminal sanctions or reaching a substantial amount of constitutionally protected conduct may withstand facial constitutional scrutiny only if it incorporates a high level of definiteness."). And while another statute might tread more lightly on fundamental rights by imposing civil rather than criminal penalties, incorporating a scienter requirement, or regulating only the conduct of sophisticated parties that can be expected to carefully parse ambiguous statutes, *Village of Hoffman Estates*, 455 U.S. at 498-99, the provisions at issue here include no such limitations.

**B.     Certain Provisions of the Act that the District Court Upheld Are Unconstitutionally Vague**

**1.     "Can Be Readily Restored or Converted To Accept"**

The Act bans magazines that "can be readily restored or converted to accept, more than ten rounds of ammunition."  N.Y. PENAL LAW § 265.00(23)(a).  In *Peoples Rights Organization, Inc. v. City of Columbus*, the Sixth Circuit struck down as unconstitutionally vague a city ordinance that similarly made it a crime to possess "any firearm which *may be restored* to an operable assault weapon."  152 F.3d 522, 537 (6th Cir. 1998) (emphasis added).  Holding that "the phrase 'may be restored' fails to provide sufficient guidance to a person of average intelligence as to what is prohibited," the *Peoples Rights Organization* court explained that "[n]o standard is provided for what 'may be restored[ ]' [means,] such as may be restored by the person in possession, or may be restored by a master gunsmith using the facilities of a fully-equipped machine shop."  *Id.* (second and third alterations in original).

So too here.  Whether a magazine "can be readily restored or converted" to accept more than ten rounds depends on the knowledge, skill, and tools available to the person doing the restoration or conversion—critical information that the Act does not supply.  *See, e.g.*, JA2017 (Galvin Affidavit) ("Nor do I know how to convert magazines in higher capacities to magazines in lower capacities, and even if I could, I would have no way of knowing whether such magazines would be

considered to be 'readily restored or converted' to accept a higher capacity.");
JA1810 (additional evidence).  Without a clearer standard for when a magazine
"can be readily restored or converted" to accommodate more than ten rounds, the
Act's prohibition on such magazines is inherently vague and a "trap [for] the
innocent."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

The district court said it was "sympathetic to Plaintiffs' concerns," but
upheld the provision because it concluded that "this provision reflects the
limitations of our language more than poor draftsmanship."  SPA46.  But there are
steps the legislature could have taken to clarify this provision, such as providing
additional details regarding the knowledge, skill, and tools available to the person
doing the restoration.  At any rate, even if the language were irreducibly vague that
does not change the fact that it is vague, and it must be struck down as such.

## 2.   Capacity of Tubular Magazines

The district court also erred in upholding provisions of the Act that ban a
semiautomatic shotgun with "a fixed magazine capacity in excess of seven
rounds," N.Y. PENAL LAW § 265.00(22)(b)(iv), and expressly allow "a
semiautomatic shotgun that cannot hold more than five rounds of ammunition in a
fixed ... magazine," *id*. § 265.00(22)(g)(iii).

To see why those provisions are unconstitutionally vague, it is first
necessary to be familiar with the tubular magazines that most semiautomatic

shotguns use.  Tubular magazines store shells end-to-end, meaning that the total

number shells the magazine will hold depends on the size of the shells that are

loaded.  To illustrate, 12 gauge shotgun shells are available, at a minimum, in 2",

2 ½", 2 ¾", 3", and 3 ½" length rounds.  *Peoples Rights Organization*, 152 F.3d at

536 n.15.  A tubular magazine that is about 17 ½" in length would hold only five 3

½" shells, but would hold eight 2" shells, seven 2 ½" shells, and six 2 ¾" shells.

Reduce the magazine length to 13 ¾" and it would hold only five 2 ¾" shells, but

also six 2" shells.  A tubular magazine's capacity thus depends on the size of the

shells used, yet the Act's restrictions on shell capacity fail to supply that critical

information.

The Sixth Circuit struck down as "a trap for the unwary" a similar ordinance

in *Peoples Rights Organization*, *id*. at 536, and the Court should do the same here.

There is simply no way to know whether a particular semiautomatic shotgun

is banned under the Act because the Act does not specify what size of shells

officials will use to judge a magazine's capacity.  As a result, someone might

acquire a shotgun intending to use it with seven shells of a given length and be

exposed to criminal liability because, unbeknownst to him, there were shorter

length shells available.  The district court found the semiautomatic shotgun

magazine restrictions not vague "[w]hen applied to a standard-length shell,"

SPA45, but that begs the question.  Regardless whether there is such a thing as a

"standard-length shell," the Act does not specify whether its restriction is to be assessed with respect to such a shell or a shell of some other length. Thus, the Act's restrictions on shotgun magazine capacity are unconstitutionally vague.

## CONCLUSION

For the foregoing reasons, New York's ban on "assault weapons" and "large capacity" magazines violates the Second Amendment, and certain provisions defining those terms are unconstitutionally vague. The district court's judgment to the contrary should be reversed, and the case should be remanded for entry of summary judgment for Plaintiffs.

Dated: April 29, 2014     Respectfully submitted,

Brian T. Stapleton       s/ Charles J. Cooper
GOLDBERG SEGALLA LLP    Charles J. Cooper
Suite 705          David H. Thompson
11 Martine Avenue      Peter A. Patterson
White Plains, NY 10606    COOPER & KIRK, PLLC
(914) 798-5400       1523 New Hampshire Avenue, N.W.
            Washington, D.C. 20036
Matthew S. Lerner      (202) 220-9600
GOLDBERG SEGALLA LLP
Suite 300
80 Southwoods Boulevard
Albany, NY 12211
(518) 935-4230

Stephen Porter Halbrook
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
(703) 352-7276

*Attorneys for Plaintiffs-Appellants-Cross-Appellees*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(a) because this brief contains 13,946 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Dated:  April 29, 2014        s/ Charles J. Cooper
                                     Charles J. Cooper
                                     *Attorney for Plaintiffs-Appellants-Cross-Appellees*

# SPECIAL APPENDIX

**TABLE OF CONTENTS**

**Page**

Decision and Order of the Honorable William M.
 Skretny, dated December 31, 2013 granting in
 part, denying in part all Motions for Summary
 Judgment ................................................................. SPA-1

Judgment, dated January 2, 2014 .............................. SPA-58

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC.;
WESTCHESTER COUNTY FIREARMS OWNERS ASSOCIATION, INC.;
SPORTSMEN'S ASSOCIATION FOR FIREARMS EDUCATION, INC.;
NEW YORK STATE AMATEUR TRAPSHOOTING ASSOCIATION, INC.;
BEDELL CUSTOM; BEIKIRCH AMMUNITION CORPORATION;
BLUELINE TACTICAL & POLICE SUPPLY, LLC;
BATAVIA MARINE & SPORTING SUPPLY; WILLIAM NOJAY,
THOMAS GALVIN, and ROGER HORVATH,

     Plaintiffs,

  v.                **DECISION AND ORDER**
                     13-CV-291S

ANDREW M. CUOMO, Governor of the State of
New York; ERIC T. SCHNEIDERMAN, Attorney
General of the State of New York; JOSEPH A.
D'AMICO, Superintendent of the New York State
Police; LAWRENCE FRIEDMAN, District
Attorney for Genesee County; and GERALD J.
GILL, Chief of Police for the Town of Lancaster,
New York,

     Defendants.

_____

**TABLE OF CONTENTS**

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.     The SAFE Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

               1.     Assault Weapons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

               2.     Magazines and Ammunition . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.     Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    DISCUSSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.     Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.     Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        C.     The Second Amendment & Heller . . . . . . . . . . . . . . . . . . . . . . . . . 11

        D.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

               1.     Common Use & Substantial Burden . . . . . . . . . . . . . . . . . . . . . 19

               2.     Intermediate Scrutiny .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        E.     Application of Intermediate Scrutiny to the SAFE Act . . . . . . . . . . . . . 27

               1.     Assault Weapons  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

               2.     Large-capacity Magazines .. . . . . . . . . . . . . . . . . . . . . . . . . . . 33

               3.     Seven-round Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        F.     Vagueness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

               1.     The "conspicuously protruding" pistol grip. . . . . . . . . . . . . . . . . 39

               2.     The threaded barrel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

               3.     Magazine-capacity restrictions . . . . . . . . . . . . . . . . . . . . . . . . 41

               4.     The five-round shotgun limit . . . . . . . . . . . . . . . . . . . . . . . . . . 42

               5.     "Can be readily restored or converted". . . . . . . . . . . . . . . . . . . . 42

6.      The "and if" clause of Penal Law § 265.36 . . . . . . . . . . . . . . . .   43

7.      Muzzle "break" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

8.      "Version" of an automatic weapon. . . . . . . . . . . . . . . . . . . . . . .   45

9.       Manufactured weight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

10.     Commercial transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

G.      Dormant Commerce Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

V.     ORDERS .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

## I.   INTRODUCTION

On January 15, 2013, New York's Governor, Andrew M. Cuomo, signed into law the New York Secure Ammunition and Firearms Enforcement Act of 2013. Commonly known by its acronym, the SAFE Act makes broad and varied changes to firearm regulation in New York State. The Act amends or supplements various aspects of New York law, including, among others, the criminal procedure law, the correction law, the family court law, the executive law, the general business law, the judiciary law, the mental hygiene law, and, of course, the penal law. According to its drafters, this network of new laws, which generally enhances regulation and increases penalties for the illegal possession of firearms, is designed to "protect New Yorkers by reducing the availability of assault weapons and deterring the criminal use of firearms while promoting a fair, consistent and efficient method of ensuring that sportsmen and other legal gun owners have full enjoyment of the guns to which they are entitled." (Senate, Assembly, and Gov. Memos in Supp., Bill No. S2230-2013.)

Plaintiffs, comprising various associations of gun owners and advocates, companies in the business of selling firearms, and individual gun-owning citizens of New York, challenge several aspects of the law. Principally, Plaintiffs maintain that certain restrictions codified in the SAFE Act, like those concerning large-capacity magazines and those regulating assault weapons, violate their right "to keep and bear arms" under the Second Amendment to the United States Constitution. They also assert that several aspects of the law are unconstitutionally vague and that certain provisions violate the Equal Protection and "dormant" Commerce Clauses of the United States Constitution.

Three motions are currently before this Court. Plaintiffs first filed a motion for a

1

preliminary injunction. That motion raised several — but not all — the challenges outlined above. In response to that motion, Defendants Andrew Cuomo, Eric Schneiderman, and Joseph D'Amico cross-moved to dismiss the case under Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure.[1] Then, Plaintiffs responded with their own motion for summary judgment. Because both sides have subsequently filed dispositive motions, this Court deems Plaintiffs' motion for a preliminary injunction moot.

In resolving the pending motions, this Court notes that whether regulating firearms is wise or warranted is not a judicial question; it is a political one. This Court's function is thus limited to resolving whether New York's elected representatives acted within the confines of the United States Constitution in passing the SAFE Act. Undertaking that task, and applying the governing legal standards, the majority of the challenged provisions withstand constitutional scrutiny.

As explained in more detail below, although so-called "assault weapons" and large-capacity magazines, as defined in the Safe Act, may — in some fashion — be "in common use," New York has presented considerable evidence that its regulation of these weapons is substantially related to the achievement of an important governmental interest. Accordingly, the Act does not violate the Second Amendment in this respect.

Further, because the SAFE Act's requirement that ammunition sales be conducted "face-to-face" does not unduly burden interstate commerce, it does not violate the dormant Commerce Clause.

---

[1]Defendant Gerald Gill also filed such a motion, in which he joins the motion filed by Cuomo, Schneiderman, and D'Amico. Although Defendant Lawrence Friedman did not appear in or defend this action, this failure does not affect the outcome of this case, and, for the sake of thoroughness, this Court will, *sua sponte*, apply the Decision and Order in equal measure to him. See Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir.1991).

The Act, however, is not constitutionally flawless. For reasons articulated below, the seven-round limit is largely an arbitrary restriction that impermissibly infringes on the rights guaranteed by the Second Amendment. This Court therefore strikes down that portion of the Act. Finally, this Court must strike three provisions of the SAFE Act as unconstitutionally vague because an ordinary person must speculate as to what those provisions of the Act command or forbid.

## II.   BACKGROUND

**A.   The SAFE Act**

In response to the tragic and incomprehensible shooting at Sandy Hook Elementary in Sandy Hook, Connecticut on December 14, 2012, the New York State Legislature and Governor Andrew Cuomo quickly enacted the New York Secure Ammunition and Firearms Enforcement Act of 2013. The 39-page Act makes broad changes to existing firearm regulation in New York State.

Section 17 of the Act, for instance, expands an existing requirement by adding a new article to the general business law that requires background checks for all gun sales — including private sales (except those made to immediate family members).

Section 48 of the Act amends the penal law to require counties within the state to re-certify gun licenses every five years. Previously, gun licenses never expired.

Section 49 establishes a statewide gun-license and record database.

Other provisions relate to firearm storage;  others still amend the mental hygiene law, strengthening provisions meant to curtail access to weapons.

But those provisions are not the subject of Plaintiffs' challenge here; their concerns principally involve the Act's two main provisions, which directly regulate firearms and ammunition.

**1.   Assault Weapons**

Before the SAFE Act was enacted, New York already regulated those weapons it considered to be "assault weapons." 2000 N.Y. Laws, ch. 189, § 10. In 2000, New York enacted a law regulating assault weapons in a manner modeled after the now-expired

federal assault weapons ban.[2] That law, enacted in 1994 as the Public Safety and Recreational Firearms Use Protection Act, established a prohibition on semiautomatic weapons — that is, weapons designed to fire once each time the trigger is pulled — with two "military-style" features.  Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (1994) (repealed by Pub. L. 103-322, § 110105(2), effective Sept. 13, 2004). Those features were defined in the statute, and weapons meeting the listed criteria were deemed "semiautomatic assault weapons" subject to stringent regulation. Id.  This model thus became known as the "two-feature" test, because, as the name suggests, the law outlawed semiautomatic weapons that had two military-style features, and, in the case of rifles and pistols, had the capacity to accept a detachable magazine.  Before the SAFE Act, New York State regulated weapons under this rubric.

But the SAFE Act expands the reach of New York's regulation to include semiautomatic weapons that have only *one* feature "commonly associated with military weapons" and, in the case of rifles and pistols, have the ability to accept a detachable magazine.  Put simply, the SAFE Act institutes a "one-feature" test.

Those features are set out in Penal Law § 265.00, and, as they apply to rifles with detachable magazines, are as follows:

- a folding or telescoping stock;

- a pistol grip that protrudes conspicuously beneath the action of the weapon;

- a thumbhole stock;

- a second handgrip or a protruding grip that can be held by the non-trigger

---

[2]Other firearms regulations go back much further. As the Second Circuit has noted, New York's efforts in regulating the possession and use of firearms "predate the Constitution." Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 84 (2d Cir. 2012). There were several laws on the books as early as 1785. Id.

hand;

- a bayonet mount;

- a flash suppressor, muzzle break, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator;

- a grenade launcher.[3,4]

Weapons meeting this criteria are defined as "assault weapons", and, subject to certain exemptions, the possession of such a weapon constitutes a "Class D" felony. N.Y. Penal Law §§ 265.02(7); 265.00(22)(g) (identifying exempt weapons).

Although colloquially referred to as a "ban," the SAFE Act does not prohibit all

---

[3] Most shotguns and pistols are unaffected by the SAFE Act. But the definition of "assault weapon" is not limited to rifles. The SAFE Act also sets forth similar features for semiautomatic shotguns and pistols. Semiautomatic shotguns meet the definition of assault weapons if they have one of the following features:

- a folding or telescoping stock,
- a thumbhole stock,
- a second handgrip or a protruding grip that can be held by the non-trigger hand,
- a fixed magazine capacity in excess of seven rounds, or
- an ability to accept a detachable magazine.

N.Y. Penal Law § 265.00(22)(b)(i)–(v).

Semiautomatic pistols meet the definition of assault weapons if they have the ability to accept a detachable magazine and are (1) "semiautomatic version[s] of an automatic rifle, shotgun, or firearm," or (2) have one of the following features:

- a folding or telescoping stock,
- a thumbhole stock,
- a second handgrip or a protruding grip that can be held by the non-trigger hand,
- the capacity to accept an ammunition magazine that attaches to the pistol outside of the pistol grip,
- a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer
- a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the non-trigger hand without being burned, or
- a manufactured weight of fifty ounces or more when the pistol is unloaded.

Id. (c)(i)–(viii).

[4]Illustrations of the banned features are set forth in Appendix A, and are available at http://www.governor.ny.gov/assets/documents/RiflesBannedFeatures.pdf

SPA-10

possession of these firearms.  Current owners of these weapons can keep them, but they must register them. And while current owners are permitted to transfer and sell the weapons, transfers and sales must be made to firearm dealers or out-of-state buyers. Id. § 265.00(22)(h).

### 2.    Magazines and Ammunition

The SAFE Act also tightens regulation of magazines and ammunition. Section 38 of the Act amends Penal Law Section 265.00(23), making it unlawful to possess or sell magazines that have the capacity to hold more than 10 rounds of ammunition. Though this restriction was a part of the prior law, the SAFE Act eliminates the "grandfather" clause, which had exempted such "large-capacity" magazines that were manufactured before September 13, 1994 (the date of the federal law).  Now, all large-capacity magazines (defined as "a magazine, belt, drum, feed strip, or similar device, that [] has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition"), regardless of their date of manufacture, are subject to regulation. Id. § 265.00(23). And, unlike the assault weapons described above, current owners cannot retain these large-capacity magazines in their current form. Owners of this type of magazine must sell it out of state, transfer it to an authorized in-state dealer or law enforcement, modify it, or discard it before January 15, 2014. Id. §§ 265.00(22)(h), 265.00(23).

Moreover, unless used at a firing range or during a shooting competition, 10-round magazines may not be fully loaded. Instead, the SAFE Act prohibits users from loading more than seven rounds of ammunition into "an ammunition feeding device." Id. § 265.37.

Possession of a large-capacity magazine is a "Class D" felony, and, depending on

7

the circumstances, penalties for possession of a magazine loaded with more than seven rounds of ammunition range from a "violation" to a "Class A" misdemeanor.[5] Id. § 265.37.

Restrictions on the sale of ammunition have been tightened as well. All ammunition dealers conducting business in New York must register with New York State or be otherwise licensed to sell ammuntion, and no sale can legally be completed without a state background check. The seller must also send a  record of the sale to the State Police. The Act also bans the sale of ammunition over the Internet, imposing a requirement that any ammunition transaction be conducted "face-to-face" and compelling the purchaser to present valid photo identification. Id. § 400.03 (effective Jan. 15, 2014).

**B.    Procedural History**

On March 21, 2013, roughly three months after the SAFE Act was enacted into law, Plaintiffs filed a complaint in this Court alleging that the law violated several of their constitutional rights. (Docket No. 1.) On April 11, 2013, they filed an amended complaint (Docket No. 17), and shortly thereafter, a motion for a preliminary injunction (Docket No. 23), in which they sought to enjoin enforcement of several aspects of the law. Defendants Andrew Cuomo, Joseph D'Amico, and Eric Schneiderman then filed a motion to dismiss and a motion for summary judgment on June 21, 2013. (Docket No. 64.) Defendant Gerald Gill joined that motion the same day. (Docket No. 70.) Plaintiffs responded with their own motion for summary judgment on August 19, 2013. (Docket No. 113.) All briefing concluded on October 18, 2013.

In addition, this Court has permitted various *amici curiae*, supporting both sides of

---

[5]It is not a felony, however, to posses a large-capacity magazine if it was (1) possessed before the SAFE Act was enacted and (2) "was manufactured before September [13, 1994]." N.Y. Penal Law § 265.02(8).

the litigation, to file briefs advocating for their interests in the outcome of this case.

## III.  DISCUSSION

### A.   Legal Standards

The various motions pending before this Court implicate two Federal Rules of Civil Procedure: Rules 12(b)(1) and 56.[6]

Rule 12(b)(1) applies to Defendants' jurisdictional arguments. A motion under this rule "challenges the district court's authority to adjudicate a case, and, once challenged, the burden of establishing that the Court in fact retains such authority lies with the party who asserts jurisdiction." Loew v. U.S. Postal Serv., No. 03-CV-5244, 2007 WL 2782768, at *4  (E.D.N.Y. Feb. 9, 2007) (citing Arndt v. UBS AG, 342 F. Supp.2d 132, 136 (E.D.N.Y. 2004)). Dismissal of a case under Rule 12(b)(1) is proper "when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

Both Plaintiffs and Defendants seek summary judgment. Under Rule 56, the plaintiff generally must produce evidence substantiating his claim, and the court can grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56. A fact is "material" if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining

---

[6]Defendants also move to dismiss at least one aspect of this case under Rule 12(b)(6). In their original memorandum, Defendants sought to dismiss the four business plaintiffs' Second Amendment claims because, as they argue, the business plaintiffs do not have Second Amendment rights. But Defendants abandoned this argument in their reply memorandum, and, regardless, resolution of this contention would not affect the outcome of this case, as explained below. Accordingly, this Court need not recount the Rule 12(b)(6) standard here.

whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted). When both parties move for summary judgment, "each party's motion must be examined on its own merits, and . . . all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintal Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Nonetheless, "disputed legal questions present nothing for trial and are appropriately resolved on a motion for summary judgment." Flair Broad. Corp. v. Powers, 733 F. Supp. 179, 184 (S.D.N.Y. 1990) (quoting Holland Indus. v. Adamar of New Jersey, Inc., 550 F. Supp. 646, 648 (S.D.N.Y. 1982)) (modifications omitted).

**B.     Standing**

As in every case, this Court must  "satisfy itself that the case comports with the 'irreducible constitutional minimum' of Article III standing." Hedges v. Obama, 724 F.3d 170, 204 (2d Cir. 2013). Here, Plaintiffs Horvath and Galvin testify that they own rifles, pistols, and large-capacity magazines that the SAFE Act regulates. They further testify that, but for the Act, they would acquire weapons and ammunition-feeding devices that the Act renders illegal. As such, these plaintiffs clearly "face a credible threat of prosecution and should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." See Holder v. Humanitarian Law Project, 561 U.S. 1, 130 S. Ct. 2705, 2717, 177 L. Ed. 2d 355 (2010). They have thus established Article III standing for the

purposes of their Second Amendment and vagueness claims. See id.; see also Ezell v. City of Chicago, 651 F.3d 684, 695 (7th Cir. 2011) (plaintiffs had standing to bring challenge under Second Amendment because "the very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper"). Further, because at least one plaintiff has standing, "jurisdiction is secure and [this Court] can adjudicate the case whether the additional plaintiff[s] ha[ve] standing or not." Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 84 n. 2 (2d Cir. 2012).

**C.    The Second Amendment & Heller**

Plaintiffs contend that New York's restrictions on assault weapons and large-capacity magazines violate the Second Amendment.

That Amendment, adopted in 1791 as part of the Bill of Rights, provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

Before 2008, most courts to address the scope and import of the Second Amendment relied heavily on United States v. Miller, one of the few Supreme Court decisions to have expressly addressed the Amendment. 307 U.S. 174, 179, 59 S. Ct. 816, 83 L. Ed. 1206 (1939). Those courts concluded that the Second Amendment confers no individual right to firearm ownership, but extends only to use or possession of a firearm that has "some reasonable relationship to the preservation or efficiency of a well regulated militia." See id.; see also, e.g., United States v. Haney, 264 F.3d 1161, 1164–66 (10th Cir. 2001) ("We hold that a federal criminal gun-control law does not violate the Second Amendment unless it impairs the state's ability to maintain a well-regulated militia"); Gillespie v. Indianapolis, 185 F.3d 693, 710–11 (7th Cir. 1999); Stevens v. United States,

440 F.2d 144, 149 (6th Cir. 1971) ("There can be no serious claim to any express constitutional right of an individual to possess a firearm"); Burton v. Sills, 53 N.J. 86, 100, 248 A.2d 521 (1968) ("[Regulation . . . which does not impair the maintenance of the State's active, organized militia is not at all in violation of [] the terms or purposes of the [S]econd [A]mendment."). But see United States v. Emerson, 270 F.3d 203 (5th Cir. 2001) (rejecting both the "collective rights" model and the proposition that Miller mandates such an approach). In other words, the Second Amendment was read by an overwhelming majority of courts to offer no protection for the right of individuals to possess and use guns for private and civilian purposes.

But in 2008 that rationale was deemed flawed in the seminal Supreme Court case, District of Columbia v. Heller, where the Court addressed a District of Columbia law that essentially prohibited the possession of handguns. 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).[7] In Heller, the first Supreme Court case since Miller to expressly address the Second Amendment, the Court noted that "[t]he Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause." Id. at 577. It held that the prefatory clause of the Amendment — that which reads, "a well regulated militia, being necessary to the security of a free State" — "announces the purpose for which the right was codified" but does not restrict the right to own guns to the circumstances of militia service. Id. at 599. The Supreme Court explained that the Second Amendment codified a pre-existing *"individual* right to keep and bear arms." Id. at 592, 622 (emphasis added).

---

[7]Indeed, the District Court for the District of Columbia, which first adjudicated the challenge to the D.C. law, dismissed the case because it found that the Second Amendment conferred no individual right to bear arms. See Parker v. District of Columbia., 311 F. Supp. 2d 103, 109 (D.D.C. 2004).

The Court did not, however, find that the prefatory clause was meaningless or decoupled from the operative clause of the provision. Indeed, "[l]ogic demands that there be a link between the stated purpose and the command." Id. at 577. Rather, the Heller Court found that because "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens . . . who would bring the sorts of lawful weapons that they possessed at home to militia duty," the prefatory clause informs and limits the right to those weapons in "common use at the time" — those weapons, that is, that a typical citizen would own and bring with him when called to service. The Court further found that this notion must be adapted and updated to include "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Id. at 582. And it went on to stress that the core component of the Amendment secures an individual right to own weapons for self defense, most notably in the home. Id. at 592–95.

The salient question for the Heller Court, then, was not what weapons were in common use during the revolutionary period, but what weapons are in common use today. Weapons that meet that test — that are "in common use at the time" — are protected, at least to some degree, by the Second Amendment. But other weapons, "not typically possessed by law-abiding citizens for lawful purposes" like self-defense, are not. Id. at 625.[8]

---

[8]Although the Bill of Rights, including the Second Amendment, originally applied only to the federal government, see Barron ex rel. Tiernan v. Mayor of Baltimore, 7 Pet. 243, 8 L. Ed. 672 (1833), most protections set out in the Bill of Rights have subsequently been held to apply to the States through the Fourteenth Amendment, which, among other things, prohibits States from depriving "any person of life, liberty, or property, without due process of law." The Second Amendment is no exception. The Heller Court did not address this question because the law at issue there applied in the District of Columbia. But two years after Heller, the Supreme Court affirmatively held that the right of an individual to "keep and bear arms," protected by the Second Amendment from infringement by the federal government, is

13

In <u>Heller</u>, the Court concluded that "the American people have considered the handgun to be the quintessential self-defense weapon" and that "handguns are the most popular weapon chosen by Americans for self-defense in the home." <u>Id.</u> at 629, 630. Therefore, the majority had no trouble finding that the District of Columbia's "complete prohibition of their use is invalid." <u>Id.</u> at  629.

The Supreme Court decided <u>Heller</u> in 2008. As many courts and commentators have noted, in many ways <u>Heller</u> raised more questions than it answered. <u>See</u> <u>United States v. Masciandaro</u>, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J.) (ground opened by <u>Heller</u> is a "vast 'terra incognita'").  Indeed, the <u>Heller</u> Court candidly remarked that the decision was never meant "to clarify the entire field" of Second Amendment jurisprudence. <u>Heller</u>, 554 U.S. at 635.

 Among the questions left open by <u>Heller</u> is the standard courts should apply when evaluating the constitutionality of gun restrictions. Some restrictions are surely valid: the Court emphasized that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." <u>Id.</u> at 626. It even explicitly identified some "presumptively lawful regulatory measures" that were meant to be illustrative, "not exhaustive":

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

<u>Id.</u> at 626–27 & n. 26.

But what other regulations, restrictions, and prohibitions are constitutionally sound?

---

incorporated by the Fourteenth Amendment and "is fully applicable to the States." <u>McDonald v. City of Chicago, Ill.</u>, 130 S. Ct. 3020, 3026, 177 L. Ed. 2d 894 (2010).

And under what framework, or level of scrutiny, must they be analyzed?  Heller did not answer these questions. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights," wrote Justice Scalia for the majority, "this law would fail constitutional muster." Id. at 628–29. That task was left, for now, to the lower courts.

Since Heller was decided, the Second Circuit has had occasion to consider and interpret that decision. Although none of the cases addresses restrictions like those in the SAFE Act, they remain instructive in determining the appropriate standard of review.

## D.    Standard of Review

First, some background. Throughout its jurisprudence, the Supreme Court has developed varying levels of scrutiny, which, depending on the circumstances, apply to statutes that affect constitutional rights. See United States v. Carolene Prods. Co., 304 U.S. 144, 152 n. 4, 58 S. Ct. 778,  82 L. Ed. 1234 (1938) (introducing the levels-of-judicial-scrutiny concept). Some laws are subject to the most deferential standard: rational-basis review. See Armour v. City of Indianapolis, Ind., 132 S. Ct. 2073, 2079, 182 L. Ed. 2d 998 (2012) (applying this standard for a classification that did not implicate a fundamental right, and concerned a local, economic, and commercial subject matter). Others, like content-neutral restrictions on speech, are subject to intermediate scrutiny. Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 189, 117 S. Ct. 1174, 137 L. Ed. 2d 369 (1997) (requirement that cable television systems dedicate some of their channels to local broadcast television stations analyzed under intermediate scrutiny). And others still, like race-based classifications, are reviewed under the most rigorous standard: strict scrutiny. See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 720, 127 S. Ct. 2738, 2751, 168 L. Ed. 2d 508 (2007) (school district relied on race to determine what public

schools children attended).[9]

In two recent decisions, <u>United States v. Decastro</u> and <u>Kachalsky v. County of Westchester</u>, the Second Circuit shed considerable light on the standard applicable to gun restrictions under the Second Amendment.  682 F.3d 160, 166 (2d Cir. 2012); 701 F.3d 81, 90 (2d Cir. 2012).

In <u>Decastro</u>, the court addressed the constitutionality of 18 U.S.C. § 922, which prohibits anyone other than a licensed importer, manufacturer, dealer or collector from transporting into his state of residence a firearm obtained outside that state. Analogizing the right to bear arms to other rights embodied in the Constitution, including the right to marry, the right to vote, and the right to free speech, the court held:

> [W]e do not read [<u>Heller</u>] to mandate that any marginal, incremental or even appreciable restraint on the right to keep and bear arms be subject to heightened scrutiny. Rather, heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in <u>Heller</u>) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes).

<u>Decastro</u>, 682 F.3d at 166 (parentheses in original).

Thus, in this Circuit, some form of heightened scrutiny (that is, intermediate or strict, or, possibly, something in between) is reserved for those "regulations that burden the Second Amendment right substantially." <u>Id.</u>  The <u>Decastro</u> court was clear that "[r]eserving heightened scrutiny for regulations that burden the Second Amendment right substantially is not inconsistent with the classification of that right as fundamental to our scheme of

_____

[9]For a full explanation of each level of scrutiny, as least as they apply in the equal-protection context, see <u>United States v. Windsor</u>, 133 S. Ct. 2675, 2717, 186 L. Ed. 2d 808 (2013). Though it should also be noted that "the label 'intermediate scrutiny' carries different connotations depending on the area of law in which it is used."  <u>Ernst J. v. Stone</u>, 452 F.3d 186, 200 n. 10 (2d Cir. 2006).

ordered liberty." <u>Id.</u> at 167. This approach accords with other circuits' reasoning in the wake of <u>Heller</u>. <u>See</u> <u>Heller v. District of Columbia.</u>, 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("<u>Heller II</u>")[10]; <u>Ezell</u>, 651 F.3d at 702; <u>United States v. Marzzarella</u>, 614 F.3d 85, 89 (3d Cir. 2010).

In <u>Ezell</u>, for example, the court found parallels to First Amendment jurisprudence, noting that "some categories of speech are unprotected as a matter of history and legal tradition. So too with the Second Amendment." 651 F.3d at 702. Thus, according to both the <u>Ezell</u> and <u>Decastro</u> courts, just as some forms of speech — obscenity, defamation, fraud — are outside the reach of the First Amendment, some forms of gun restrictions are outside the reach of the Second.  Applying this standard, the <u>Decastro</u> court found that the prohibition on importing out-of-state firearms was among those restrictions that did not implicate the Second Amendment

The Second Circuit built on this foundation in <u>Kachalsky</u>, where it faced the following issue: "Does New York's handgun licensing scheme violate the Second Amendment by requiring an applicant to demonstrate 'proper cause' to obtain a license to carry a concealed handgun in public?" <u>Kachalsky</u>, 701 F.3d at 83. Drawing from its earlier ruling in <u>Decastro</u>, the court found that New York's licensing scheme — unlike the challenged law in <u>Decastro</u> — <em>did</em> impose a substantial burden on the plaintiffs' Second Amendment rights. It held, "New York's proper cause requirement places substantial limits on the ability of

---

[10]Some clarification of <u>Heller II</u> is warranted. After the Supreme Court ruled that the District of Columbia's ban on handguns was unconstitutional, the District adopted the Firearms Registration Amendment Act of 2008, D.C. Law 17–372, which required the registration of all firearms, and prohibited both the possession of "assault weapons" and magazines with a capacity of more than 10 rounds of ammunition. Joined by several other plaintiffs, Anthony Dick Heller, the same plaintiff from the earlier litigation, brought suit challenging the new law. Thus, this second round of litigation concerning D.C.'s firearm laws will be referred to in this Decision and Order as "<u>Heller II</u>."

law-abiding citizens to possess firearms for self-defense in public." Id. at 93.

The court's next holding is critical in determining the correct standard of review here. It found that the proper sequence of analysis required it to review the law under the familiar three-tiered scrutiny system. Specifically, it held:

> Although we have no occasion to decide what level of scrutiny should apply to laws that burden the "core" Second Amendment protection identified in Heller, we believe that applying less than strict scrutiny when the regulation does not burden the "core" protection of self-defense in the home makes eminent sense in this context and is in line with the approach taken by our sister circuits.

Id.

The court concluded that "because our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public," and because the restriction did not burden a "core" right, intermediate scrutiny was appropriate. Id. at 96. The licensing requirement, which was substantially related to the achievement of an important governmental interest, survived under that standard.

Extrapolating from these holdings, this Court finds that it must engage in a three-part inquiry. First, it must determine whether any of the regulated weapons or magazines are commonly used for lawful purposes. If any are, it must next determine if any of the challenged provisions of the SAFE Act substantially burden a Second Amendment right. Finally, if any do, it must then decide what level of scrutiny to apply.

Contrary to the urging of some amici, the Second Circuit has eschewed any test under the so-called "history-and-tradition" model. Espoused most prominently by Judge Kavanaugh in dissent in Heller II, this model would test the constitutionality of certain gun laws by asking whether they were "rooted in history and tradition." 670 F.3d at 1284; see

18

<u>also</u> Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1463 (2009). But the Second Circuit categorically "disagree[s]" with this approach, stating unequivocally:

> <u>Heller</u> stands for the rather unremarkable proposition that where a state regulation is entirely inconsistent with the protections afforded by an enumerated right — as understood through that right's text, history, and tradition — it is an exercise in futility to apply means-end scrutiny. Moreover, the conclusion that the law would be unconstitutional "[u]nder any of the standards of scrutiny" applicable to other rights implies, if anything, that one of the conventional levels of scrutiny would be applicable to regulations alleged to infringe Second Amendment rights.

<u>Kachalsky</u>, 701 F.3d at 89 n. 9.

Accordingly, this Court will analyze the law under the rubric set forth in <u>Heller</u>, and as further developed by the Second Circuit.

### 1.    Common Use & Substantial Burden

Under <u>Heller</u>, the Second Amendment does not apply to weapons that are not "in common use at the time." Thus, inherent in the substantial-burden analysis is the question whether the SAFE Act affects weapons in common use.

Much of Plaintiffs' briefs are dedicated to the topic of the popularity and lawfulness of the firearms that New York defines as assault weapons. Both sides attempt to point to empirical evidence that suggests the weapons are — or are not — in common use for lawful purposes.  And, in turn, much of that evidence deals with the archetypal AR-15.

 This weapon, first manufactured by ArmaLite (thus, "AR"), then sold to and popularized under Colt, is representative of the type of weapon the SAFE Act seeks to regulate. Though the mark "AR-15" is Colt's, many manufacturers make a similar firearm.

Generally, it is a semiautomatic rifle that has a detachable magazine, has a grip protruding roughly four inches below the action of the rifle, and is easily accessorized and adapted.[11] (See Overstreet Decl., ¶¶ 3–5; Docket No. 23-2); (National Shooting Sports Foundation survey, at 7, attached as Ex. B; Docket No. 23–3,4,5) (84% of owners of AR-15 type rifles have at least once accessory on their rifle).

It is also popular. According to Plaintiffs, since 1986 (when record-keeping began) "at least 3.97 million AR-15 type rifles have been manufactured in the United States for the commercial market." (Overstreet Decl., ¶ 5.) In 2011, AR-15s accounted for 7% of all firearms sold. (Id., ¶ 8.) Plaintiffs also assert that the AR-15 rifles are regularly used for self defense, hunting, and sporting competitions.

As the Heller II court found, "in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market." 670 F.3d at 1261.  Although the Heller II court could not determine if this type of weapon is used for lawful purposes, it "th[ought] it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'" Id.

Defendants paint a different picture, contending that assault weapons "are a tiny percentage of the firearms available." (Def.'s Br., at 29; Docket No. 77.) According to the testimony of Professor Laurence Tribe before the United States Senate in February of 2013, Americans own roughly 310 million firearms and roughly 7 million assault weapons. (Tribe Testimony, at 24, attached as Ex. 28; Docket No. 78-3.) Using these rough numbers, assault weapons account for only about 2% of the guns owned in this country.

---

[11]An action is the mechanism on a firearm that loads, fires, and ejects a cartridge. Varieties include the lever action, pump action, bolt action, and semi-automatic.

20

But these statistics leave many questions unanswered. The Brady Center for the Prevention of Gun Violence, as *amicus curiae*, points out that the <u>Heller</u> Court did not specify what "time" it meant when it held that protected weapons are those that are "in common use at the time." There is no dispute that there has been a surge in the popularity of this type of firearm in the last decade. (Brady Center Br., at 8; Docket No. 121.[12]) The Brady Center argues that it is anomalous that a weapon could be unprotected under the Second Amendment one moment, then, subject only to the whims of the public, garner protection in the next moment. (<u>Id.</u>, at 9.) It contends that this Court must look to a "historically representative period of time" and that there is no evidence that the weapons regulated by the SAFE Act were in common use for such a period. (<u>Id.</u>)

Regardless, ownership statistics alone are not enough. The firearm must also be possessed for lawful purposes, like self-defense. <u>Heller</u>, 554 U.S. at 625 ("Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."). On this point, too, the parties are deeply divided. And, as the <u>Heller II</u> court noted, reliable empirical evidence on this point is elusive. 670 F.3d at 1261 ("[W]e cannot be certain whether these weapons are commonly used or are useful specifically for self-defense or hunting and therefore whether the prohibitions . . . meaningfully affect the right to keep and bear arms."). Although Defendants argue that the regulated weapons are not suitable for self-defense due to, among other things, their excessive firepower, there can be little dispute that tens of thousands of Americans own these guns and use them exclusively for lawful purposes such as hunting, target shooting,

---

[12]This brief was filed jointly by the Brady Center, The Police Foundation, and the Major Cities Chiefs Association.

and even self-defense. See Christopher S. Koper *et al.*, U. Penn. Jerry Lee Ctr. of Criminology, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* at 1 (2004) (around 1990, "there were an estimated 1 million privately owned [assault weapons] in the U.S."); see also Heller II, 670 F.3d at 1287–88 (Kavanagh J., dissenting) (A "brief perusal of the website of a popular American gun seller" underscores that "[s]emi-automatic rifles are commonly used for self-defense in the home, hunting, target shooting, and competitions"); (King Aff. ¶¶ 16–18; Docket No. 116.)

Despite the inherent ambiguities in making such a determination, for purposes of this Decision, this Court will assume that the weapons at issue are commonly used for lawful purposes. Further, because the SAFE Act renders acquisition of these weapons illegal under most circumstances, this Court finds that the restrictions at issue more than "minimally affect" Plaintiffs' ability to acquire and use the firearms, and they therefore impose a substantial burden on Plaintiffs' Second Amendment rights.

Large-capacity magazines are also popular, and Defendants concede they are in common use nationally. See Heller II, 670 F.3d at 331 ("There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten."); Koper, *supra*, at 10 (as of 1994, roughly 20% of civilian owned handguns were equipped with large-capacity magazines); (Defs.' Br., at 36; Docket No. 77). Indeed, the "standard magazine" for an AR-15 holds 20 or 30 rounds. (Overstreet Decl., ¶ 4.) Given their popularity in the assumably law-abiding public, this Court is willing to proceed under the premise that these magazines are commonly owned for lawful purposes.

22

Further, this Court finds that a restraint on the amount of ammunition a citizen is permitted to load into his or her weapon — whether 10 rounds or seven — is also more than a "marginal, incremental or even appreciable restraint" on the right to keep and bear arms. See Kachalsky, 701 F.3d at 93 (New York's proper cause requirement for a concealed carry permit places a substantial burden on the Second Amendment right); see also Koper, supra, at 1 (A [large capacity-magazine] is arguably the most functionally important feature of most [assault weapons], many of which have magazines holding 30 or more rounds). Certainly, if the firearm itself implicates the Second Amendment, so too must the right to load that weapon with ammunition. Round restrictions, whether seven or 10, are therefore deserving of constitutional scrutiny. Thus, under Second Circuit precedent, this Court must next ask under what standard the restraints ought to be judged.

### 2.    Intermediate Scrutiny

In Kachalsky, the Second Circuit applied intermediate scrutiny to restrictions on the possession of a gun outside the home, but noted that it did not have occasion to consider what standard would apply to restrictions inside the home, where "Second Amendment guarantees are at their zenith." 701 F.3d at 89. Although the SAFE Act unquestionably affects Plaintiffs' ownership rights in their home, for three reasons, this Court finds that intermediate scrutiny remains the appropriate standard under which to evaluate the law.

First, although addressing varied and divergent laws, courts throughout the country have nearly universally applied some form of intermediate scrutiny in the Second Amendment context. See, e.g., id.; Marzzarella, 614 F.3d at 96; United States v. Skoien, 614 F.3d 638, 641-42 (7th Cir. 2010); United States v. Walker, 709 F. Supp. 2d 460 (E.D. Va. 2010); see also United States v. Lahey, No. 10-CR-765 KMK, 2013 WL 4792852, at

SPA-27

*15 (S.D.N.Y. Aug. 8, 2013) ("The emerging consensus appears to be that intermediate scrutiny is generally the appropriate level of scrutiny for laws which substantially burden Second Amendment rights.").

Second, application of strict scrutiny would appear to be inconsistent with the Supreme Court's holdings in Heller and McDonald, where the Court recognized several "presumptively lawful regulatory measures." Heller, 554 U.S. at 626–27; McDonald, 130 S. Ct. at 3047 ("Incorporation does not imperil every law regulating firearms."). These types of restrictions are presumably justified because of the unique ability of firearms to upset and disrupt public order. The four dissenting justices in Heller point out that "the majority implicitly, and appropriately, rejects [a] suggestion [that strict scrutiny should apply] by broadly approving a set of laws — prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales — whose constitutionality under a strict scrutiny standard would be far from clear." Heller, 554 U.S. at 688 (Breyer, J.). The Western District of Pennsylvania later reiterated this sentiment, writing that "the Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review." United States v. Marzzarella, 595 F. Supp. 2d 596, 604 (W.D. Pa. 2009). The district court in Heller II similarly noted that "a strict scrutiny standard of review would not square with" the majority's holding in Heller. Heller v. District of Columbia., 698 F. Supp. 2d 179, 187 (D.D.C. 2010). Accordingly, not only does this level of scrutiny lack precedent, but the Supreme Court's own holdings suggest that it is incongruous with extant, presumptively valid restrictions.

24

Last, this Court finds that First Amendment jurisprudence provides a useful guidepost in this arena.[13] As the Third Circuit has held, "[T]he right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue. . . . We see no reason why the Second Amendment would be any different." Marzzarella, 614 F.3d at 96 (internal citations omitted).

When considering restrictions that implicate the First Amendment, strict scrutiny is triggered only by content-based restrictions on speech in a public forum.  By contrast, content-neutral restrictions that affect only the time, place, and manner of speech trigger a form of intermediate scrutiny. See Hobbs v. Cnty. of Westchester, 397 F.3d 133, 149 (2d Cir. 2005); see also Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 791, 114 S. Ct. 2516, 2537, 129 L. Ed. 2d 593 (1994) (Scalia, J.) (concurring in part and dissenting in part) (intermediate scrutiny "applicable to so-called 'time, place, and manner regulations' of speech").

Like the Heller II court, which applied intermediate scrutiny to firearm restrictions similar to those at issue here, this Court finds that the burden here is akin to a time, place, and manner restriction. As described by the Heller II court, "[R]estrictions that impose severe burdens (because they don't leave open ample alternative channels) must be judged under strict scrutiny, but restrictions that impose only modest burdens (because

---

[13]The Second Circuit has expressed reservations about "import[ing] *substantive* First Amendment principles wholesale into Second Amendment jurisprudence." Kachalsky, 701 F.3d at 92 (emphasis in original). But that admonishment is not applicable here. This Court is not applying "substantive principles"; rather, as the Second Circuit has explicitly held, when deciding whether a law substantially burdens a Second Amendment right, or, in deciding what level of scrutiny to apply, "it is [] appropriate to consult principles from other areas of constitutional law, including the First Amendment." Decastro, 682 F.3d at 167–68 (citing Marzzarella, 614 F.3d at 89 & n.4).

they do leave open ample alternative channels) are judged under a mild form of intermediate scrutiny." 670 F.3d at 1262 (quoting Volokh, *supra*, at 1471) (parentheses in original). The court concluded that because "the prohibition of semiautomatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves" — because, in other words, alternative channels for the possession of substitute firearms exist — the restrictions should be judged under intermediate scrutiny. Id.

Calling the SAFE Act's restrictions "a ban on an entire class of firearms," Plaintiffs liken the SAFE Act to the ban struck down by the Supreme Court in Heller. But unlike the handgun ban, the SAFE Act applies only to a subset of firearms with characteristics New York State has determined to be particularly dangerous and unnecessary for self-defense; it does not totally disarm New York's citizens; and it does not meaningfully jeopardize their right to self-defense.  Current owners of the now-regulated weapons may lawfully possess them so long as they register the weapons with the State. They may also possess 10-round magazines, and, most places, they may load those magazines with up to seven rounds of ammunition. And, at certain designated areas, they may load the weapon with 10 rounds. Although the Act does make unlawful future purchases or sales of assault weapons, New Yorkers can still purchase, own, and sell all manner of semiautomatic weapons that lack the features outlawed by the SAFE Act. Indeed, Plaintiffs themselves concede that attributes of the banned weapons are "present in easily-substituted unbanned, counterpart firearms." (Pls.' Br. at 22; Docket No. 23-1.)

Accordingly, this Court finds that intermediate scrutiny is the most suitable standard under which to evaluate each challenged aspect of the law.

### E.   Application of Intermediate Scrutiny to the SAFE Act

Under intermediate scrutiny, this Court must ask whether the challenged restrictions are "substantially related to the achievement of an important governmental interest." Kachalsky, 701 F.3d at 96. The Second Circuit recently observed and reaffirmed that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention." Id. at 97. There is no dispute that the SAFE Act is clearly intended to further this goal. (See Senate, Assembly, and Gov. Memos in Supp., *supra*.) Thus, the only remaining question is whether the challenged provisions are substantially related to the governmental interest in public safety and crime prevention. Starting with New York's definition of assault weapons, moving to the ban on large-capacity magazines, and concluding with the seven-round limit, this Court next undertakes that analysis.

### 1.   Assault Weapons

There is much debate, both in the community at large and in this litigation, whether the banned "military-style features" of semiautomatic weapons will be effective in reducing crime and violence.

Plaintiffs contend that many of the outlawed features do not make firearms more lethal; instead, according to Plaintiffs, several of the outlawed features simply make the firearm easier to use. For instance, they argue that a  telescoping stock, which allows the user to adjust the length of the stock, does not make a weapon more dangerous, but instead, like finding the right size shoe, simply allows the shooter to rest the weapon on his or her shoulder properly and comfortably. Another outlawed feature, the pistol grip, also increases comfort and stability. The same goes for the "thumbhole stock," which, as the name suggests, is a hole in the stock of the rifle for the user's thumb. It too increases

27

comfort, stability, and accuracy according to Plaintiffs.

But Plaintiffs later argue that the banned features increase the utility for self-defense — which is just another way of saying that the features increase their lethality. Plaintiffs make this explicit: "Where it is necessary for a crime victim to shoot the aggressor, and lethal or incapacitating injury will stop him, the lethality of the defender's firearm is a precondition to her ability end the criminal attack." (Pls.' Br. at 22; Docket No. 23-1.) The National Rifle Association of America, as *amicus curiae,* make a similar argument, describing how the banned features improve a firearm's usability.  (NRA Br. at 10; Docket No. 46.)

There thus can be no serious dispute that the very features that increase a weapon's utility for self-defense also increase its dangerousness to the public at large. See, e.g., McDonald, 130 S. Ct. at 3107 (Stevens, J., dissenting) ("Just as [firearms] can help homeowners defend their families and property from intruders, they can help thugs and insurrectionists murder innocent victims."). Pointing to the benefits of these features to those who might use them defensively, Plaintiffs argue that the SAFE Act ought to be struck down. But under intermediate scrutiny, this Court must give "substantial deference to the predictive judgments of the legislature." Kachalsky, 701 F.3d at 97. And "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." Id. (quoting Turner Broad., 512 U.S. at  665).

To be sure, this Court's deference is not without bounds. New York must rely on evidence that "fairly support[s]" its rationale in passing the law. City of Los Angeles v.

28

Alameda Books, Inc., 535 U.S. 425, 438, 122 S. Ct. 1728, 1736, 152 L. Ed. 2d 670 (2002).

Here, New York has met that burden; substantial evidence supports its judgment that the banned features are unusually dangerous, commonly associated with military combat situations, and are commonly found on weapons used in mass shootings.

The recent mass shooting in Newtown, CT, which prompted the quick passage of this law, was no exception. The shooter armed himself with a .223-caliber Bushmaster Model XM15 rifle and a 30-round magazine. See Connecticut State Police Press Release, Jan. 18, 2013, available at   http://www.ct.gov/despp/cwp/view.asp?Q=517284 ("The shooter used the Bushmaster .223 to murder 20 children and six adults inside the school; he used a handgun to take his own life inside the school. No other weapons were used in this crime.").

Of course, this is only one incident. But it is nonetheless illustrative. Studies and data support New York's view that assault weapons are often used to devastating effect in mass shootings. (See Koper Decl., ¶¶ 11–14; Zimring Decl. ¶¶ 15–22; Docket Nos. 67, 68). For example, an exhaustive study of mass shootings in America, defined as the murder of four or more people in a single incident, found that there have been at least  62 mass shootings across the country since 1982.[14] Mark Follman, et al., A Guide to Mass Shootings in America, Mother Jones, updated Feb. 27, 2013, http://www.motherjones.com/politics/2012/07/mass-shootings-map.   Frighteningly, "twenty-five of these mass shootings have occurred since 2006, and seven of them took place in 2012." Id. In the mass shooting with the most victims, at an Aurora, Colorado

---

[14]The study excluded crimes involving armed robbery or gang violence.

movie theater, police say the shooter used an AR-15 type weapon until its 100-round barrel magazine jammed. In all, the study found that assault weapons, high-capacity magazines, or both were used in over half of all mass shootings. Id.

The State points to other evidence as well. It suggests that it should come as no surprise that assault weapons produced carnage in Aurora and Newtown, as The Bureau of Alcohol Tobacco and Firearms found that these weapons "were designed for rapid fire, close quarter shooting at human beings" — or, as the report called it, "mass produced mayhem." (ATF, *Assault Weapons Profile,* at 19 (1994), attached as Ex. 40.) The Supreme Court has previously described the AR–15 as "the civilian version of the military's M–16 rifle." Staples v. United States, 511 U.S. 600, 603, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994). Indeed, there is no dispute that the AR-15 type rifle derives from a weapon designed for fully-automatic military use on the battlefield. As Brain Siebel testified, the military features of semiautomatic assault weapons "serve specific, combat-functional ends" and are "designed to enhance the capacity to shoot multiple human targets rapidly." (Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence, at 1 (Oct. 1, 2008), attached as Ex. 29.) "The net effect of these military combat features is a capability for lethality — more wounds, more serious, in more victims — far beyond that of firearms in general, including other semiautomatic guns." H.R. Rep. 103-489, at 19-20 (1994) (chronicling five years of congressional hearings on semiautomatic assault weapons); (see Bruen Decl. ¶¶ 13-26; Docket No. 66.) The Chief of Police for the Rochester Police Department expresses similar sentiments, stating that assault weapons "are designed for one purpose — to efficiently kill numerous people." (Shepard Decl., ¶ 14; Docket No. 72). In other words, evidence suggests that the banned features make a deadly weapon

30

deadlier.

And while there is not (and cannot be) a dispute that the outlawed features make semiautomatic weapons easier to use, New York identifies purposes of these features that are particularly unnecessary for lawful use. Of course, several of the banned features, like a grenade launcher, bayonet mount, or a silencer, require no explanation. Indeed, Plaintiffs do not explicitly argue that the Act's regulation of firearms with these features violates the Second Amendment. But for the contested features, like a pistol grip and thumbhole stock, New York points to evidence that these features aid shooters when "spray firing" from the hip. (Bruen Decl., ¶ 19; see Heller II, 670 F.3d at 1262–63 (quoting Siebel Testimony, *supra*). As the Second Circuit has held, "This factor aims to identify those rifles whose pistol grips are designed to make such spray firing from the hip particularly easy." Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 685 (2d Cir. 1996). Folding and  telescoping stocks aid concealability and portability. (See Bruen Decl., ¶ 18; 2011 ATF Study at 9, attached as Ex. 10); see also Richmond Boro, 97 F.3d at 684–85. A muzzle compensator reduces recoil and muzzle movement caused by rapid fire. (Bruen Decl., ¶ 20.)

And New York further points to evidence that AR-15 type rifles are "not generally recognized as particularly suitable for or readily adaptable to sporting purposes," nor used frequently for self-defense. See Dep't of Treasury*, Study on the Sporting Suitability of Modified Semi-automatic Assault Rifles*, 38 (1998); Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self–Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 185 (1995) (revolvers and semi-automatic pistols are together used almost 80% of the time in incidents of self-defense with a gun).

31

What's more, New York presents evidence that its regulations will be effective. Drawing from his comprehensive study of the 1994 federal ban (*supra*, at 21), Christopher Koper avows that the regulations will reduce the stock of "dangerous weaponry" in New York and are thus "likely to advance New York's interests in protecting its populace from the dangers of [] shootings." (Koper Decl., ¶ 65.) His analysis of the data "indicates that the criminal use of assault weapons declined after the federal assault weapons ban was enacted in 1994, independently of trends in gun crime." (Id.) Because New York's regulations are  tighter than those in the federal ban, he believes, quite reasonably, that the affect will be greater. (Id., ¶ 60.)

For their part, Plaintiffs point to conflicting opinions and argue that criminals will retain their assault weapons while law-abiding citizens will be unable to acquire them. They also argue that the ban is irrational because there are numerous legal substitutes offering the same firepower. Further, there is no dispute that semiautomatic handguns are also often used in mass shootings. In fact, according to the Follman study, handguns were used in greater numbers than assault rifles.

But to survive intermediate scrutiny, the fit between the governmental objective and the challenged regulation need only be substantial, not perfect. And while these are legitimate considerations, "it is the legislature's job, not [this Court's], to weigh conflicting evidence and make policy judgments." Kachalsky, 701 F.3d at 99. New York, citing the undisputed potential for mass casualty that assault weapons present, is empowered to take action to reduce the quantity of such weapons in its state. See  Nat'l Rifle Ass'n, 700 F.3d at 211 (quoting Buckley v. Valeo, 424 U.S. 1, 105, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)) ("It is well-settled that 'a statute is not invalid under the Constitution because it

32

might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'"). The ultimate merits of this judgment remain to be seen, but, considering especially that Plaintiffs themselves concede that the banned features increase the lethality of firearms — or as Brain Siebel has testified, that the military features of semiautomatic assault weapons are "designed to enhance the capacity to shoot multiple human targets rapidly" — this Court finds that New York has satisfied its burden to demonstrate a substantial link, based on reasonably relevant evidence, between the SAFE Act's regulation of assault weapons and the compelling interest of public safety that it seeks to advance.

  2.  **Large-capacity Magazines**

  The same finding is true for the ban on large-capacity magazines. Indeed, the link between the SAFE Act's restrictions on large-capacity magazines and the state's interest in public safety is arguably even stronger here.

  Koper testifies that it is "particularly" the large-capacity magazine ban that will prevent shootings and save lives. (Koper Decl., ¶ 65.) Indeed, large-capacity magazines are used regularly in mass shootings — they were used in more than half of the mass shootings since 1982. And, more troubling, their use is on the rise. In the past year, guns with large-capacity magazines were used in at least five of the six mass shootings. (Allen Decl.¶ 18; Docket No. 69.)

  Evidence also suggests that, quite simply, more people die when a shooter has a large-capacity magazine. According to analysis conducted by NERA Economic Consulting, the average number of fatalities or injuries per mass shooting more than doubles when a

shooter uses a large-capacity magazine. (Id., ¶ 20.) Similarly, a 2013 study of mass shootings over the past four years using data collected by the FBI found that shooters who used assault weapons, high-capacity magazines, or both shot over twice as many people and killed 57% more people than shooters who did not use these weapons. *(*Mayors Against Illegal Guns*, Analysis of Recent Mass Shootings*, February 22, 2013, attached as Ex. 39.)

Just as with assault weapons, Plaintiffs find policy and judgment flaws in New York's decision to ban large-capacity magazines. Mass shooters, argues Gary Kleck in an affidavit submitted by Plaintiffs, often carry multiple firearms. (Kleck Decl., at 5; Docket No. 23–9.) So, according to Plaintiffs, any large-capacity-magazine ban would be ineffective, or worse, would only affect law-abiding citizens. But New York's evidence — far more comprehensive than Plaintiffs' — runs counter to this presumption, and again, "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." Kachalsky, 701 F.3d at 97 (quoting Turner Broad. Sys., 512 U.S. at 665.) This Court's role is "to assure that, in formulating its judgments, New York has drawn reasonable inferences based on substantial evidence." Id. (internal citations omitted). Though by no means a panacea, in passing these provisions New York has made a public policy judgment that draws reasonable inferences from substantial evidence.  It thus survives intermediate scrutiny.

**3.     Seven-round limit**

The same cannot be said, however, about the seven-round limit. The SAFE Act adds New York Penal Law § 265.00(37), which makes it "unlawful for a person to

34

knowingly possess an ammunition feeding device where such device contains more than seven rounds of ammunition."[15] Unlike the restrictions on assault weapons and large-capacity magazines, the seven-round limit cannot survive intermediate scrutiny.

It stretches the bounds of this Court's deference to the predictive judgments of the legislature to suppose that those intent on doing harm (whom, of course, the Act is aimed to stop) will load their weapon with only the permitted seven rounds. In this sense, the provision is not "substantially related" to the important government interest in public safety and crime prevention.

Indeed, <u>Heller</u> found that the Second Amendment right is at its zenith in the home; in particular, the Court highlighted the right of a citizen to arm him or herself for self-defense. But this provision, much more so than with respect to the other provisions of the law, presents the  possibility of a disturbing perverse effect, pitting the criminal with a fully-loaded magazine against the law-abiding citizen limited to seven rounds.

Although Plaintiffs make this type of argument with respect to all aspects of the SAFE Act, the distinction here is plain. This Court has ruled that New York is entitled to regulate assault weapons and large-capacity magazines under the principal presumption that the law will reduce their prevalence and accessability in New York State, and thus,

---

[15]The seven-round limit does not apply at:

> an indoor or outdoor firing range located in or on premises owned  or occupied by  a duly incorporated  organization organized  for conservation purposes or to foster proficiency in arms; at an indoor or outdoor firing range for the purpose of firing a rifle or shotgun; at a collegiate, olympic or target shooting competition under the auspices of or approved by  the national rifle association;   or at an organized match sanctioned by the international handgun metallic silhouette association.

N.Y. Penal Law § 265.20(7-f).

inversely, increase public safety. (See Koper Decl., ¶ 64) (restrictions in Safe Act will "help prevent the spread of particularly dangerous weaponry"). The ban on the number of rounds a gun owner is permitted to load into his 10-round magazine, however, will obviously have no such effect because 10-round magazines remain legal. As described above, the seven -round limit thus carries a much stronger possibility of disproportionately affecting law-abiding citizens.

Defendants contend, pointing to a study conducted by the NRA, that the average citizen using his or her weapon in self-defense expends only two bullets. (Allen Decl., ¶¶ 12–15). Thus, New York argues, citizens do not truly need more than seven rounds, and the restriction minimizes the danger without hampering self-defense capabilities. But as an initial matter, New York fails to explain its decision to set the maximum at seven rounds, which appears to be a largely arbitrary number. And even if a person using a weapon in self-defense needs only a few rounds, and even if that is a rational reason for adopting the law, under intermediate scrutiny there must a "substantial relation" between the means and the end. The State's justification for the law need not be perfect, but it must be "exceedingly persuasive." Windsor v. United States, 699 F.3d 169, 185 (2d Cir. 2012) (quoting United States v. Virginia, 518 U.S. 515, 533, 116 S. Ct. 2264, 135 L .Ed. 2d 735 (1996)); see Lederman v. N.Y. City Dep't of Parks & Recreation, 731 F.3d 199, 202 (2d Cir. 2013). This peripheral rationale, which is possibly meant to protect bystanders when a firearm is being discharged lawfully, or victims of impromptu acts of violence, is largely unsupported by evidence before this Court. It thus fails the more demanding test and must

**SPA-40**

be stuck down.[16]

**F.      Vagueness**

In addition to their Second Amendment arguments, Plaintiffs also contend that various aspects of the SAFE Act, mainly those describing the banned features, are unconstitutionally vague. They contend, in other words, that certain aspects of the law are void for vagueness.

The void-for-vagueness doctrine finds its roots in the Due Process Clause of the United States Constitution, as "[a]mong the most fundamental protections of due process is the principle that no one may be required at peril of life, liberty or property to speculate as to the meaning of statutes." Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y., 660 F.3d 612, 620 (2d Cir. 2011) (internal modifications, quotation marks, and citations omitted). Simply, "[a]ll are entitled to be informed as to what the State commands or forbids." Id.

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (quoting Kolender v. Lawson, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)).

The Supreme Court has cautioned, however, "that this doctrine does not require 'meticulous specificity' from every statute, as language is necessarily marked by a degree

---

[16]In light of this ruling, this Court need not address Plaintiffs' alternative argument that the seven-round limit violates the Equal Protection Clause.

of imprecision." <u>Thibodeau v. Portuondo</u>, 486 F.3d 61, 66 (2d Cir. 2007) (quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 110, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972)).

Finally, depending on the type of law and conduct at issue, a statute may be challenged on vagueness grounds either "as applied" or "on its face." "Both types of vagueness challenges require the inquiry described above." <u>Id.</u> at 67 (internal citation omitted). Here, because the challenge is mounted "pre-enforcement," or before Plaintiffs have been charged with any crime under the law, it is correctly categorized as a "facial challenge." <u>See</u> <u>Richmond Boro</u>, 97 F.3d at 686 ("It would be premature to entertain [an as-applied] vagueness challenge . . . until a broader use of the ordinance is actually initiated"); <u>see also</u> <u>Parker v. Levy</u>, 417 U.S. 733, 759, 94 S. Ct. 2547, 41 L. Ed. 2d 439 (1974) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court."). But "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances exists under which the Act would be valid*." <u>United States v. Salerno</u>, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697 (1987) (emphasis added).

A three-member plurality of the Supreme Court, however, has also set forth a somewhat different test, finding  that when a criminal law with no *mens rea* requirement is the subject of the challenge and "[w]hen vagueness permeates the text of such a law, it is subject to facial attack." <u>City of Chicago v. Morales</u>, 527 U.S. 41, 119 S. Ct. 1849, 144 L.Ed. 2d 67 (1999) (Stevens, J.). The Second Circuit, highlighting the unsettled nature of this area of law, has declined to express a preference for either the "no-set-of-

38

circumstances" or "permeated-with-vagueness" standard. Rybicki, 354 F.3d at 132 n. 3 (*en banc*).

It is unclear whether the challenged provisions here lack a *mens rea* requirement to a degree that would trigger the latter test; but it is no matter, as this Court finds that the outcome is the same regardless of the standard applied.

Plaintiffs' vagueness challenge concerns the following 10 aspects of the SAFE Act:

- "conspicuously protruding" pistol grip

- threaded barrel

- magazine-capacity restrictions

- five-round shotgun limit

- "can be readily restored or converted"

- the "and if" clause of N.Y. Penal Law § 265.36

- muzzle "break"

- "version" of automatic weapon

- manufactured weight

- commercial transfer

This Court will explain and address each in turn.

**1.     The "conspicuously protruding" pistol grip**

Penal Law § 265.00 regulates semiautomatic weapons that have a "pistol grip that protrudes conspicuously beneath the action of the weapon." Plaintiffs assert that an ordinary person would not know whether a pistol grip "conspicuously protrudes" beneath a weapon.

The Second Circuit, however, has already found that this provision is not

39

unconstitutionally vague, at least as analyzed under the "no-set-of-circumstances" test. In Richmond Boro Gun Club, the Second Circuit addressed a New York City law that criminalizes, in much the same way as the SAFE Act, possession or transfer of assault weapons.  97 F.3d 681. The law at issue there, Local Law 78, also employs a one-feature test and bans semiautomatic rifles and shotguns that have, among other features, a "pistol grip that protrudes conspicuously beneath the action of the weapon."

In that case, the plaintiff sued New York City, arguing that this provision and others were unconstitutionally vague. The Appeals Court found that "Plaintiff's facial vagueness challenge is plainly without merit" because, among other reasons, "it is obvious in this case that there exist numerous conceivably valid applications of Local Law 78." Id. at 684. Relying on evidence that is also present in this case (such as depictions of rifles with conspicuously protruding pistol grips), the circuit court found the plaintiff's argument regarding the "conspicuously protruding pistol grip" to be "disingenuous." Id. at 685.

Although the Second Circuit was proceeding under the assumption that Local Law 78 did not implicate a "fundamental right," Plaintiffs here have not identified any compelling reason to depart from this precedent.[17]

_____

[17]National Shooting Sports Foundation, Inc., as amicus curiae, argue that a more stringent test should apply because the right to firearm ownership is, as we now know, fundamental.  As an initial matter, however, amicus does not specify what test it advocates. Moreover, to the extent amicus asks this Court to apply the "overbreadth doctrine," the Supreme Court has never recognized the doctrine outside the limited context of the First Amendment. Further, while the Court has recognized a "less strict" test in some situations, such a situation is not present here and this Court has not considered the law under this relaxed standard. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S.  498,  102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982) (a "less strict" standard applies to economic regulation). Indeed, the "more stringent analysis" applies "when examining laws that impose criminal penalties." Thibodeau, 486 F.3d at 66; see also Arriaga v. Mukasey, 521 F.3d 219, 222–23 (2d Cir. 2008) ("The 'void for vagueness' doctrine is chiefly applied to criminal legislation. Laws with civil consequences receive less exacting vagueness scrutiny.").

Further, even under the "permeated-with-vagueness" standard, which was articulated  after the <u>Richmond Boro</u> decision, this provision still survives. Under this standard "a law must at a minimum be 'vague in the vast majority of its applications' to be facially vague." <u>United States v. Awan</u>, 459 F. Supp. 2d 167, 180 (E.D.N.Y. 2006) (quoting <u>Doctor John's, Inc. v. City of Roy</u>, 465 F.3d 1150, 1152 (10th Cir. 2006)). That is not the case here — as the <u>Richmond Boro</u> court noted, there are a significant number of applications where this provision is not vague. 97 F.3d at 684–85. Accordingly, this provision will not be struck for vagueness.

**2.     The threaded barrel**

Penal Law § 265.00 also regulates semiautomatic weapons that have a "threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator." Plaintiffs assert that an ordinary person could not know whether a threaded barrel is "designed" to accommodate the outlawed attachments.

But like the pistol grip, the Second Circuit in <u>Richmond Boro</u> has already found that the phrase "threaded barrel designed to accommodate a flash suppressor" is not vague. <u>Id.</u> at 683. It rejected the plaintiff's argument with respect to the outlawed "threaded barrel" because "when the statute is applied to firearms advertised to include parts identified as bayonet mounts, flash suppressors, barrel shrouds, or grenade launchers," there is "certainly" no vagueness. <u>Id.</u>

Even if this were not binding precedent, this Court finds the term to be sufficiently clear. Accordingly, this provision will not be struck for vagueness.

**3.     Magazine-capacity restrictions**

Plaintiffs contend that the 10-round magazine restriction, found at N.Y. Penal Law

41

§ 265.00(23), is vague when applied to tubular magazines, because the capacity of such a magazine varies with the length of the cartridge.

This challenge must fail because, as is evident from Plaintiffs' argument, this provision is only possibly vague when applied to a specific use. When applied to non-tubular magazines, the restriction is not vague. (See Bruen Decl., ¶ 30.) Plaintiffs do not argue otherwise. Because the provision is neither impermissibly vague in all its applications, nor permeated with vagueness, this challenge must fail.

### 4.      The five-round shotgun limit

Plaintiffs further argue that the language excluding "semiautomatic shotgun[s] that cannot hold more than five rounds of ammunition in a fixed or detachable magazine" from the definition of assault weapons is vague because shotgun shells come in various lengths. See § 265.00(22)(g)(iii).

But this challenge fails for the same reason: it is only possibly vague when applied to a specific use. When applied to a standard-length shell, the restriction is not vague. Thus, this language will also not be stricken for vagueness.

### 5.      "Can be readily restored or converted"

The SAFE Act not only criminalizes magazines that have the capacity to accept more than 10 rounds of ammunition, it also outlaws any magazine that "can be readily restored or converted to accept" more than 10 rounds of ammunition. N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.36, 265.37. Plaintiffs contend that this language is impermissibly vague because it is unclear what is meant by "readily," which, they contend, is a purely subjective criterion.

This language has been in existence since the 1994 federal ban, and was adopted

by New York in its 2000 assault weapons ban. While that does not, in itself, render the

language sufficiently clear, Plaintiffs have presented no evidence that there has been any

confusion on this issue in the many years of its existence.

Although this Court is sympathetic to Plaintiffs' concerns, this provision reflects the

limitations of our language more than poor draftsmanship.  In this sense, this Court agrees

with the District of New Jersey, which, addressing similar language and relying in part on

the Second Circuit's decision in Richmond Boro, held:

> Surely the Legislature, intent on reaching assault weapons
> which could be altered in minor ways or disassembled to avoid
> the purview of the other assault weapon definitions, did not
> have to specify in hours and minutes and with reference to
> specific tools and degrees of knowledge the parameters of
> what 'readily assembled' means. The precision in drafting
> which plaintiffs demand is neither constitutionally required nor
> perhaps even possible or advisable given the confines of
> language in which we all operate.

Coal. of N.J. Sportsmen, Inc. v. Whitman, 44 F. Supp. 2d 666, 681 (D.N.J. 1999).

Here,  "[t]he words of this provision are marked by flexibility and reasonable breadth,

rather than meticulous specificity, but [this Court] think[s] it is clear what the ordinance as

a whole prohibits" — namely, magazines that can be easily restored to violate the law.

Accordingly, this provision is not unconstitutionally vague. See Grayned v. City of Rockford,

408 U.S. 104, 110, 92 S. Ct. 2294, 2300, 33 L. Ed. 2d 222 (1972) (citations and quotations

marks omitted).

**6.      The "and if" clause of Penal Law § 265.36**

New York Penal Law § 265.36 provides, in relevant part, that:

> It shall be unlawful for a person to knowingly possess a large
> capacity ammunition feeding device manufactured before
> September thirteenth, nineteen hundred ninety-four, **and if**

43

such person lawfully possessed such large capacity feeding device before the effective date of the chapter of the laws of two thousand thirteen which added this section, that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition.

Plaintiffs concede that this Section "is clear in making it unlawful to knowingly possess a large capacity ammunition feeding device manufactured before September 13, 1994." (Pls.' Br. at 42; Docket No. 114). They contend only that the remainder of the paragraph should be stricken.

Plaintiffs correctly note that the clause beginning with "and if" is unintelligible. Although Defendants contend that this is simply a "grammatical error" and the meaning of the provision, when read as a whole, remains apparent despite the error,  this Court cannot agree. The error is more substantial than a mere mistake in grammar. Rather, the "and if" clause is incomplete and entirely indecipherable; in short, it requires an ordinary person to "speculate as to" its meaning. See Cunney, 660 F.3d at 620.  This clause must therefore be stricken as unconstitutionally vague. Id. The preceding clause, however, is not challenged, and will remain.[18]

### 7.   Muzzle "break"

When properly attached to a firearm, a muzzle brake reduces recoil. The SAFE Act, however, regulates muzzle "breaks." See N.Y. Penal Law § 265.00(22)(a)(vi).  Although New York contends that this is a simple oversight in drafting, and that it intended to refer to muzzle "brakes," it has provided no evidence suggesting that this was the legislature's

---

[18]Section 265.36 contains two subsequent error-free paragraphs. Those are also unchallenged, and will remain.

intent. In any event, "[b]ecause construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text." <u>Crandon v. United States</u>, 494 U.S. 152, 160, 110 S. Ct. 997, 108 L. Ed. 2d 132 (1990). Indeed, "[l]egislatures and not courts should define criminal activity." <u>McBoyle v. United States</u>, 283 U.S. 25, 27, 51 S. Ct. 340, 75 L. Ed. 816 (1931) (Holmes, J.). This Court's job is to "presume that a legislature says in a statute what it means and means in a statute what it says there." <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253–54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992). Of course here, the word "break" has its own meaning, distinct from its homophone "brake." And there is no dispute that there is no accepted meaning to the term "muzzle break." Both sides agree that it is, quite simply, meaningless. Consequently, an ordinary person cannot be "informed as to what the State commands or forbids." <u>See</u> <u>Cunney</u>, 660 F.3d at 620. All references to muzzle "break" must therefore be stricken.

### 8.    "Version" of an automatic weapon

New York Penal Law § 265.00(22)(c)(viii) regulates semiautomatic pistols that have an ability to accept a detachable magazine and that are "semiautomatic version[s] of an automatic rifle, shotgun or firearm."

This Court also finds this language to be excessively vague, as an ordinary person cannot know whether any single semiautomatic pistol is a "version" of an automatic one.

New York argues that some courts, referencing certain firearms, have called them "versions" of automatic weapons. <u>See, e.g.</u>, <u>Staples</u>, 511 U.S. at 614 (referring to the AR-15 rifle as the civilian version of the M-16 automatic rifle). But that alone is insufficient to adequately inform an ordinary gun owner whether his or her specific weapon is a version

45

SPA-49

of an automatic weapon. The statute provides no criteria to inform this determination, and, aside from the largely irrelevant citations to case law, New York fails to point to any evidence whatsoever that would lend meaning to this term. Thus, it not only fails to provide fair warning, but also "encourag[es] arbitrary and discriminatory enforcement." Section 265.00(22)(c)(viii) must therefore be stricken as unconstitutionally vague.

### 9.   Manufactured weight

New York Penal Law § 265.00(22)(c)(vii) regulates semiautomatic pistols that have an ability to accept a detachable magazine and that have a manufactured weight of fifty ounces or more when unloaded. Plaintiffs claim that the term "manufactured weight" is vague. But this Court finds that the term has a plain and commonly-accepted meaning, and that this meaning provides sufficient notice to the ordinary person. This challenge is rejected.

### 10.   Commercial transfer

Plaintiffs also claim that the term "commercial transfer" is vague as used in N.Y. Penal Law § 400.03(7), which outlaws any commercial transfer of a firearm or ammunition unless a licensed dealer in firearms or a registered seller of ammunition acts an intermediary. Once again, however, this Court finds the term has an ordinary and commonly-accepted meaning. Accordingly, this Court will not strike it as vague.

### G.   Dormant Commerce Clause

Last, Plaintiffs argue that a portion of the SAFE Act violates the so-called "dormant" aspect of the Commerce Clause.

That portion, Section 50, effectively bans ammunition sales over the Internet and imposes a requirement that an ammunition transfer "must occur in person." Plaintiffs,

46

including those who allege that they would continue to buy ammunition online from out-of-state dealers if not for the law, contend that this violates the Commerce Clause, which provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. As the Second Circuit has astutely observed, "[i]t is well established that the affirmative implies the negative, and that the Commerce Clause establishes a 'dormant' constraint on the power of the states to enact legislation that interferes with or burdens interstate commerce." Arnold's Wines, Inc. v. Boyle, 571 F.3d 185, 188 (2d Cir. 2009). Thus, "[t]he negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." Gen. Motors Corp. v. Tracy, 519 U.S. 278, 287, 117 S. Ct. 811, 136 L. Ed. 2d 761 (1997) (internal quotation marks, brackets, and citations omitted).

Initially, Defendants contend that this Court should not address the merits of this challenge; they argue that because the provision at issue is not effective until January 15, 2014, Plaintiffs' Commerce Clause claim is not ripe and should be dismissed under Federal Rule of Civil Procedure 12(b)(1).[19]

The ripeness doctrine, "drawn both from Article III limitations on judicial power and

---

[19]Defendants do not seek dismissal on the related issue of standing, but this Court notes that Plaintiffs allege that they currently buy ammunition from out-of-state dealers. Under the Act, Plaintiffs will be foreclosed from doing so. As with the discussion regarding the possession of firearms and ammunition, this assertion is adequate to establish standing for this particular claim because Plaintiffs are forced to choose between refraining from making purchases that are not "face-to-face," or subjecting themselves to prosecution. See Humanitarian Law Project, 130 S. Ct. at 271; see also Gen. Motors Corp., 519 U.S. at 286 (customers of class that has allegedly been discriminated against in violation of dormant Commerce Clause have standing); Am. Booksellers Found. v. Dean, 342 F.3d 96, 101 (2d Cir. 2003) (plaintiffs had standing to bring dormant Commerce Clause claim because "[i]n th[at] case, the choice that the statute present[ed] to plaintiffs — censor their communications or risk prosecution — plainly present[ed] a 'realistic danger' of 'direct injury'").

from prudential reasons for refusing to exercise jurisdiction," protects the government from "judicial interference until a [] . . . decision has been formalized and its effects felt in a concrete way by the challenging parties." Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808, 123 S. Ct. 2026, 155 L. Ed. 2d 1017 (2003) (internal citations omitted); Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 1515, 18 L. Ed. 2d 681 (1967), *overruled on other grounds*, Califano v. Sanders, 430 U.S. 99, 97 S .Ct. 980, 51 L .Ed .2d 192 (1977). New York does not identify whether it seeks dismissal on Article III or prudential grounds, but this Court finds that the facts demonstrate a "concrete dispute affecting cognizable current concerns of the parties" sufficient to satisfy constitutional ripeness. See N.Y. Civil Liberties Union v. Grandeau, 528 F.3d 122, 131 (2d Cir. 2008) (internal citation omitted).  Indeed, pre-enforcement review of the validity of a statute or regulation is warranted "principally when an individual would, in the absence of court review, be faced with a choice between risking likely criminal prosecution entailing serious consequences, or forgoing potentially lawful behavior." Thomas v. City of New York, 143 F.3d 31, 35 (2d Cir. 1998). That is the case here.

Thus, the only issue is one of prudential ripeness. "A case held not to be prudentially ripe reflects a court's judgment that the case would 'be better decided later.'" Ehrenfeld v. Mahfouz, 489 F.3d 542, 546 (2d Cir. 2007). Challenges of this sort require courts to engage in a two-part inquiry, related to the Article III inquiry, that evaluates "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Labs., 387 U.S. at 149; Grandeau, 528 F.3d at 132.

The first step "is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur," while the second step asks "whether and

to what extent the parties will endure hardship if decision is withheld." <u>Grandeau</u>, 528 F.3d at 132, 134 (internal citations and quotation marks omitted).  In assessing the possibility of hardship, courts "ask whether the challenged action creates a direct and immediate dilemma for the parties." <u>Id.</u>

Here, this Court finds that both facets of the prudential-ripeness requirement are met. Plaintiffs raise a purely legal question, unconnected to "future events that may never occur." And Plaintiffs have sufficiently demonstrated that the impending effective date for the law imposes a direct and immediate dilemma, as Plaintiffs must prepare to comply with the law's new requirements. <u>See</u> <u>New York v. United States</u>, 505 U.S. 144, 175, 112 S. Ct. 2408, 120 L. Ed.2d 120 (1992) (issue ripe for review where plaintiff had to take action to avoid the consequences of a provision with an effective date several years off). Plaintiffs' claim of hardship is further buttressed by the fact that the law creates new obligations and subjects those failing to comply to civil and criminal liability. <u>C.f.</u> <u>Nat'l Park</u>, 538 U.S. at 809 (claim not ripe because regulation at issue did "not command anyone to do anything or to refrain from doing anything[,] . . .  subject anyone to any civil or criminal liability," nor create "legal rights or obligations") (modifications omitted).

Having determined that Plaintiffs' claim is ripe for review, the Court will move to the merits.

Under dormant Commerce Clause jurisprudence, a challenged provision is likewise analyzed under a two-prong test: First, this Court asks whether the ordinance "discriminates" against interstate commerce. If it does, this Court will apply the strictest scrutiny to the ordinance.  If it does not, this Court proceeds to "balance" the ordinance's "incidental" burdens on interstate commerce against its "putative local benefits." <u>See</u>

49

Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579, 106 S. Ct. 2080, 90 L. Ed. 2d 552 (1986); Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970).

Undertaking that analysis, this Court finds that the face-to-face requirement does not run afoul of the dormant Commerce Clause. The Second Circuit addressed a remarkably  similar issue in Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 213 (2d Cir. 2003). There, the plaintiffs alleged that a New York law prohibiting cigarette sellers from shipping and transporting cigarettes directly to New York consumers violated the dormant Commerce Clause. The Second Circuit disagreed, holding that the statute imposed burdens on in-state and out-of-state dealers alike and that, contrary to the plaintiffs' argument and the district court's holding, it did not effectively forbid out-of-state dealers from selling cigarettes in New York state; instead, it eliminated *all* sales not made face-to-face, regardless of the seller's place of business.

The Brown court then went on to find that whatever additional costs the statute imposed were only "incidental effects on interstate commerce" and that the statute passed constitutional muster under the Pike balancing test. Id. at 216–17.

The same is true here. As in Brown, Section 50 of the SAFE Act applies restrictions evenhandedly between in-state and out-of-state arms and ammunition dealers. It does not create a "monopoly" for New York dealers, as Plaintiffs argue; instead (and again like Brown) it eliminates the direct sale of ammunition to New Yorkers no matter the seller's place of business.  As the Brown court found with regard to cigarettes, even assuming that the only way an out-of-state dealer could legally sell ammunition to New York consumers is to establish a brick-and-mortar outlet in New York, so too must in-state sellers. And,

50

even if it is costly and burdensome for out-of-state dealers "to establish brick-and-mortar outlets in New York, that is insufficient to establish a discriminatory effect." See Brown, 320 F.3d at 212; see also Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 125, 98 S. Ct. 2207, 2214, 57 L. Ed. 2d 91 (1978) (even if a statute's burdens fall solely on interstate companies, this "does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce at the retail level").

Having determined that the statute regulates evenhandedly with only incidental effects on interstate commerce, this Court must uphold the law unless the burden imposed on interstate commerce is clearly excessive in relation to a legitimate local public interest. See Pike, 397 U.S. at 142; USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272, 1287 (2d Cir. 1995).

This provision is plainly intended to further a legitimate and important public interest: preventing those prohibited from purchasing ammunition from doing so online, especially in mass quantities, by requiring sellers to confirm the identity of a buyer through inspection of valid photo identification. (See Gov.'s Memo in Support, at 7.) If, like here, "a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Pike, 397 U.S. at 142. Although Plaintiffs argue that New York's goal can be achieved through other means (such as electronic background checks), Plaintiffs offer no evidence on this point, and have thus have failed to raise a triable issue of fact — as is their obligation — that the law "places a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits." See Town of Southold v. Town of E.

SPA-55

<u>Hampton</u>, 477 F.3d 38, 47 (2d Cir. 2007) (If the challenging party cannot show discrimination . . . it must demonstrate that the law "places a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits'"). Accordingly, Plaintiffs' motion on this ground is denied and Defendants' is granted.

**IV. CONCLUSION**

"Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty." <u>Kolender v. Lawson</u>, 461 U.S. 352, 357, 103 S. Ct. 1855, 1858, 75 L. Ed. 2d 903 (1983). In <u>Heller</u> and <u>McDonald</u>, the Supreme Court found that the right to "keep and bear arms," enshrined in the Second Amendment, was among those individual freedoms. But the Court also noted that the right was not unlimited. Drawing from post-<u>Heller</u> rulings that have begun to settle the vast *terra incognita* left by the Supreme Court, this Court finds that the challenged provisions of the SAFE Act — including the Act's definition and regulation of assault weapons and its ban on large-capacity magazines — further the state's important interest in public safety, and do not impermissibly infringe on Plaintiffs' Second Amendment rights. But, the seven-round limit fails the relevant test because the purported link between the ban and the State's interest is tenuous, strained, and unsupported in the record.

Further, three aspects of the law — the "and if" clause of N.Y. Penal Law § 265.36, the references to muzzle "breaks" in N.Y. Penal Law § 265.00(22)(a)(vi), and the regulation with respect to pistols that are "versions" of automatic weapons in N.Y. Penal Law § 265.00(22)(c)(viii) — must be stricken because they do not adequately inform an ordinary person as to what conduct is prohibited.

Finally, because the SAFE Act's requirement that all ammunition sales be conducted in-person does not unduly burden interstate commerce, it does not violate the Commerce Clause.

## V.  ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' Motion for Summary Judgment (Docket No. 113) is GRANTED in part and DENIED in part.

FURTHER, that Plaintiffs' Motion for a Preliminary Injunction (Docket No. 23) is DENIED as moot.

FURTHER, that New York State Defendants' Motion for Summary Judgment and Motion to Dismiss (Docket No. 64) is GRANTED in part and DENIED in part.

FURTHER, that Gerald Gill's Motion for Summary Judgment and Motion to Dismiss (Docket No. 70) is GRANTED in part and DENIED in part.

FURTHER, the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:      December 31, 2013
            Buffalo, New York

                              /s/William M. Skretny
                              WILLIAM M. SKRETNY
                                  Chief Judge
                            United States District Court

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court
## WESTERN DISTRICT OF NEW YORK

NEW YORK STATE RIFLE AND
PISTOL ASSOCIATION, INC. et al.,

       v.

ANDREW M. CUOMO, et al.,

**JUDGMENT IN A CIVIL CASE**
CASE NUMBER: 13-CV-291S

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED: that Plaintiffs' Motion for Summary Judgment is Granted in part and Denied in part; that Plaintiffs' Motion for a Preliminary Injunction is Denied as moot; that New York State Defendants' Motion for Summary Judgment and Motion to Dismiss is Granted in part and Denied in part and that Gerald Gill's Motion for Summary Judgment and Motion to Dismiss is Granted in part and Denied in part.

Date: January 2, 2014

MICHAEL J. ROEMER, CLERK

By: s/Suzanne Grunzweig
       Deputy Clerk