# 14-0036 (L)

### 14-0037 (XAP)

## United States Court of Appeals

*for the*

## Second Circuit

WILLIAM NOJAY,

*Plaintiffs-Appellants-Cross-Appellees,*

v.

ANDREW M. CUOMO, Governor of the State of New York, ERIC T. SCHNEIDERMAN,
Attorney General of the State of New York, JOSEPH A. D'AMICO,
Superintendent of the New York State Police,

*Defendants-Appellees-Cross-Appellants,*

(caption continued on inside front cover)
————————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
————————————————————————————————————————

**CORRECTED BRIEF FOR *AMICUS CURIAE* MAJOR CITIES CHIEFS ASSOCIATION IN
SUPPORT OF DEFENDANTS/APPELLEES/CROSS-APPELLANTS**

————————————————————————————————————————

*Counsel for Amicus Curiae:*
PAUL B. CARBERRY
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

(caption continued from front cover)

THOMAS GALVIN, ROGER HORVATH, BATAVIA MARINE & SPORTING SUPPLY, NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., WESTCHESTER COUNTY FIREARMS OWNERS ASSOCIATION, INC., SPORTSMEN'S ASSOCIATION FOR FIREARMS EDUCATION, INC., NEW YORK STATE AMATEUR TRAPSHOOTING ASSOCIATION, INC., BEDELL CUSTOM, BEIKIRCH AMMUNITION CORPORATION, BLUELINE TACTICAL & POLICE SUPPLY, LLC,

*Plaintiffs-Appellants-Cross-Appellees*,

v.

GERALD J. GILL, Chief of Police for the Town of Lancaster, New York, LAWRENCE FRIEDMAN,

*Defendants-Appellees,*

FRANK A. SEDITA, III, District Attorney for Erie County,

*Defendant.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

*Amicus curiae,* Major Cities Chiefs Association, states that it has no parent corporation and that no publicly held corporation owns more than 10% of its stock.

# TABLE OF AUTHORITIES

## CASES

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ................................. 20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............................................. 5, 6

*Heller v. Dist. of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ................................... 21

*Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) ................................. 6

*McLaughlin v. Florida*, 379 U.S. 184 (1964) ........................................................... 24

*New York State Rifle and Pistol Ass'n, et al., v. Cuomo*, No. 13-000291 ................. 23

*Ry. Express Agency v. People of New York*, 336 U.S. 106 (1949) ........................... 25

*U.S. v. Carolene Prods. Co.*, 304 U.S. 144 (1938) .................................................... 25

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012), *cert. denied*, 133 S.Ct. 838 (2013) ................................................................................................................... 5

*Williamson v. Lee Optical of Okla.*, 348 U.S. 483 (1955) ........................................ 24

## STATUTES AND RULES

NY Penal Law § 255 [22] ............................................................................................ 7

Secure Ammunition and Firearms Enforcement Act of 2013 ("NY SAFE Act")…passim

Violent Crime Control and Law Enforcement Act of 1994 ..................................... 10

## MISCELLANEOUS

140 Cong. Rec. H3063 (May 5, 1994)....................................................................... 21

ATF, *Report and Recommendations of the ATF Working Group on the Importability of Certain Semi-Automatic Rifles* (July 6, 1989)............................. 9

ATF, U.S. Dept' of the Treasury, Assault Weapons Profile 19 (1994) ........... 7

Brady Ctr, *On Target: The Impact of the 1994 Federal Assault Weapon Act* (2004) ..................................................................................................................... 7

Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004: Key Findings and Implications* in REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE (2013)............................. passim

Christopher S. Koper, Jerry Lee Ctr. of Criminology, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (2004) .............................................................................. 8, 9, 10, 12

David S. Fallis. *Data indicate drop in high-capacity magazines during federal gun ban*, THE WASHINGTON POST, January 10, 2013, http://www.washingtonpost.com/investigations/data-point-to-drop-in-high-capacity-magazines-during-federal-gun-ban/2013/01/10/d56d3bb6-4b91-11e2-a6a6-aabac85e8036_story.html ......................................................................... 15

DIANNE FEINSTEIN ET AL., U.S. SENATE, *Assault Weapons Ban of 2013* 4 (2013), *available at* http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=dd2252a0-db96-45cc-96a8-493a2e348c6d\ ....................................................................... 9

Erica Goode, *Even Defining 'Assault Rifles' is Complicated*, NY TIMES, Jan. 16, 2013, http://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html?_r=0 ...................................................................... 22

*FBI Crime in the United States, Table 20, Murder by State, Types of Weapon,* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl20.xls........................................................................... 18

EVERYTOWN FOR GUN SAFETY, ANALYSIS OF RECENT MASS SHOOTINGS 4 (July 17, 2014), *available at* http://3gbwir1ummda16xrhf4do9d21bsx.wpengine.netdna-cdn.com/wp-content/uploads/2014/07/analysis-of-recent-mass-shootings.pdf ... 13

INT'L ASS'N OF CHIEFS OF POLICE, *Legislative Agenda for the 113th Congress, January 2013-January 2015*, at 7 (2013) , *available at* http://www.theiacp.org/Portals/0/pdfs/IACP113thLegislativeAgendaFINAL.pdf10

Jake Matthews, *For Lives and liberty: Banning Assault Weapons in America*, HARVARD UNIVERSITY INSTITUTE OF POLITICS, www.iop.harvard.edu/lives-and-libery-banning-assault-weapons-america ........................................................... 12

Joanna Molloy, *Ex-NYPD top cop Bill Bratton pushing for overdue ban on assault-weapons ammo clips*, NY DAILY NEWS, May 19, 2011, http://www.nydailynews.com/news/crime/ex-nypd-top-bill-bratton-pushing-overdue-ban ...................................................................................................... 15

Lou Michel, *The return of the assault rifle; High-powered weapons seem to be regaining their deadly role in WNY crime and violence*, THE BUFFALO NEWS, Nov. 21, 2010, http://www.buffalonews.com/apps/pbcs.dll/article?AID=/20101121/CITYAND REGION/311219987. ......................................................................................... 11

Mark Follman and Gavin Aronsen. *"A Killing Machine:" Half of All Mass Shooters Used High-Capacity magazines*, MOTHER JONES, January 30, 2013, http://www.motherjones.com/politics/2013/01/high-capacity-magazines-mass-shootings .............................................................................................................. 17

Mark Follman, Gavin Aronsen, and Deanna Pan, *A Guide to Mass Shootings in America*, MOTHER JONES, http://www.motherjones.com/politics/2012/07/mass-shootings-map ..................................................................................................... 13

Matt Pearce, *Gun's magazine shaped the pace of Colorado theater massacre*, LA TIMES, July 22, 2010, http://articles.latimes.com/2012/jul/22/nation/la-na-nn-theater-shooting-magazine-20120722/2 ........................................................ 17, 18

New York State Senate Introducer's Memorandum in Support, http://www.nysenate.gov/files/pdfs/2nd%20Amendment%20Protection%20Act. pdf .................................................................................................................. 23

POLICE EXECUTIVE RESEARCH FORUM , GUNS AND CRIME: BREAKING NEW GROUND BY FOCUSING ON THE LOCAL IMPACT, May 2010, available at http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=40f529c9 -edf2-4492-a424-348412b283c2 ....................................................................... 11

*Police Fear a Future of Armored Enemies*, USA Today Mar. 3, 1997 ...................... 9

Trevor Hughes, *First responders praised for speed, caring in Colo. shooting.* USA TODAY, July 22, 2012, http://usatoday30.usatoday.com/news/nation/story/2012-07-22/aurora-police-praise-first-responders/56422078/1 ...................................... 18

VIOLENCE POLICY CTR., *"Officer Down:" Assault Weapons and the War on Law Enforcement.* (2003) ........................................................................................ 10

# **TABLE OF CONTENTS**

INTEREST OF AMICUS ..................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................ 2

ARGUMENT ....................................................................................................... 5

I.  The SAFE Act's Ban On Assault Weapons And Large-Capacity Magazines Does Not Warrant Heightened Scrutiny, But If It Does, Then No More Than Intermediate Scrutiny Should Be Applied ............................................................................................. 5

II.  Prohibiting Access To Assault Weapons And Large-Capacity Magazines Is Substantially Related To The Compelling Governmental Interest Of Protecting Police Officers And The General Public From Harm ........................................................................... 7

    1.  Assault Weapons Are Characterized By Military-Style Features And, Thus, Are Designed To Be Efficiently Lethal In Combat Against Other Persons ......................... 7

    2.  Assault Weapons Pose Special Dangers To Law Enforcement Personnel .................... 9

    3.  Assault Weapons Have Also Been Used In Mass Shootings In Numbers Disproportionately Large Compared To Their Proportion Of Total Firearms ........... 12

    4.  Large-Capacity Magazines Allow A Shooter To Target Victims Continuously Without Reloading ........................................................................................... 14

    5.  Large-Capacity Magazines Can Be Particularly Dangerous To Law Enforcement Personnel In The Context Of Mass Shootings .......................................... 17

III.  Arguments Set Forth In The Sheriffs' Association *Amicus* Brief Fail On Legal And Factual . 19 The arguments put forth by the Sheriffs' Association *amicus* brief in support of Plaintiffs-Appellants are unpersuasive for the following reasons. ................................................................ 19

    1.  The Evidence Considered By The New York State Legislature Adequately Supports The NY SAFE Act .............................................................................. 19

    2.  "Assault Weapons" Is A Not Political, Made-Up Term To Vilify Military-Style Firearms Which Are Used In Only A Small Percentage Of Gun Crimes ................. 22

    3.  The Sheriffs' Association *Amicus* Brief Relies On Stale Data To Argue Assault Weapons Are Used In Only A Small Percentage Of Gun Crimes ............................. 23

IV.  Conclusion ...................................................................................................... 26

# INTEREST OF AMICUS[1]

*Amicus curiae*, the Major Cities Chiefs Association ("MCCA" or "*Amicus*") is composed of police executives heading the sixty-six largest police departments in the United States, including Atlanta, Chicago, Dallas, Detroit, Los Angeles, New York, Philadelphia, Washington, D.C., and many others, which protect roughly 22% of America's population.[2]  This *amicus* brief will provide the Court with insight and perspective from a national organization that represents the interests of police officers and police chiefs on the important role that reasonable firearms restrictions, like those contained in the Secure Ammunition and Firearms Enforcement Act of 2013 (the "NY SAFE Act"), play in protecting the lives of law enforcement personnel while in the line of duty.

Members of the MCCA experience firsthand the dangers posed by the firearms and accessories at issue in this litigation.  Law enforcement personnel are often the front-line of defense against violent gun crimes.  Therefore, the MCCA have unique insight into the impact that laws, such as the NY SAFE Act, can have in safeguarding those whose job it is to protect the public.  The information and argument presented here will shed important light on the parties' claims as well as practical and potentially serious consequences resulting from a reversal the lower

---

[1]      *Amicus curiae* make the following disclosure pursuant to Fed. R. App. P. 29(c)(5): No party's counsel authored this brief in whole or in part.  Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person other than *amicus curiae*, its members, and its counsel contributed money that was intended to fund preparing or submitting this brief.

[2]      All parties appearing in this appeal have consented to the filing of this brief.

court's sensible decision to uphold the NY SAFE Act's ban on assault weapons and large-capacity magazines.

## SUMMARY OF ARGUMENT

The NY SAFE Act, which was upheld in substantial part by the lower court, does not impinge upon the fundamental right to keep and bear arms for the lawful purpose of self-defense, principally in the home. Accordingly, heightened scrutiny need not be applied here. However, even if this Court were to decide that some form of heightened scrutiny is warranted, intermediate scrutiny should be the applicable standard. The NY SAFE Act passes constitutional muster even under that standard because the means it employs are substantially and reasonably related to an important—indeed compelling—governmental interest: the protection of the law enforcement officers who risk their lives daily protecting the general public from gun violence.

Not only are the NY SAFE Act's prohibitions on assault weapons and large-capacity magazines constitutional, they are also sensible. Limiting access to assault weapons and large-capacity magazines has been shown to reduce the number of deaths resulting from homicides involving firearms. As our front-line defenders, law enforcement personnel are slain in crimes involving assault weapons and large-capacity magazines with unacceptable and astonishing frequency. The facts are clear: assault weapons and large-capacity magazines are

instruments of war and are designed to kill and maim human beings at close range. In light of the danger they pose to society—and particularly to police officers in the line of duty—prohibiting access to them is a common sense response to a pervasive menace amongst us.

Finally, this brief will address the arguments asserted by *amici curiae*, the New York State Sheriffs' Association, the Law Enforcement Legal Defense Fund, the Law Enforcement Action Network, and the International Law Enforcement Educators and Trainers Association. These *amici* claim that (i) the New York legislature failed properly to consider evidence when passing the NY SAFE Act, (ii) the term "assault weapon" is a product of gun control advocates and their partisan politics, and (iii) the New York legislature singled out a small portion of a larger, overarching problem while leaving other aspects of the issue unaddressed thus invalidating their piecemeal efforts. These claims are patently false and mischaracterize the scope of the legislature's appropriate exercise of its police powers.

First, the New York legislature did consider evidence on the record when it passed the NY SAFE Act. Moreover legislative records and academic studies cited in pleadings filed on court dockets across the nation make clear the widely known truth that assault weapons and large-capacity magazines impose significant public health risks to society. Second, the NY SAFE ACT defines the term 'assault

3

weapon' objectively, by reference to the specifically listed firearm features. Third, nothing in the jurisprudence of this Court or the Supreme Court requires a state legislature, when addressing a problem such as the safety of the general public and law enforcement personnel, to exercise its police power in an all-or-nothing fashion. That is, partial solutions to wide-ranging problems are acceptable and justified, especially given the difficulty of crafting a comprehensive solution to such an intractable problem as gun violence.

Accordingly, the lower court's decision upholding the assault weapons and large-capacity magazines ban contained in the NY SAFE Act should be AFFIRMED.[3]

---

[3] This brief is intended to support the affirmance of all those provisions of the NY SAFE Act that were found to be constitutional in the lower court. For the avoidance of doubt, this brief does not seek the affirmance of the lower court's finding that the 7-round load limit is unconstitutional and that the prohibitions contained in the NY SAFE Act against pistols that are semiautomatic versions of an automatic rifle, shotgun, or firearm and semiautomatic rifles with detachable magazines and a muzzle breaks are unconstitutionally vague.

## ARGUMENT

I.  **The SAFE Act's Ban On Assault Weapons And Large-Capacity Magazines Does Not Warrant Heightened Scrutiny, But If It Does, Then No More Than Intermediate Scrutiny Should Be Applied**

As set forth in the brief submitted by the State Defendants, *see* State Def. Br. at 23-34, the SAFE Act's ban on assault weapons and large-capacity magazines does not warrant heightened scrutiny because it does not intrude upon the core protections of the Second Amendment—the right of law-abiding citizens to possess firearms for the lawful purpose of self-defense, primarily in the home.  *See District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (holding that the right guaranteed by the Second Amendment "is not unlimited" and is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").  Nor is heightened scrutiny warranted here because the ban on assault weapons and large-capacity magazines does not substantially burden the Second Amendment rights of plaintiffs.  *See* State Def. Br. at 35-42; *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012), *cert. denied*, 133 S.Ct. 838 (2013) ("[H]eightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes).").

However, even if the ban on assault weapons and large-capacity magazines does substantially burden the core right to self-defense protected by the Second Amendment such that heightened scrutiny is appropriate, then no more than intermediate scrutiny need be applied and, as the District Court correctly found, the SAFE Act's prohibition on assault weapons and large-capacity magazines is at least substantially related to the government's compelling interest in protecting the health and safety of New York's law enforcement personnel and the public at large.  As this Court found in *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012), intermediate scrutiny is appropriate where, as here, the restriction at issue does not severely burden the "core" protection of self-defense in the home. As noted in the State Defendants' brief, *see* State Def. Br. at 79, the SAFE Act's prohibition on assault weapons and large-capacity magazines leaves New Yorkers with myriad other firearms from which to choose for their self-defense needs. Thus, it cannot be said that the prohibition substantially burdens the "right of law-abiding, responsible citizens to use arms in defense of hearth and home," as such, no more than intermediate scrutiny is appropriate. *Kachalsky*, 701 F.3d at 93 (quoting *Heller*, 554 U.S. at 634-35).

Even under intermediate scrutiny, the SAFE Act's ban on assault weapons and large-capacity magazines easily passes constitutional muster since it is substantially related to perhaps the most compelling of governmental interests—

insuring the safety of police officers and other law enforcement personnel who risk their lives every day protecting ordinary citizens from harm.

## II.     Prohibiting Access To Assault Weapons And Large-Capacity Magazines Is Substantially Related To The Compelling Governmental Interest Of Protecting Police Officers And The General Public From Harm

Assault weapons and large-capacity magazines are specifically designed to increase the lethal firepower available to a shooter.  In the context of law enforcement, this increased lethality poses special risks to police officers, warranting the prohibitions imposed by the NY SAFE Act.

### 1.     Assault Weapons Are Characterized By Military-Style Features And, Thus, Are Designed To Be Efficiently Lethal In Combat Against Other Persons

Assault weapons are instruments of war designed to kill as many people as possible, as efficiently as possible.[4]  According to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), "assault weapons were designed for rapid fire, close quarter shooting at human beings.  That is why they were put together the way they were . . . .  They are mass produced mayhem."[5]

The NY SAFE Act defines an assault weapon as a semiautomatic firearm that has an ability to accept a detachable magazine and has at least one military-style feature unnecessary for hunting and sporting purposes.  NY Penal Law §255

---

[4]     BRADY CTR, *On Target: The Impact of the 1994 Federal Assault Weapon Act*, 3 (2004) ("[Assault weapons] were specifically designed for military use in order to kill greater numbers of people more effectively.")

[5]     ATF, U.S. DEPT' OF THE TREASURY, ASSAULT WEAPONS PROFILE 19 (1994).

[22].  Lawmakers' adoption of a stricter one-feature test (as compared to the two-feature test embodied in New York's previous gun legislation) was "intended to bring a simplicity of definition focusing on the lethality of the weapon, amplified by the particular features."[6]  The features included in the one-feature test are designed for combat purposes.[7]   While other banned features, such as a grenade launcher, are equally as inapplicable for sporting or self-defense purposes, the following features are examples of military-style features banned by the NY SAFE Act:

- *pistol grips or thumbhole stocks.* Allows a shooter to spray-fire from the hip position, while a sport shooter aims from the shoulder for precision;[8]

- *barrel shrouds on an assault pistol.*  Protects a shooter's hands from burns caused by the heat generated by firing multiple rounds in rapid succession and stabilizing the barrel with a free hand;[9]

- *a threaded-barrel design capable of accepting other accessories*, such as a flash suppressor or silencer.  A flash suppressor allows a shooter to remain concealed when shooting at night and a silencer allows an assassin or sniper to avoid detection.[10]

The increased firepower of assault weapons' military-style features and large-capacity magazines heighten the risk of multiple gunshot wounds and severe penetrating trauma resulting in more critical injuries to targets and bystanders

---

[6]     Memorandum from the Governor's Program Bill 6 (2013).
[7]     ATF Assault Weapons Profile at 20.
[8]     Appellee's Statutory Addendum, *Heller v. District of Columbia*, No. 10-7036 (D.C. Cir. June 21, 2013), ECF No. 78-4.
[9]     Christopher S. Koper, Jerry Lee Ctr. of Criminology,  *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, 7 (2004) [*hereinafter, Updated Assessment*].
[10]    *Id.* at 8.

alike.[11]   Accordingly, assault weapons, as defined in the Act, have no legitimate

use in recreation, sport or hunting[12] and can wreak havoc if used for self-defense.[13]

Instead, according to Philadelphia Police Commissioner Charles Ramsey, president

of the MCCA, "[i]n the major cities of our nation, these weapons are tools of

violent crime and death."[14]

### 2.   Assault Weapons Pose Special Dangers To Law Enforcement Personnel

Law enforcement personnel occupy the front lines in the fight against gun

violence, confronting criminals armed with these tools of violent crime and death

every day.[15]   Assault weapons are overwhelmingly the firearms of choice for gang

members and drug dealers, and police regularly encounter assault weapons in drug

---

[11]   DIANNE FEINSTEIN ET AL., U.S. SENATE, *Assault Weapons Ban of 2013* 4 (2013)[*hereinafter Assault Weapons Ban of 2013*]   available at ADDIN BA \xc <@nper> \xl 107 \s UFRJFC000033 \xesp -1 \l "http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=dd2252a0-db96-45cc-96a8-493a2e348c6d\" http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=dd2252a0-db96-45cc-96a8-493a2e348c6d\. (citing Dr. James Madara, executive vice president and CEO, American Medical Association).

[12]   ATF Assault Weapons Profile at 20; *see also* ATF, *Report and Recommendations of the ATF Working Group on the Importability of Certain Semi-Automatic Rifles* (July 6, 1989)(survey of 935 hunting guides found sportsmen do not use assault weapons); DEPT' OF TREASURY, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 38 (1998)(ATF study confirming same).

[13]   *See Police Fear a Future of Armored Enemies*, USA Today Mar. 3, 1997. The combat-ready design of assault weapons make them dangerous for use in self-defense. According to the executive director of the Fraternal Order of Police, Jim Pasco,"[a]n AK-47 fires a military round. In a conventional home with dry-wall walls, I wouldn't be surprised if it went through six of them."). *Id.* The former Baltimore County Police Department Colonel agrees that "because of potential harm to others in the household, passersby, and bystanders, too much firepower is a hazard. Indeed, in most self-defense scenarios, the tendency is for defenders to keep firing until all bullets have been expended." *Id.*

[14]   *Assault Weapons Bans of 2013* at 4.

[15]   There is evidence of a criminal preference for purchasing assault weapons. *Updated Assessment* at 17-18. A 1998 study of young adult handgun buyers in California found buyers with minor criminal histories were more than twice as likely to purchase assault pistols as other buyers. Additionally, 6.6% of handgun buyers charged with a previous gun offense bought assault weapons and 10% of buyers with two or more serious violent offenses bought assault pistols. The same study found assault pistol purchasers were more likely to be arrested subsequent to their purchases than were other gun purchasers.

busts.[16]  Assault weapons make up a larger share of guns used in murders of police officers than they do in other gun crimes presumably because their greater firepower and combat-ready features are particularly well-suited to pitched gun battles with similarly armed law enforcement personnel.[17]  Police officers protect our communities from the most dangerous and violent elements in society; as a consequence they are exposed to the brutally violent brunt of these weapons which are designed for military use—tellingly, one in five law enforcement officers slain in the line of duty are killed with an assault weapon.[18]

According to a leading expert on the impact of assault weapons on crime, a ban on assault weapons should have an even bigger impact on the frequency of police officer gun murders than gun murders of civilians because police officers more frequently confront violent criminals wielding such weapons.[19]  The Violent Crime Control and Law Enforcement Act of 1994, commonly referred to as the federal assault weapons ban, had a real and substantial impact on the number of gun crimes involving assault weapons, suggesting that the NY SAFE Act's ban will similarly curb gun crimes using assault weapons to the tremendous benefit of New York's law enforcement personnel.

---

[16]   INT'L ASS'N OF CHIEFS OF POLICE, *Legislative Agenda for the 113th Congress, January 2013-January 2015*, at 7 (2013) , *available at* http://www.theiacp.org/Portals/0/pdfs/IACP113thLegislativeAgendaFINAL.pdf.

[17]   *Updated Assessment* at 87.

[18]   VIOLENCE POLICY CTR., *"Officer Down:" Assault Weapons and the War on Law Enforcement*, 5. (2003) (relying on annual data provided by the Federal Bureau of Investigation between January 1998 and January 2001).

[19]   *Updated Assessment* at 97.

Based on a study of six major cities during the period the federal assault weapons ban was in place, the proportion of gun crimes involving assault weapons decreased by at least 17% while police recoveries of assault weapons in those cities decreased by at least 28%.[20]  Local police agencies around the country reported similar experiences after the federal assault weapons ban expired in 2004; 37% of local police agencies reported noticeable increases in criminals' use of assault weapons following expiration of the ban.[21]

The experience of law enforcement agents in Buffalo, New York and the surrounding area of Erie County during and after the federal assault weapons ban is particularly revealing.  In the twenty-two month period prior to the expiration of the federal ban, forty banned assault weapons were confiscated by Buffalo police officers and only two assault weapons were confiscated in the rest of Erie County.[22]  In sharp contrast, police recovered eighty-four assault weapons in Buffalo and thirty-two assault weapons elsewhere in Erie County during the

---

[20]  The measurable and substantive impact of the federal assault weapons ban in curbing assault weapons crime is even more compelling when considered in light of the gun industry's response to the debate of the ban, as well as the exemptions and loopholes built into in the law.  Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004: Key Findings and Implications*, ch. 12, at 162 in REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE (2013) [*hereinafter, America's Experience*].  For example, the gun industry responded to Congress' debate of the ban with a surge in production of assault weapons.  *Id.*  Importantly, the federal assault weapons ban contained an exemption for all assault weapons manufactured before the effective date of the ban.  *Id.* at 160.  Estimates suggest that by the date the ban took effect there were more than 1.5 million privately owned assault weapons in the United States.  The "grandfathering" exemption meant all 1.5 million of those assault weapons could be legally owned and transferred.

[21]  POLICE EXECUTIVE RESEARCH FORUM , GUNS AND CRIME: BREAKING NEW GROUND BY FOCUSING ON THE LOCAL IMPACT, May 2010, available at http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=40f529c9-edf2-4492-a424-348412b283c2.

[22]  Lou Michel, *The return of the assault rifle; High-powered weapons seem to be regaining their deadly role in WNY crime and violence*, THE BUFFALO NEWS, Nov. 21, 2010, http://www.buffalonews.com/apps/pbcs.dll/article?AID=/20101121/CITYANDREGION/311219987.

twenty-two month period after the expiration of the federal ban.[23]  In other words,
there was a 176% increase in the number of assault weapons confiscated in Buffalo
and Erie County after the federal ban expired.[24]

A decade after the expiration of the federal assault weapons ban, too many
law enforcement agents are being murdered by guns, including assault weapons. In
2011, gunfire surpassed traffic fatalities as the leading cause of on-duty police
officer death.[25]  Troublingly, each of the previous three years demonstrated a
steady increase in the number of police officers killed by firearms.[26]  Just as the
federal assault weapons ban had a positive impact in decreasing the number of
crimes using assault weapons during its tenure, the NY SAFE Act's ban on assault
weapons is likely to have a real impact in decreasing the number of law
enforcement injuries and deaths caused by such weapons.

### 3.   Assault Weapons Have Also Been Used In Mass Shootings In Numbers Disproportionately Large Compared To Their Proportion Of Total Firearms

Assault weapons and large-capacity magazines have been employed in
highly publicized mass shootings for decades in the United States.[27]  In more than

---

[23]     *Id.*

[24]     *Id.*

[25]     Jake Matthews, *For Lives and Liberty: Banning Assault Weapons in America*, HARVARD UNIVERSITY INSTITUTE OF POLITICS, ADDIN BA \xc <@nper> \xl 68 \s UFRJFC000077 \xct \xeml \l "www.iop.harvard.edu/lives-and-liberty-banning-assault-weapons-america" www.iop.harvard.edu/lives-and-liberty-banning-assault-weapons-america.

[26]     *Id.* ("In 2009, 49 police officers died from gunfire, a 24% increase from 2008.  In 2010, 61 officers were shot and killed, a 37% increase from 2009.  And in 2011, 68 officers died from gunfire.")

[27]     *See Updated Assessment*, at 14-19.  For lists and descriptions of the mass shootings involving assault weapons and large-capacity magazines, see *id.* at 14.  Since 2007, there have been at least 15 incidents in

25% of mass shootings, defined by the FBI as an incident involving the death of four or more people, the gunmen used assault weapons; in another 48% of mass shooting incidents, the gunmen used other types of semi-automatic handguns, typically also equipped with large-capacity magazines.[28]

Between 2009 and 2013, mass shooting incidents involving assault weapons resulted in an average of 14.8 people shot, compared to 6.8 people injured in incidents not involving assault weapons.[29] Mass shootings carried out with assault weapons resulted in an average eight deaths, compared to incidents without assault weapons which resulted in an average of 5.1 deaths.[30] Another study of all 110 mass shooting incidents between January 2009 and January 2014 found that, when assault weapons and large-capacity magazines were involved, there was a 156% increase in the number of people shot and a 63% increase in the number of deaths compared to mass shooting incidents that did not involve assault weapons or large-capacity magazines.[31]

It is not surprising that the lethality of these weapons make assault weapons more attractive to a gunman intent on killing as many people as possible. While

---

which parties armed with assault weapons have killed or wounded eight or more people. *America's Experience* at 157-58.

[28] Mark Follman, Gavin Aronsen, and Deanna Pan, *A Guide to Mass Shootings in America*, MOTHER JONES, ADDIN BA \xc <@nper> \xl 62 \s UFRJFC000079 \xct \xeml \l "http://www.motherjones.com/politics/2012/07/mass-shootings-map" http://www.motherjones.com/politics/2012/07/mass-shootings-map (last updated May 24, 2014).

[29] MAYORS AGAINST ILLEGAL GUNS, ANALYSIS OF RECENT MASS SHOOTING 1 (2013).

[30] *Id.*

[31] EVERYTOWN FOR GUN SAFETY, ANALYSIS OF RECENT MASS SHOOTINGS 4 (July 17, 2014) *available at* ADDIN BA \xc <@nper> \xl 124 \s UFRJFC000049 \xels \l "http://3gbwir1ummda16xrhf4do9d21bsx.wpengine.netdna-cdn.com/wp-content/uploads/2014/07/analysis-of-recent-mass-shootings.pdf" http://3gbwir1ummda16xrhf4do9d21bsx.wpengine.netdna-cdn.com/wp-content/uploads/2014/07/analysis-of-recent-mass-shootings.pdf

civilians appropriately flee the indiscriminate and deadly firepower of a mass shooter armed with an assault weapon equipped with a large-capacity magazine, law enforcement agents must put themselves at great risk to stop mass shooters. Mass shooters often take their own lives before police arrive at the scene of the crime, which accounts for the relatively low number of police officer deaths in mass shootings.  However, upon police officers' arrival at the scene of a mass shooting, there is always a risk of a standoff with the shooter; the lower incidence of police officer deaths at crime scenes where the shooter does not take his or her life speaks more to the effective management of the crime scene, not the lack of a clear and present danger.  As the front-line defense against violent crime (and first responders to incidents of violence), police officers are equally as threatened by assault weapon wielding mass shooters as the general public.  Thus, prohibiting access to assault weapons and large-capacity magazines will result in greater safety for the police who have the unfortunate duty of stopping heavily armed gunmen intent upon inflicting senseless suffering on innocent victims.

### 4. Large-Capacity Magazines Allow A Shooter To Target Victims Continuously Without Reloading

Large-capacity magazines make it easier for shooters to injure and kill greater numbers of people, including law enforcement personnel, in a very short period of time.  Former Chief of the Los Angeles Police Department and current Police Commissioner of the City of New York William Bratton described large-

capacity magazines as "weapons of war," "designed to kill as many people as possible in the shortest period of time," which "simply do not belong in untrained civilian hands."[32]

Large-capacity magazines pose an excessive danger to society and law enforcement personnel in particular because they increase collateral damage and can lead to extended fire-fights. Large-capacity magazines allow a shooter to fire twenty, fifty, or even one hundred rounds before having to re-load. A recent study showed that large-capacity magazines play an outsized role in gun deaths of law enforcement personnel; while large-capacity magazines are used in an estimated 13% to 26% of all gun crimes, large-capacity magazines are used in 31% to 41% of gun murders of police officers.[33]

An investigation into the types of firearms recovered by police revealed that the federal assault weapons ban directly and substantially curbed criminals' access to large-capacity magazines.[34] Data from the Criminal Firearms Clearinghouse in Virginia has shown that the rate at which law enforcement recovered firearms with large-capacity magazines began to drop around 1998, four years after institution of

---

[32]     Joanna Molloy, *Ex-NYPD top cop Bill Bratton pushing for overdue ban on assault-weapons ammo clips*, NY DAILY NEWS, May 19, 2011, http://www.nydailynews.com/news/crime/ex-nypd-top-bill-bratton-pushing-overdue-ban.

[33]     *America's Experience*, at 162.

[34]     David S. Fallis. *Data indicate drop in high-capacity magazines during federal gun ban*, THE WASHINGTON POST, January 10, 2013, ADDIN BA \xc <@nper> \xl 172 \s UFRJFC000075 \xct \xeml \l "http://www.washingtonpost.com/investigations/data-point-to-drop-in-high-capacity-magazines-during-federal-gun-ban/2013/01/10/d56d3bb6-4b91-11e2-a6a6-aabac85e8036_story.html" http://www.washingtonpost.com/investigations/data-point-to-drop-in-high-capacity-magazines-during-federal-gun-ban/2013/01/10/d56d3bb6-4b91-11e2-a6a6-aabac85e8036_story.html.

the federal ban.  The rate of recovery continued to drop to a low of 9% in 2004, the year the federal ban expired.[35]  From 2005 to 2010, the rate of recovered firearms with large-capacity magazines increased steadily to 20% of all firearms recovered.[36]  Garen Wintemute, head of the Violence Prevention Research Program at the University of California at Davis School of Medicine, admitted that despite his skepticism about the federal assault weapons ban's efficacy, the collected data provided "about as clear an example as we could ask for of evidence that the ban was working."[37]  This clear evidence of the impact of the federal ban on large-capacity magazines is especially persuasive given the exemption for large-capacity magazines manufactured prior to the ban, which resulted in a huge stock pile of legal large-capacity magazines.[38]

Given the federal ban's measurable and substantial impact on reducing the number of large-capacity magazines in the hands of criminals and lowering the percentage of police officer deaths involving large-capacity magazines, the NY SAFE Act's prohibition of large-capacity magazines is likely to save the lives of

---

[35]     *Id.*
[36]     *Id*.
[37]     *Id*.
[38]     *See America's Experience* at 161.  ("Gun owners in America possessed an estimated 25 million guns that were equipped with LCMs or 10-round magazines in 1994, and gun industry sources estimated that, including aftermarket items for repairing and extending magazines, there were at least 25 million LCMs available in the United States as of 1995. Moreover, an additional 4.8 million pre-ban LCMs were imported into the country from 1994 through 2000 under the grandfathering exemption, with the largest number arriving in 1999. During this same period, importers were also authorized to import another 42 million pre-ban LCMs that may have arrived after 2000.")(internal citations omitted).

16

New York law enforcement personnel and therefore serves the important governmental purpose of protecting police officers.

### 5. Large-Capacity Magazines Can Be Particularly Dangerous To Law Enforcement Personnel In The Context Of Mass Shootings

Large-capacity magazines have been used in at least half of the mass shooting incidents since 2009, including six mass shootings in 2011 and 2012. Large-capacity magazines turn the perpetrators of these incidents into "killing machines."[39]   As first responders, law enforcement personnel must run towards these killing machines to neutralize the threat.   At Fort Hood, Texas, Maj. Nidal Mailk Hasan killed thirteen people and wounded dozens more using the largest-capacity handgun he could find and utilizing a thirty-round magazine.   Soldier witnesses testified that their colleagues could only attempt to rush Hasan while he was reloading, although he was ultimately stopped when he was shot by two armed policemen.[40]   In Tucson, Arizona, Jared Loughner emptied his thirty-three round magazine in just thirty seconds, killing six people and injuring thirteen more.

---

[39]    Mark Follman and Gavin Aronsen. *"A Killing Machine:" Half of All Mass Shooters Used High-Capacity magazines*, MOTHER JONES. January 30, 2013, ADDIN BA \xc <@nper> \xl 82 \s UFRJFC000078 \xct \xeml \l "http://www.motherjones.com/politics/2013/01/high-capacity-magazines-mass-shootings" http://www.motherjones.com/politics/2013/01/high-capacity-magazines-mass-shootings

[40]    Matt Pearce, *Gun's magazine shaped the pace of Colorado theater massacre*, LA TIMES, July 22, 2010, ADDIN BA \xc <@nper> \xl 92 \s UFRJFC000080 \xct \xeml \l "http://articles.latimes.com/2012/jul/22/nation/la-na-nn-theater-shooting-magazine-20120722/2"    http://articles.latimes.com/2012/jul/22/nation/la-na-nn-theater-shooting-magazine-20120722/2.

Loughner was only tackled by bystanders after he emptied his clip and attempted to reload.[41]

In Aurora, Colorado, James Holmes used forty and one hundred round magazines to kill twelve individuals and injure fifty-eight more.[42]  In that incident, police officers arrived on the scene within ninety seconds of emergency calls.[43] Even with this incredibly quick police response, a federal law enforcement official reported that Holmes' large-capacity magazine equipped AR-15 jammed, forcing him to switch to another weapon before he could fire again.[44]  Given the size of the magazines in Holmes' possession at the time of his rampage, it is easy to imagine that many more than twelve individuals, including numerous police officers, could have been gunned down if his magazine had not jammed.

While estimates of the likely impact of the NY SAFE Act's ban of large-capacity magazines are difficult to calculate, evidence suggests that a ban of large-capacity magazines on the federal level might produce as much as a 5% decrease in shootings overall.[45]  In addition to lives saved, estimates of the full societal cost (medical, criminal justice and other governmental and private costs) could be as high as $1 million per shooting.[46]  In 2010, 517 people were killed by firearms in

---

[41]    *Id.*
[42]    *Id.*
[43]    Trevor Hughes, *First responders praised for speed, caring in Colo. shooting.* USA TODAY, July 22, 2012, http://usatoday30.usatoday.com/news/nation/story/2012-07-22/aurora-police-praise-first-responders/56422078/1
[44]    Pearce, *supra* nt. 40.
[45]    *America's Experience* at 167.
[46]    *Id.*

New York State.[47]  Even a small reduction in the number of gun murders and non-fatal shootings in New York[48] would make a real difference in the number of lives saved, including the lives of those who serve and protect as law enforcement personnel, a compelling governmental interest.

## III.   Arguments Set Forth In The Sheriffs' Association *Amicus* Brief Fail On Legal And Factual

The arguments put forth by the Sheriffs' Association *amicus* brief in support of Plaintiffs-Appellants are unpersuasive for the following reasons.

### 1.   The Evidence Considered By The New York State Legislature Adequately Supports The NY SAFE Act

The *amici* Sheriffs' Association, et al., suggest in their *amicus* brief that the evidence considered by the New York legislature was inadequate to support the challenged prohibitions on assault weapons and large-capacity magazines.  *See* Sheriffs' Ass'n. Br. at 13.  It is simply incorrect to say that the legislature did not consider any evidence.  Ample evidence of the particular dangers posed by assault weapons and large-capacity magazines existed at the time the NY SAFE Act was enacted, was commonly known and, in fact, was referenced in the legislative history of the NY SAFE Act. *See, e.g.*, NY Senate Floor Debate Record at 122 (Jan. 14, 2013) (noting the terrible outcomes from massacres involving assault

---

[47]   *FBI Crime in the United States, Table 20, Murder by State, Types of Weapon,* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl20.xls.

[48]   *America's Experience* at 167. A reasonable estimate of a one percent reduction in shootings attributable to a ban on assault weapons and large -capacity magazines would save real lives, nationally this small reduction would equal as many as 650 lives saved annually.

weapons like the massacre at Newtown).  Similarly, the legislative record indicates concern for the rights of law-abiding gun owners and their legitimate right to bear arms for lawful purposes such as hunting and the important distinction between such legitimate uses and the unlawful and dangerous use of assault weapons and large-capacity magazines.  *See*, *e.g.*, NYS Assembly Floor Debate Record at 127 (January 15, 2013).

In any event, the Supreme Court has held that the restriction of certain rights subject to intermediate scrutiny need not be based on new, independent studies of the problem in question.  For instance, in *City of Renton v. Playtime Theatres*, *Inc.*, a time, place and manner restriction placed upon the rights of proprietors of adult film theaters by virtue of a zoning ordinance that prohibited the operation of such businesses in certain areas was not invalid just because it was not based on new studies or "evidence independent of that already generated by other cities." 475 U.S. 41, 52 (1986).  *City of Renton* may be reasonably read to stand for the proposition that legislatures do not act in a vacuum and the Constitution does not require a state legislature to undertake the rote exercise of commissioning new studies to support legislation that may encroach upon constitutionally protected rights where compelling evidence generated by other legislative bodies in the nation exists and is widely known.

As noted in Section II above, there is substantial evidence that assault weapons are designed to kill humans at close range and that police officers, as the front-line defense, are particularly vulnerable to the dangers they present.  Other governmental entities have relied upon data in choosing to regulate the possession and use of assault weapons and large-capacity magazines.  *See*, *e.g.*, *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011) ("*Heller II*") (surveying evidence relied upon by the committee that reviewed evidence ahead of establishing restrictions on assault weapons and large-capacity magazines in the District of Columbia).  In addition, the legislative history of the 1994 federal assault weapons ban shows significant legislative consideration of the evidence that supports prohibitions on access to assault weapons and large-capacity magazines.  *See*, *e.g.*, 140 Cong. Rec. H3063 (May 5, 1994) ("[B]etween 1990 and 1993, reports of assault weapons [used in crimes] increased 35 percent. . . from 5.9 percent to 8.1 percent. . . . Since studies show that assault weapons make up only 1 percent of the firearms in circulation, assault weapons are in proportion used more often to commit crimes").  Accordingly, where the common sense truth that these weapons of mass mayhem place police officers and the public in harm's way—a truth borne out by substantial evidence produced and relied upon by legislative bodies all over the nation—the provisions of the NY SAFE Act prohibiting access to guns with military-style features and large-capacity magazines cannot be said to

be based on no evidence.  Thus, as the State Defendants properly assert,  the "body of evidence before the [New York] Legislature [when it passed the NY SAFE Act] . . . included the legislative records of the 1994 federal statute and of New York's adopting the federal restrictions [in 2000]."  State Def. Br. at 19.  Accordingly, *Amicus curiae* respectfully submit that the assertion that the New York legislature failed adequately to consider relevant evidence is false.

### 2.     "Assault Weapons" Is A Not Political, Made-Up Term To Vilify Military-Style Firearms Which Are Used In Only A Small Percentage Of Gun Crimes

The Sheriffs' Association, *et al.*, also suggest that the term "assault weapons" is a political, made-up term to vilify military-style firearms which are used in only a small percentage of gun crimes.  *See*  Sheriffs' Ass'n Br. at 14.  This statement is manifestly incorrect, as the term was not made up by the so-called anti-gun lobby, but was invented by the gun manufacturing industry itself as a marketing effort to sell assault weapons to the general public.[49]  More importantly, however, the New York legislature did not rely on any blanket terminology.  On the contrary, the legislature has specifically identified features which make certain firearms inherently more dangerous and sought to ban guns with detachable

---

[49]     Erica Goode, *Even Defining 'Assault Rifles' is Complicated*, NY TIMES, Jan. 16, 2013, ADDIN BA \xc <@nper> \xl 91 \s UFRJFC000076 \xct \xeml \l "http://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html?_r=0"
http://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html?_r=0 ("The term was first adopted by the manufacturers, wholesalers, importers and dealers in the American firearms industry to stimulate sales of certain firearms that did not have an appearance that was familiar to many firearm owners. The manufacturers and gun writers of the day needed a catchy name to identify this new type of gun.") (internal quotations omitted).

magazines that contain one or more such features.[50]  Indeed, these specific features

were identified so as to make the law more administrable in an effort to address

clearly the effort by gun manufacturers to circumvent the two-feature test and

avoid the necessity of continually updating a list of prohibited assault weapons that

would accompany a method of regulation that prohibited firearms based upon

model-types.[51]

### 3. The Sheriffs' Association *Amicus* Brief Relies On Stale Data To Argue Assault Weapons Are Used In Only A Small Percentage Of Gun Crimes

Most of the data that the Sheriffs' Association, *et al*., rely upon to argue that

assault weapons are only used in a small percentage of gun crimes is dated. *See*,

*e.g.*, *id.* (citing to data from 1974-1992).  Relying on old data to make arguments

that are clearly erroneous in light of the recent surge in mass shootings and violent

crime using assault weapons and large-capacity magazines muddies the debate.

---

[50]    The Sheriffs' Association, *et al*., also argue that the NY SAFE Act's provisions are unconstitutionally vague on their face.  *See* Sheriffs' Ass'n Br. at 21-27.  These arguments fail for the following reasons.  First, the features enumerated in the NY SAFE Act are objective and descriptively specific.  Moreover they are the same features contained in the federal assault weapons ban and in the 2000 New York legislation which were not previously struck down for vagueness.  Thus, law enforcement agents have been familiar with and have used these features as indicia of assault weapons for decades.  Second, as the New York Sheriffs' Association acknowledges, the New York State Police has published a guide on enforcing the NY SAFE Act.  *Id.* at 25, n. 14.  This document compiles all the relevant information necessary for the enforcement of the NY SAFE Act in one easy-to-use guide so that law enforcement personnel do not have to scour the various laws that were amended pursuant to the NY SAFE Act in order to be well-equipped to enforce the same.  In addition, the website created to provide information about the NY SAFE Act provides annotated photographs to show clearly what to look for when determining whether a particular firearm is equipped with the prohibited features.  *See* Decl. of William J Taylor, Jr., *New York State Rifle and Pistol Ass'n, et al., v. Cuomo*, No. 13-000291 (Docket No. 74), Ex. 61-67 (June 21, 2013).  Accordingly, there is ample guidance available to police officers tasked with enforcing the NY SAFE Act and, accordingly, the statute is not unconstitutionally vague.

[51]    New    York    State    Senate    Introducer's    Memorandum    in    Support, http://www.nysenate.gov/files/pdfs/2nd%20Amendment%20Protection%20Act.pdf.

The facts are clear: as set forth above, recent data and experience show that assault weapons are designed to kill and maim humans, that they are used in that capacity with sufficient regularity to justify—indeed require—a legislative response, and that the New York legislature's response was justified in light of the commonly known and overwhelming evidence showing the deleterious effect these weapons have on the safety of law enforcement personnel and the general public.

Lastly, even if it were true that assault weapons and large-capacity magazines were used in a small portion of violent crimes against police officers and the general public (which it is not),[52] when combatting a serious, wide-ranging problem like gun violence, the government is entitled to attack a smaller segment of the problem without addressing the whole problem; the fact that the proposed legislative solution does not directly address the entire problem is not a basis for invalidating a partial solution to a broad and complicated problem. *See McLaughlin v. Florida*, 379 U.S. 184 (1964) ("Normally, the widest discretion is allowed the legislative judgment in determining whether to attack some, rather than all, of the manifestations of the evil aimed at; and normally that judgment is given the benefit of every conceivable circumstance which might suffice to characterize the classification as reasonable rather than arbitrary and invidious.");

---

[52]     As shown *supra* in Section II of this brief, convincing evidence proves that assault weapons and large-capacity magazines are used in a large proportion of violent crimes against police officers. *See supra* at 20-21 (noting that 1 in 5 police officers are killed by assault weapons and 31% to 41% of police officer deaths by firearms involved large-capacity magazines).

*Williamson v. Lee Optical of Okla.*, 348 U.S. 483 (1955) ("Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.  The legislature may select one phase of one field and apply a remedy there, neglecting others.") (citations omitted); *Ry. Express Agency v. People of New York*, 336 U.S. 106 (1949) ("And the fact that New York City sees fit to eliminate from traffic this kind of distraction but does not touch what may be even greater ones in a different category, such as the vivid displays on Times Square, is immaterial.  It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."); *U.S. v. Carolene Prods. Co.*, 304 U.S. 144 (1938) ("The Fifth Amendment has no equal protection clause, and even that of the Fourteenth, applicable only to the states, does not compel their Legislatures to prohibit all like evils, or none.  A Legislature may hit at an abuse which it has found, even though it has failed to strike at another.").

Thus, the suggestion that a small overall percentage of violent crimes involving assault weapons and large-capacity magazines means that the New York legislature was somehow outside the bounds of its police power to isolate and prohibit access to a specific type of firearm and firearm accessory is false and contrary to established principles of judicial review of legislative authority.

**IV.    Conclusion**

Through its enactment of the NY SAFE Act, the New York legislature acted within its authority to prohibit access to assault weapons and large-capacity magazines.  This action was based on substantial and convincing evidence that such prohibitions would promote public safety, and in particular have a tangible impact on providing protection to those who are charged with protecting the public: police officers.  The NY SAFE Act's prohibition of assault weapons and large-capacity magazines does not substantially burden any fundamental right, and therefore no level of heightened scrutiny should apply.  Even if this Court decides that some form of heightened scrutiny is warranted, intermediate scrutiny should be the applicable standard.  The most compelling of governmental interests—the protection of law enforcement personnel—is clearly and effectively served by the NY SAFE Act by means that are substantially and reasonably related to accomplishing the desired end.  As such, *Amicus* respectfully submits that the decision of the lower court upholding the assault weapons and large-capacity magazines ban contained in the NY SAFE Act should be affirmed.


Dated: August 5, 2014
        New York, New York

                                        WHITE & CASE LLP


                                        By:    /s/ Paul B. Carberry

Paul B. Carberry

1155 Avenue of the Americas
New York, New York 10036
Tel.: (212) 819-8200
Fax: (212) 354-8113

Counsel for *Amicus Curiae*
MAJOR CITIES CHIEFS
ASSOCIATION

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 25th day of August, 2014, this brief of *amicus curiae* was served, via electronic delivery to all parties' counsel via CM/ECF system which will forward copies to all Counsel of Record.

Dated: August 25, 2014
      New York, New York

                                              /s/ Mark Franke
                                              Mark P. Franke

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Fed. R. App. R. 28(e)(2)(a), as this brief contains fewer than 7,000 words.  Specifically, this brief contains 6,850 words, excluding the parts of the brief exempted from Fed. R. App. P. 32(a)(7)(B)(viii).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated: August 5, 2014
    New York, New York

_____ /s/ Mark Franke
Mark P. Franke
