# 14-0036(L)

14-37(XAP)

## United States Court of Appeals
## for the Second Circuit

NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC.,
WESTCHESTER COUNTY FIREARMS OWNERS ASSOCIATION, INC.,
SPORTSMEN'S ASSOCIATION FOR FIREARMS EDUCATION, INC.,
NEW YORK STATE AMATEUR TRAPSHOOTING ASSOCIATION, INC.,
BEDELL CUSTOM, BEIKIRCH AMMUNITION CORPORATION, BLUELINE
TACTICAL & POLICE SUPPLY, LLC, BATAVIA MARINE & SPORTING
SUPPLY, WILLIAM NOJAY, THOMAS GALVIN, ROGER HORVATH,

*Plaintiffs-Appellants-Cross-Appellees*,

*Caption continued inside front cover. . .*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICI CURIAE* SECOND AMENDMENT FOUNDATION,
LONG ISLAND FIREARMS, MATTHEW CARON, MATTHEW GUDGER,
JEFFREY MURRAY, MD, GARY WEHNER, JOHN AMIDON, AND
NUNZIO CALCE IN SUPPORT OF CROSS-APPELLEES**

David D. Jensen
DAVID JENSEN PLLC
111 John Street, Suite 420
New York, New York 10038
(212) 380-6615 tel
(917) 591-1318 fax
david@djensenpllc.com
*Attorney for Amici Curiae*

*v.*

ANDREW M. CUOMO, Governor of the State of New York,
ERIC T. SCHNEIDERMAN, Attorney General of the State of New York,
JOSEPH A. D'AMICO, Superintendent of the New York State Police

*Defendants-Appellees-Cross-Appellants*,

GERALD J. GILL, Chief of Police for the Town of Lancaster, New York,
LAWRENCE FRIEDMAN,

*Defendants-Appellees*,

FRANK A. SEDITA, III, District Attorney for Erie County,

*Defendants*.

_____

**CORPORATE DISCLOSURE STATEMENT**

The Second Amendment Foundation, Inc. has no parent corporation, and no publicly held corporation owns its stock.

Long Island Firearms, LLC has no parent corporation, and no publicly held corporation owns its stock (or any other interest in the company).

## TABLE OF CONTENTS

IDENTITY AND INTERESTS OF THE *AMICI* .......................................1

INTRODUCTION ........................................................................3

ARGUMENT ...............................................................................5

    I.    The Core of the Second Amendment is the Right of the Law-Abiding to Defend Themselves and Their Families with Firearms that are Modern and Practically Useful .........5

    II.    Magazine Capacity Limits Substantially Impair the Utility of Modern Handguns .........................................................8

    III.    Limitations on Magazine Capacity Substantially – and Disproportionately – Burden the Law-Abiding .......................10

    IV.    The Seven-Round Load Limit Does Not Reflect any Meaningful Legislative Determination and is Not Substantially Related to Preventing Gun Violence ...............14

    CONCLUSION ........................................................................20

## TABLE OF AUTHORITIES

CASES

Colo. Outfitters Ass'n v. Hickenlooper, no. 13-cv-1300,
   2014 U.S. Dist. LEXIS 87021 (D. Colo. Jun. 26, 2014) ................. 14

District of Columbia v. Heller, 554 U.S. 570 (2008) ............................. 5-8

Fyock v. Sunnyvale, no. C-13-5807-RMW,
   2014 U.S. Dist. LEXIS 87021 (N.D. Cal. Mar. 5, 2014) ................. 14

Heller v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011) ............. 13

Kachalsky v. Westchester, 701 F.3d 81 (2d Cir. 2012) .................... 14, 15

McDonald v. Chicago, 130 S. Ct. 3020 (2010) ...................................... 1, 5

Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012) ......................... 2, 14, 19

Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007), aff'd
   sub nom. District of Columbia v. Heller, 554 U.S. 570 (2008) ........ 7

Shew v. Malloy, 994 F. Supp. 2d 234 (D. Conn. 2014) ........................... 13

Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.,
   502 U.S. 105 (1991) ...................................................................... 17

United States v. Decastro, 682 F.3d 160 (2d Cir. 2012) ........................ 10

United States v. Miller, 307 U.S. 174 (1939) ........................................... 7

STATUTES

Cal. Penal Code § 16740 ........................................................................... 3

Cal. Penal Code § 32310 ........................................................................... 3

Colo. Rev. Stat. § 18-12-301 .................................................................... 3

Colo. Rev. Stat. § 18-12-302 .................................................................... 3

Conn. Gen. Stat. § 53-202w ...................................................................... 3

D.C. Code § 7-2507.02 (2008) .................................................................. 6

Haw. Rev. Stat. § 134-8 ............................................................................ 3

Mass. Gen. Laws ch. 140, § 121 .............................................................. 3

Mass. Gen. Laws ch. 140, § 131M ........................................................... 3

Md. Code Ann., Crim. Law § 4-305 ........................................................... 3

N.J. Stat. Ann. § 2C:39-1 ........................................................................... 3

N.J. Stat. Ann. § 2C:39-3 ........................................................................... 3

N.Y. Envtl. Conserv. Law § 11-0931 ..................................................... 18

N.Y. Penal Law § 265.00 ........................................................................... 3

N.Y. Penal Law § 265.02 ........................................................................... 3

N.Y. Penal Law § 265.20 ..................................................................... 3, 11

N.Y. Penal Law § 265.36 ........................................................................... 3

N.Y. Penal Law § 265.37 ................................................................ *passim*

Violent Crime Control and Law Enforcement Act of 1994,
    Pub. L. No. 103-322, 108 Stat. 1796 (1994) ...................................... 3

## OTHER AUTHORITIES

50 C.F.R. § 20.21 ..................................................................................... 18

Migratory Bird Permits; Regulations for Managing Resident Canada
    Goose Populations, 72 Fed. Reg. 46,403 (Aug. 20, 2007) ............... 19

Bailey Brower Jr., Savage Pistols (Don Gulbrandsen, ed. 2008) ............ 9

John Browning & Curt Gentry, John M. Browning:  American
    Gunmaker (9th prtg. 1989) ............................................................... 10

System Planning Corp., Mass Shootings at Virginia Tech:  Report
    of the Review Panel (Apr. 16, 2007) ................................................ 13

Anthony Vanderlinden, FN Browning Pistols:  Side-Arms that
    Shaped History (Adam Firestone, ed. 2009) ................................... 10

## IDENTITY AND INTERESTS OF THE *AMICI*[1]

*Amici* are the plaintiffs in an action pending in the Northern District of New York that challenges the constitutionality of New York Penal Law § 265.37, which prohibits individuals from loading more than seven rounds of ammunition into otherwise lawful eight-, nine-, and ten-round magazines (the "seven-round load limit").[2]  To conserve judicial resources, *Amici* agreed to stay this action, and the Governor and State Police pledged to refrain from enforcing this law, pending resolution of the present appeal.

*Amicus* Second Amendment Foundation is a non-profit member organization with over 650,000 members and supporters nationwide, including in the State of New York.  SAF promotes the constitutional right to own and use firearms through education, research, publishing, and legal action.  SAF has sponsored and been a party to several cases that recognize key aspects of the right to keep and bear arms, such as McDonald v. Chicago, 130 S. Ct. 3020 (2010), which held the Second Amendment's protections applicable against the States, and Moore v.

---

[1] Pursuant to Fed. R. App. P. 29(c)(5), *Amici* affirm that no party's counsel has authored this brief in whole or in part, nor has any party or its counsel provided any money to fund this brief.  No person other than the *Amici* and their members have contributed money towards the preparation of this brief.

[2] Caron v. Cuomo, no. 1:13-cv-1211 (N.D.N.Y. filed Sept. 27, 2013).

Madigan, 702 F.3d 933 (7th Cir. 2012), which overturned Illinois's ban on carrying handguns for self-protection.

*Amicus* Long Island Firearms is a New York limited liability company dedicated to protecting the right of self-defense for residents of New York State, and particularly those living on Long Island. LIF operates a firearms club and promotes responsible firearms ownership through education and workshops. LIF also seeks to provide a means for gun owners to contribute to the community and sponsors blood drives, coat collections for the needy, and other community services.

Finally, *Amici* Matthew Caron, Matthew Gudger, Jeffrey Murray, MD, Gary Wehner, John Amidon, and Nunzio Calce are all law-abiding New York citizens who choose to keep handguns for the protection of themselves and their families. The seven-round load limit significantly impairs their right of armed self-defense because it requires them to keep less ammunition than they otherwise would in their handguns.

All parties have consented to the filing of this *Amici* brief. *Amici* support affirmance of the cross-appeal, and on May 9, 2014 the Court granted *Amici* leave to file this brief seven days after Plaintiffs-Appellants-Cross-Appellees had filed their response and reply brief.

## INTRODUCTION

New York's Secure Ammunition and Firearms Enforcement (or "SAFE") Act establishes a limit on the number of rounds of ammunition that firearms magazines can hold:  ten.  N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.36.  Under this law, any ammunition magazine "that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds" is prohibited.  Id. § 265.00(23).  The State's asserted interest is in decreasing the severity of criminal shootings by forcing shooters to reload more frequently.

While several other States have limited ammunition magazines to a physical capacity of either ten or fifteen rounds,[3] and while federal law imposed a ten-round limit for a period of ten years,[4] the SAFE Act goes a bizarre step further:  it prohibits having an ammunition magazine that "*contains* more than *seven* rounds of ammunition," except while at a target range.  N.Y. Penal Law §§ 265.20(a)(7-f), 265.37 (emphasis added).  Thus, it is legal to buy, possess, and sell ammunition

---

[3] See Cal. Penal Code §§ 16740, 32310(a) (ten rounds); Colo. Rev. Stat. §§ 18-12-301(2)(a)(I), 18-12-302(1) (fifteen rounds); Conn. Gen. Stat. § 53-202w(a)(1), (b) (10 rounds); Haw. Rev. Stat. § 134-8(c) (ten rounds); Md. Code Ann., Crim. Law § 4-305(b) (ten rounds); Mass. Gen. Laws ch. 140, §§ 121, 131M (ten rounds); N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j) (fifteen rounds).
[4] See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110103(a)-(b), 108 Stat. 1796, 1998-99 (1994).

magazines holding ten rounds, but the public is directed to place no more than seven rounds in them.  This additional burden, which depends wholly on the voluntary decision to comply, burdens law-abiding citizens, but does not substantially advance any interest in preventing or mitigating the criminal misuse of guns.

This *Amici* Brief provides select, additional information that is particularly pertinent to the seven-round load limit.  Part I explains that the Second Amendment specifically secures the right of armed self-defense using modern and appropriate self-defense firearms – including modern handguns, in particular.  Part II shows that modern handguns have purposefully incorporated designs that allow for increased magazine capacity, and that the current prevalence of these designs shows the significant advantage that increased capacity provides. Finally, Part III explains why magazine capacity limitations substantially burden the people's right of armed self-defense, and Part IV details why the seven-round load limit does not have any substantial "fit" with the State's asserted legislative purposes.

# ARGUMENT

## I.    The Core of the Second Amendment is the Right of the Law-Abiding to Defend Themselves and Their Families with Firearms that are Modern and Practically Useful

While people own and use guns for a number of reasons – such as hunting, target shooting, and collecting – the Supreme Court's decisions in McDonald and District of Columbia v. Heller, 554 U.S. 570 (2008), repeatedly emphasize that "individual self-defense is 'the *central component*' of the Second Amendment right."  McDonald, 130 S. Ct. at 3036 (quoting Heller, 554 U.S. at 599) (emphasis in source); see also id. at 3026 (in Heller "we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense"); id. at 3044 (the "central holding in Heller" is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home"); Heller, 554 U.S. at 628 ("the inherent right of self-defense has been central to the Second Amendment right"); id. at 630 ("self-defense" is "the core lawful purpose").  In Heller, the Court expressly rejected the "assertion that individual self-defense is merely a subsidiary interest of the right to keep and bear arms" as "profoundly mistaken."  Heller, 554 U.S. at 599 (quotation omitted).

As such, the Second Amendment protects not just an abstract ability to possess firearms, but rather, a right to firearms that are suited to the core self-defense purpose.  Indeed, at least three of <u>Heller</u>'s subsidiary holdings show that the Second Amendment protects the right to keep firearms that are both modern and practically useful.

First, <u>Heller</u> overturned not just the District of Columbia's ban on handguns, but also its requirement that legally owned guns be kept "unloaded and dissembled or bound by a trigger lock or similar device." <u>Heller</u>, 554 U.S. at 575 (quoting D.C. Code § 7-2507.02 (2008)).  The Court succinctly ruled that this restriction "makes it impossible for citizens to use [guns] for the core lawful purpose of self-defense and is hence unconstitutional." <u>Id.</u> at 630.

Next, the Supreme Court specifically rejected the argument that it was permissible to prohibit modern firearms so long as historical firearms remained available – an outcome-determinative finding.  <u>See</u> <u>id.</u> at 582.  "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all

instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Id.

Finally, and perhaps most significantly, the Court grounded its rejection of the claim that handguns could be banned so long rifles and shotguns remained lawful in, specifically, the handgun's practical usefulness for self-defense in modern society. See id. at 629; see also id. at 708-10 (Breyer, J., dissenting). The Court of Appeals for the District of Columbia Circuit had also rejected the rifles-and-shotguns argument, but it had done so on the rationale that "modern handgun[s]" were "lineal descendant[s]" of pistols that had been in "common use" at the time of the Constitution. See Parker v. District of Columbia, 478 F.3d 370, 397-98 (D.C. Cir. 2007), aff'd sub nom. Heller, 554 U.S. 570. The Supreme Court, in contrast, looked to "common use" during the *present* time to establish the "limit[]" of the right's protection: "weapons not typically possessed by law-abiding citizens for lawful purposes," such as (specifically) the purpose of "self-defense." See Heller, 554 U.S. at 624-25 (citing and discussing United States v. Miller, 307 U.S. 174 (1939)); see also id. at 627. The Court thus grounded its rejection of the rifles-and-shotguns argument not in the historical prevalence of handguns,

-7-

but rather, in their *modern* status as "the quintessential self-defense weapon" and "the most popular weapon chosen by Americans for self-defense in the home." Id. at 629.

## II.  Magazine Capacity Limits Substantially Impair the Utility of Modern Handguns

Although the State tries to juxtapose images of "assault weapons" and mass shootings with its magazine capacity restrictions, the brunt of the impact of these restrictions is on handguns used for self-defense.[5]

At the present time, a strong majority (82%) of new handguns are semiautomatic, and about 61.5% of these semiautomatic handguns use magazines that hold more than ten rounds of ammunition.  JA143.  The National Shooting Sports Foundation ("NSSF") estimates that there are 158 million rifle and handgun magazines in circulation, and that 46% of these magazines hold more than then rounds.  See *Amicus Curiae* Brief of NSSF (Doc. No. 169) p. 10 & addendum p. 6.  These market preferences reflect an ongoing trend towards increased capacity for self-defense handguns.  JA 143-144.  These figures are the market's

---

[5] The State's expert Chris Koper agreed that magazines holding more than ten rounds "are frequently used with guns that fall outside of the definition of assault weapon" and that "the universe" of guns impacted by the restriction "is substantially larger than the universe of assault weapons alone."  JA285.

recognition that increased ammunition capacity provides a substantial self-defense advantage.

The trend toward increased capacity began about as soon as the first commercially successful semiautomatic handguns appeared at the turn of the Twentieth Century. In 1908 Savage Arms Co. of Utica, New York began selling the first semiautomatic handgun that used a "staggered" or "doublestack" magazine – one in which the rounds of ammunition were stacked at an offset, rather than in a straight line. This allowed the Savage to hold (first) ten and (later) eleven rounds of ammunition in its magazine, while Colt's comparably sized automatic held only eight. The design feature proved popular: using advertising that emphasized the gun's increased capacity over competitors, Savage sold over 270,000 of the guns. See generally Bailey Brower Jr., Savage Pistols 50, 112, 121, 201, 245 (Don Gulbrandsen, ed. 2008).

John Browning, the prodigious gun designer who developed (among other firearms) the Colt .45 automatic pistol, the Winchester 30-30 lever action rifle, and the first semiautomatic shotgun, also recognized the advantage that increased magazine capacity would provide in a self-defense handgun. At the time of his death in 1926, he

was developing the first staggered-magazine pistol that chambered a full powered round.  This gun, released in 1935 and holding 13 rounds of 9mm ammunition in its magazine, was a profound commercial success and "became the most prolific handgun in the world."  Anthony Vanderlinden, <u>FN Browning Pistols:  Side-Arms that Shaped History</u> 317 (Adam Firestone, ed. 2009); <u>see also</u> John Browning & Curt Gentry, <u>John M. Browning:  American Gunmaker</u> 302-03 (9th prtg. 1989).

The continued commercial success of the staggered magazine design and its prominence in the market today results from the basic fact that increases in ammunition capacity provide individuals with a substantial and material advantage in self-defense situations.

### III.  Limitations on Magazine Capacity Substantially – and Disproportionately – Burden the Law-Abiding

Limitations on magazine capacity are "a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense," and they accordingly require the application of heightened scrutiny review standards.  <u>See</u> <u>United States v. Decastro</u>, 682 F.3d 160, 164 (2d Cir. 2012).  This is because magazine capacity restrictions increase the chance that an individual's gun will become empty before he or she can stop an attacker (or attackers), forcing him or her to stop

-10-

and reload – if, that is, extra ammunition is available.  All things being equal, an individual forced to defend himself or herself with a gun is more likely to survive if he or she has more ammunition at the ready. Indeed, the statutory scheme itself recognizes this, as it exempts police officers (both active and retired), military personnel, and prison officials from magazine capacity limits – tacit recognition that greater magazine capacity provides a material and significant advantage if it becomes necessary to use arms to restore peace.  See N.Y. Penal Law § 265.20(a)(1)(a)-(e), (a)(2) & (e).

The State's claim (p. 77) that a seven-round limitation is *not* a substantial burden because it "does not prevent a person from reloading or from using a second firearm," cannot be squared with the State's proffered justification (pp. 65-66) for imposing magazine capacity limits in the first place:  "mass killers . . . will be forced to reload more often, creating an opening for law enforcement or bystanders to intervene and prevent further killing."  Proposals for limiting magazine capacity necessarily assume that such limits impose a significant burden, and indeed, the Judiciary Committee report for the federal law that previously prohibited the manufacture of magazines holding more than

ten rounds emphasized that revolvers – with a capacity of *six* rounds of ammunition – were "no match" for semiautomatics with substantially larger capacities.  JA727-28.  Put simply, if capacity limits do not substantially burden one's ability to use a gun in a confrontation, then there is no justification for imposing them.

Moreover, the State's description of the burden – as being the mere obligation to either reload or to resort to a second firearm – is only accurate if a person actually has an extra magazine or a second gun ready and available for immediate use.  A person who picks up a gun to investigate noises at night, but does not pick up a second gun or an extra ammunition magazine, does not have the burden of reloading – this person has the burden of being out of ammunition after expending his or her seven shots.  However, mass shooters, in contrast to law-abiding citizens going about their daily lives, almost invariably bring multiple extra magazines and/or weapons.  JA258-59; JA286-88 (detailing mass shootings).  For example, the killer in the Virginia Tech mass shooting brought 19 magazines, and it is notable that many of these magazines held only ten rounds.  <u>See</u> System Planning Corp., <u>Mass Shootings at Virginia Tech:  Report of the Review Panel</u> 92 (Apr.

16, 2007). Not insignificantly, the Virginia Tech Review Panel concluded that a ban on magazines holding more than ten rounds "would have not made much difference in the incident. Even pistols with rapid loaders could have been about as deadly in this situation." Id. at 74. Thus, the burden that falls on premeditated criminals – who may need to reload more frequently, but who are likely bring enough ammunition to accomplish their evil purposes – is considerably less than the burden on law-abiding citizens who are not expecting violence.

Indeed, given the apparent advantage that increased magazine capacity provides, it is little surprise that courts have generally agreed that magazines holding more than ten or fifteen rounds are in common use, and that limiting the physical capacity of magazines to these amounts burdens the right of self-defense in a manner that requires heightened scrutiny review principles. See Heller v. District of Columbia, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("There may well be some capacity above which magazines are not in common use but . . . that capacity surely is not ten."); Shew v. Malloy, 994 F. Supp. 2d 234, 246 (D. Conn. 2014) (ten rounds); Colo. Outfitters Ass'n v. Hickenlooper, no. 13-cv-1300, 2014 U.S. Dist. LEXIS 87021, *46-47 (D. Colo. Jun. 26,

2014) (fifteen rounds); <u>Fyock v. Sunnyvale</u>, no. C-13-5807-RMW, 2014
U.S. Dist. LEXIS 87021, *16 (N.D. Cal. Mar. 5, 2014) (ten rounds).  If
magazines were not entitled to protection, then "any jurisdiction could
effectively ban all weapons simply by forbidding magazines and
ammunition."  <u>Fyock</u>, 2014 U.S. Dist. LEXIS 87021 at *17.

**IV.  The Seven-Round Load Limit Does Not Reflect any
Meaningful Legislative Determination and is Not
Substantially Related to Preventing Gun Violence**

The seven-round load limit burdens the right of self-defense in all
places, even in the home, and it is accordingly unconstitutional unless it
is necessary and narrowly tailored to achieve a compelling government
interest.  <u>See</u> <u>Moore v. Madigan</u>, 702 F.3d 933, 939-40 (7th Cir. 2012) (a
"substantial a curtailment of the right of armed self-defense requires a
greater showing of justification" than does a restriction that applies
"merely in particular places" or to particular persons, where "the state
doesn't need to prove so strong a need"); <u>see also</u> <u>Kachalsky v.
Westchester</u>, 701 F.3d 81, 93 (2d Cir. 2012) ("applying less than strict
scrutiny when the regulation does not burden the 'core' protection of
self-defense in the home makes eminent sense").  At an absolute
minimum, the State must show that the burden of the seven-round load

limit is "substantially related to the achievement of an important governmental interest." Kachalsky, 701 F.3d at 96.

And while the degree of "fit" between a limit on the physical capacity of an ammunition magazine and the societal interest in reducing the severity of criminal firearms use is attenuated, a *further* limit on the number of rounds that can be placed in that magazine – otherwise lawful to possess, buy, and sell – does not further this interest at all.  Contrary to the State's argument (pp. 77-78), the interests that the State invokes to justify limiting the physical capacity of ammunition magazines do not "apply equally" to the seven-round load limit.

The essential rationale of the ten-round capacity limit is (per the State, pp. 65-66) that "mass shooters . . . will be forced to reload more often, creating an opening for law enforcement or bystanders to intervene and prevent further killing."  The State Police explain that "even if some individuals desire higher capacity magazine rounds, the danger they pose to the public and law enforcement in the hands of a criminal far outweighs any possible potential benefit from such greater round capacity."  JA278-79.  Thus, the rationale makes a physical

capacity limitation seem a trade-off – between an individual's interest in self-defense (including an individual who might intervene) and society's interest in limiting the effectiveness of a criminal's misuse of firearms.

And while the burden of this capacity trade-off falls more on the law-abiding than on the premeditated criminal (as explained *infra*), the seven-round load limit burdens the law-abiding almost exclusively. Anyone can freely purchase ten-round magazines in the State of New York, and the only thing that prevents them from loading them with more than their full ten-round capacity is their voluntary desire to comply with the law – a desire that criminals, particularly those committed to violence, by definition lack.  The seven-round load limit thus lacks any degree of "trade-off" – it imposes a substantial burden on the right of armed self-defense that all law-abiding citizens enjoy, but it imposes no practical burden on those who intend to criminally misuse firearms.

Of course, a burden imposed for its own sake is plainly unconstitutional.  The State cannot justify a burden on the right of armed self-defense by pointing to a desire to suppress that right any

more than it could justify restrictions on the right to vote with a desire
to make it more difficult to vote, or restrictions on the right of free
speech with a desire to limit the free expression of ideas.  See Simon &
Schuster, Inc. v. N.Y. State Crime Victims Bd., 502 U.S. 105, 118 (1991)
(no legitimate interest in suppressing speech).

The State's alternative claim (p. 78) that the legislature sought to
"mitigat[e] the risks posed to bystanders, even by lawful defensive gun
use" is utterly absent from the legislative record, and equally lacking in
legislative findings.  The Governor's Memorandum (for the original
enactment) reasoned that "some ammunition devices [are] so lethal that
we simply cannot afford to continue selling them in our state," JA668,
and it expressed the desire to be "the first in the nation . . . to ban any
magazine that holds more than seven rounds (rather than a limit of
ten)," JA663-64.  The Memorandum said nothing about limiting
bystander injuries that might result from lawful gun use.  And the only
legislative purpose that has ever been provided for the later decision to
allow the continued sale of ten-round magazines is that provided by the
New York State Police in litigation:  "Because few such [seven-round]
magazines are made by manufacturers, however, this provision was

permanently suspended and made not effective by a subsequent chapter amendment." JA277.

The analogy that the State (p. 78) and two members of the Assembly (JA1659) try to draw to the ammunition limit in the Environmental Conservation Law is wholly misplaced. This law is a hunting regulation that seeks to limit the effectiveness of hunting guns in order to prevent poaching. Of course, deer and ducks do not shoot back. Moreover, contrary to the State's claim that this restriction applies to "most semiautomatic firearms," the restriction actually exempts handguns that have barrel lengths less than eight inches – which essentially amounts to *all* semiautomatic handguns that are better suited to self-defense than hunting. See N.Y. Envtl. Conserv. Law § 11-0931(1)(c)(3). And notwithstanding the State's hopeful suggestion, there is nothing about this law that indicates a desire to limit injuries to bystanders. While there does not appear to be any caselaw that discusses this New York State restriction, the rationale for the federal government's comparable restriction (on loading more than three rounds while hunting waterfowl, see 50 C.F.R. § 20.21(b)) is the one that is apparent: preventing hunters from killing too many birds.

Indeed, when the Fish and Wildlife Service partially lifted this restriction for non-migrating Canada Geese, it did so "to increase the sport harvest of resident Canada geese" – without considering any interest in (supposedly) avoiding bystander injuries.  See Migratory Bird Permits; Regulations for Managing Resident Canada Goose Populations, 72 Fed. Reg. 46,403, 46,405 (Aug. 20, 2007).

Indeed, while the State's expert defended the State's ban on magazines with the physical capacity to hold more than ten rounds of ammunition at length, the most he could say to support the seven-round load limit was that it "has the *potential* for favorable reduction effects on shootings in New York."  JA305 (emphasis added).  However, a substantial "curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would."  Moore, 702 F.3d at 940 (emphasis in source).

Whatever the merit of a physical capacity limit might be, the purposes that would justify such a limit plainly do not extend to justify a further restriction below physical capacity – as the District Court recognized, and as the State has tacitly recognized by offering new,

creative rationales that rely on nothing but supposition and alleged "potential," but which were not before the legislature.

## CONCLUSION

Perhaps the best explanation that can be offered for the seven-round load limit is the one not stated: that the horrific crimes committed at Newtown, Connecticut shocked the country's collective conscious and motivated legislators to "do something" – perhaps anything – in response.

Whatever the motivation, the seven-round load limit substantially burdens the fundamental right of armed self-defense without materially advancing society's interest in mitigating the criminal misuse of firearms – and as such, it is an unconstitutional infringement of the people's Second Amendment rights, as the District Court found.

Dated:    October 6, 2014

David D. Jensen
DAVID JENSEN PLLC
111 John Street, Suite 420
New York, New York 10038
(212) 380-6615 tel
(917) 591-1318 fax
*david@djensenpllc.com*
Attorney for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) & 32(a)(7)(B) because it contains 3,980 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B).

2.  This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook type.

Dated:    October 6, 2014

 s/ David D. Jensen
David D. Jensen
Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

On October 6, 2014 I served the foregoing brief by electronically filing it with the Court's CM/ECF system, which generates a Notice of Filing and effects service upon counsel for all parties in the case.

I affirm the foregoing statement under penalty of perjury under the laws of the United States of America.

Dated:     October 6, 2014


 s/ David D. Jensen
David D. Jensen
Attorney for *Amici Curiae*