# Cooper & Kirk

Lawyers

A Professional Limited Liability Company

1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036

David H. Thompson
dthompson@cooperkirk.com

(202) 220-9600
Fax (202) 220-9601

July 13, 2015

**VIA ELECTRONIC FILING**

Catherine O'Hagan Wolfe, Clerk of Court
United States Court of Appeals
  for the Second Circuit
40 Foley Square
New York, NY 10007

Re:   *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, Nos. 14-36(L),
14-37(XAP).

Dear Ms. Wolfe:

I write to inform the Court of the United States Supreme Court's recent decision in *Johnson v. United States*, No. 13-7120, 2015 WL 2473450 (U.S. June 26, 2015). In *Johnson*, the Supreme Court struck down the residual clause of the Armed Career Criminal Act as void for vagueness despite recognizing that "there will be straightforward cases" in which proper application of the clause is clear. Slip Op. 10. In so ruling, the Supreme Court explained that "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Id.* at 11.

*Johnson* squarely rejects New York's argument that a plaintiff who alleges that a statute is facially void for vagueness "bears the exceedingly heavy burden of establishing that a statute is 'impermissibly vague in all of its applications.' " State Br. 69 (quoting *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982)); *see* Plaintiffs' Br. 53; Reply Br. 51–52. To the contrary, *Johnson* says that Supreme Court precedent "refute[s] any suggestion that the existence of *some* obvious[ ] … crimes establishes [a statute's] constitutionality," and expressly rejects a "requirement of vagueness in all applications" as a "tautology." Slip Op. 11.

 *Johnson* clarifies that the test for determining whether a statute is void for vagueness is straightforward: a statute is invalid under that doctrine if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Id.* at 3. If anything, that standard is more exacting here than it was in *Johnson* because the provisions of New York law at issue in this case are not only permeated with vagueness but also burden a fundamental constitutional right. In light of *Johnson*, this Court should strike down the provisions in question as void for vagueness.

Sincerely,

s/ David H. Thompson
David H. Thompson
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
*Attorney for Plaintiffs-Appellants-Cross-Appellees*

cc: Counsel of record (via ECF)

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JOHNSON *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 13–7120. Argued November 5, 2014—Reargued April 20, 2015— Decided June 26, 2015

After petitioner Johnson pleaded guilty to being a felon in possession of a firearm, see 18 U. S. C. §922(g), the Government sought an enhanced sentence under the Armed Career Criminal Act, which imposes an increased prison term upon a defendant with three prior convictions for a "violent felony," §924(e)(1), a term defined by §924(e)(2)(B)'s residual clause to include any felony that "involves conduct that presents a serious potential risk of physical injury to another." The Government argued that Johnson's prior conviction for unlawful possession of a short-barreled shotgun met this definition, making the third conviction of a violent felony. This Court had previously pronounced upon the meaning of the residual clause in *James* v. *United States*, 550 U. S. 192; *Begay* v. *United States*, 553 U. S. 137; *Chambers* v. *United States*, 555 U. S. 122; and *Sykes* v. *United States*, 564 U. S. 1, and had rejected suggestions by dissenting Justices in both *James* and *Sykes* that the clause is void for vagueness. Here, the District Court held that the residual clause does cover unlawful possession of a short-barreled shotgun, and imposed a 15-year sentence under ACCA. The Eighth Circuit affirmed.

*Held*: Imposing an increased sentence under ACCA's residual clause violates due process. Pp. 3–15.

(a) The Government violates the Due Process Clause when it takes away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Kolender* v. *Lawson*, 461 U. S. 352, 357–358. Courts must use the "categorical approach" when deciding whether an offense is a violent felony, looking "only to the fact that the defendant has been convicted

Syllabus

of crimes falling within certain categories, and not to the facts under-
lying the prior convictions." *Taylor* v. *United States*, 495 U. S. 575,
600. Deciding whether the residual clause covers a crime thus re-
quires a court to picture the kind of conduct that the crime involves
in "the ordinary case," and to judge whether that abstraction pre-
sents a serious potential risk of physical injury. *James, supra,* at
208. Pp. 3–5.

(b) Two features of the residual clause conspire to make it uncon-
stitutionally vague. By tying the judicial assessment of risk to a judi-
cially imagined "ordinary case" of a crime rather than to real-world
facts or statutory elements, the clause leaves grave uncertainty about
how to estimate the risk posed by a crime. See *James, supra,* at 211.
At the same time, the residual clause leaves uncertainty about how
much risk it takes for a crime to qualify as a violent felony. Taken
together, these uncertainties produce more unpredictability and arbi-
trariness than the Due Process Clause tolerates. This Court's re-
peated failure to craft a principled standard out of the residual clause
and the lower courts' persistent inability to apply the clause in a con-
sistent way confirm its hopeless indeterminacy. Pp. 5–10.

(c) This Court's cases squarely contradict the theory that the resid-
ual clause is constitutional merely because some underlying crimes
may clearly pose a serious potential risk of physical injury to another.
See, *e.g., United States* v. *L. Cohen Grocery Co.,* 255 U. S. 81, 89.
Holding the residual clause void for vagueness does not put other
criminal laws that use terms such as "substantial risk" in doubt, be-
cause those laws generally require gauging the riskiness of an indi-
vidual's conduct on a particular occasion, not the riskiness of an ide-
alized ordinary case of the crime. Pp. 10–13.

(d) The doctrine of *stare decisis* does not require continued adher-
ence to *James* and *Sykes.* Experience leaves no doubt about the una-
voidable uncertainty and arbitrariness of adjudication under the re-
sidual clause. *James* and *Sykes* opined about vagueness without full
briefing or argument. And continued adherence to those decisions
would undermine, rather than promote, the goals of evenhandedness,
predictability, and consistency served by *stare decisis.* Pp. 13–15.

526 Fed. Appx. 708, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J.,
and GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. KENNEDY,
J., and THOMAS, J., filed opinions concurring in the judgment. ALITO, J.,
filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 13–7120

———————

## SAMUEL JAMES JOHNSON, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE SCALIA delivered the opinion of the Court.

Under the Armed Career Criminal Act of 1984, a defendant convicted of being a felon in possession of a firearm faces more severe punishment if he has three or more previous convictions for a "violent felony," a term defined to include any felony that "involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B). We must decide whether this part of the definition of a violent felony survives the Constitution's prohibition of vague criminal laws.

I

Federal law forbids certain people—such as convicted felons, persons committed to mental institutions, and drug users—to ship, possess, and receive firearms. §922(g). In general, the law punishes violation of this ban by up to 10 years' imprisonment. §924(a)(2). But if the violator has three or more earlier convictions for a "serious drug offense" or a "violent felony," the Armed Career Criminal Act increases his prison term to a minimum of 15 years and a maximum of life. §924(e)(1); *Johnson* v. *United States*, 559 U. S. 133, 136 (2010). The Act defines "violent

felony" as follows:

> "any crime punishable by imprisonment for a term exceeding one year . . . that—
>
>     "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
>     "(ii) is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*." §924(e)(2)(B) (emphasis added).

The closing words of this definition, italicized above, have come to be known as the Act's residual clause. Since 2007, this Court has decided four cases attempting to discern its meaning. We have held that the residual clause (1) covers Florida's offense of attempted burglary, *James* v. *United States*, 550 U. S. 192 (2007); (2) does *not* cover New Mexico's offense of driving under the influence, *Begay* v. *United States*, 553 U. S. 137 (2008); (3) does *not* cover Illinois' offense of failure to report to a penal institution, *Chambers* v. *United States*, 555 U. S. 122 (2009); and (4) does cover Indiana's offense of vehicular flight from a law-enforcement officer, *Sykes* v. *United States*, 564 U. S. 1 (2011). In both *James* and *Sykes*, the Court rejected suggestions by dissenting Justices that the residual clause violates the Constitution's prohibition of vague criminal laws. Compare *James*, 550 U. S., at 210, n. 6, with *id.,* at 230 (SCALIA, J., dissenting); compare *Sykes*, 564 U. S., at ___ (slip op., at 13–14), with *id.,* at ___ (SCALIA, J., dissenting) (slip op., at 6–8).

This case involves the application of the residual clause to another crime, Minnesota's offense of unlawful possession of a short-barreled shotgun. Petitioner Samuel Johnson is a felon with a long criminal record. In 2010, the Federal Bureau of Investigation began to monitor him because of his involvement in a white-supremacist organi-

zation that the Bureau suspected was planning to commit acts of terrorism. During the investigation, Johnson disclosed to undercover agents that he had manufactured explosives and that he planned to attack "the Mexican consulate" in Minnesota, "progressive bookstores," and "'liberals.'" Revised Presentence Investigation in No. 0:12CR00104–001 (D. Minn.), p. 15, ¶16. Johnson showed the agents his AK–47 rifle, several semiautomatic firearms, and over 1,000 rounds of ammunition.

After his eventual arrest, Johnson pleaded guilty to being a felon in possession of a firearm in violation of §922(g). The Government requested an enhanced sentence under the Armed Career Criminal Act. It argued that three of Johnson's previous offenses—including unlawful possession of a short-barreled shotgun, see Minn. Stat. §609.67 (2006)—qualified as violent felonies. The District Court agreed and sentenced Johnson to a 15-year prison term under the Act. The Court of Appeals affirmed. 526 Fed. Appx. 708 (CA8 2013) (*per curiam*). We granted certiorari to decide whether Minnesota's offense of unlawful possession of a short-barreled shotgun ranks as a violent felony under the residual clause. 572 U. S. ___ (2014). We later asked the parties to present reargument addressing the compatibility of the residual clause with the Constitution's prohibition of vague criminal laws. 574 U. S. ___ (2015).

## II

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Kolender* v. *Lawson*, 461 U. S. 352, 357–358

(1983). The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." *Connally* v. *General Constr. Co.*, 269 U. S. 385, 391 (1926). These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences. *United States* v. *Batchelder*, 442 U. S. 114, 123 (1979).

In *Taylor* v. *United States*, 495 U. S. 575, 600 (1990), this Court held that the Armed Career Criminal Act requires courts to use a framework known as the categorical approach when deciding whether an offense "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." Under the categorical approach, a court assesses whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Begay*, *supra*, at 141.

Deciding whether the residual clause covers a crime thus requires a court to picture the kind of conduct that the crime involves in "the ordinary case," and to judge whether that abstraction presents a serious potential risk of physical injury. *James, supra,* at 208. The court's task goes beyond deciding whether creation of risk is an element of the crime. That is so because, unlike the part of the definition of a violent felony that asks whether the crime "has *as an element* the use . . . of physical force," the residual clause asks whether the crime "*involves conduct*" that presents too much risk of physical injury. What is more, the inclusion of burglary and extortion among the enumerated offenses preceding the residual clause confirms that the court's task also goes beyond evaluating the chances that the physical acts that make up the crime will

injure someone. The act of making an extortionate demand or breaking and entering into someone's home does not, in and of itself, normally cause physical injury. Rather, risk of injury arises because the extortionist might engage in violence *after* making his demand or because the burglar might confront a resident in the home *after* breaking and entering.

We are convinced that the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges. Increasing a defendant's sentence under the clause denies due process of law.

### A

Two features of the residual clause conspire to make it unconstitutionally vague. In the first place, the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime. It ties the judicial assessment of risk to a judicially imagined "ordinary case" of a crime, not to real-world facts or statutory elements. How does one go about deciding what kind of conduct the "ordinary case" of a crime involves? "A statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut instinct?" *United States* v. *Mayer*, 560 F. 3d 948, 952 (CA9 2009) (Kozinski, C. J., dissenting from denial of rehearing en banc). To take an example, does the ordinary instance of witness tampering involve offering a witness a bribe? Or threatening a witness with violence? Critically, picturing the criminal's behavior is not enough; as we have already discussed, assessing "potential risk" seemingly requires the judge to imagine how the idealized ordinary case of the crime subsequently plays out. *James* illustrates how speculative (and how detached from statutory elements) this enterprise can become. Explaining why attempted burglary poses a serious potential risk of physical injury, the Court said: "An armed would-be burglar

may be spotted by a police officer, a private security guard, or a participant in a neighborhood watch program. Or a homeowner . . . may give chase, and a violent encounter may ensue." 550 U. S., at 211. The dissent, by contrast, asserted that any confrontation that occurs during an attempted burglary "is likely to consist of nothing more than the occupant's yelling 'Who's there?' from his window, and the burglar's running away." *Id.*, at 226 (opinion of SCALIA, J.). The residual clause offers no reliable way to choose between these competing accounts of what "ordinary" attempted burglary involves.

At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. It is one thing to apply an imprecise "serious potential risk" standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction. By asking whether the crime "*otherwise* involves conduct that presents a serious potential risk," moreover, the residual clause forces courts to interpret "serious potential risk" in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives. These offenses are "far from clear in respect to the degree of risk each poses." *Begay*, 553 U. S., at 143. Does the ordinary burglar invade an occupied home by night or an unoccupied home by day? Does the typical extortionist threaten his victim in person with the use of force, or does he threaten his victim by mail with the revelation of embarrassing personal information? By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates.

This Court has acknowledged that the failure of "persistent efforts . . . to establish a standard" can provide evidence of vagueness. *United States* v. *L. Cohen Grocery*

*Co.,* 255 U. S. 81, 91 (1921). Here, this Court's repeated attempts and repeated failures to craft a principled and objective standard out of the residual clause confirm its hopeless indeterminacy. Three of the Court's previous four decisions about the clause concentrated on the level of risk posed by the crime in question, though in each case we found it necessary to resort to a different ad hoc test to guide our inquiry. In *James*, we asked whether "the risk posed by attempted burglary is comparable to that posed by its closest analog among the enumerated offenses," namely completed burglary; we concluded that it was. 550 U. S., at 203. That rule takes care of attempted burglary, but offers no help at all with respect to the vast majority of offenses, which have no apparent analog among the enumerated crimes. "Is, for example, driving under the influence of alcohol more analogous to burglary, arson, extortion, or a crime involving use of explosives?" *Id.,* at 215 (SCALIA, J., dissenting).

*Chambers,* our next case to focus on risk, relied principally on a statistical report prepared by the Sentencing Commission to conclude that an offender who fails to report to prison is not "significantly more likely than others to attack, or physically to resist, an apprehender, thereby producing a 'serious potential risk of physical injury.'" 555 U. S., at 128–129. So much for failure to report to prison, but what about the tens of thousands of federal and state crimes for which no comparable reports exist? And even those studies that are available might suffer from methodological flaws, be skewed toward rarer forms of the crime, or paint widely divergent pictures of the riskiness of the conduct that the crime involves. See *Sykes*, 564 U. S., at ___–___ (SCALIA, J., dissenting) (slip op., at 4–6); *id.,* at ___, n. 4 (KAGAN, J., dissenting) (slip op., at 6, n. 4).

Our most recent case, *Sykes*, also relied on statistics, though only to "confirm the commonsense conclusion that

Indiana's vehicular flight crime is a violent felony." *Id.*, at ___ (majority opinion) (slip op., at 8). But common sense is a much less useful criterion than it sounds—as *Sykes* itself illustrates. The Indiana statute involved in that case covered everything from provoking a high-speed car chase to merely failing to stop immediately after seeing a police officer's signal. See *id.,* at ___ (KAGAN, J., dissenting) (slip op., at 3–4). How does common sense help a federal court discern where the "ordinary case" of vehicular flight in Indiana lies along this spectrum? Common sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes; there is no reason to expect it to fare any better with respect to thousands of unenumerated crimes. All in all, *James*, *Chambers*, and *Sykes* failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition.

The remaining case, *Begay*, which preceded *Chambers* and *Sykes*, took an entirely different approach. The Court held that in order to qualify as a violent felony under the residual clause, a crime must resemble the enumerated offenses "in kind as well as in degree of risk posed." 553 U. S., at 143. The Court deemed drunk driving insufficiently similar to the listed crimes, because it typically does not involve "purposeful, violent, and aggressive conduct." *Id.,* at 144–145 (internal quotation marks omitted). Alas, *Begay* did not succeed in bringing clarity to the meaning of the residual clause. It did not (and could not) eliminate the need to imagine the kind of conduct typically involved in a crime. In addition, the enumerated crimes are not much more similar to one another in kind than in degree of risk posed, and the concept of "aggressive conduct" is far from clear. *Sykes* criticized the "purposeful, violent, and aggressive" test as an "addition to the statutory text," explained that "levels of risk" would normally be

dispositive, and confined *Begay* to "strict liability, negligence, and recklessness crimes." 564 U. S., at \_\_\_–\_\_\_ (slip op., at 10–11).

The present case, our fifth about the meaning of the residual clause, opens a new front of uncertainty. When deciding whether unlawful possession of a short-barreled shotgun is a violent felony, do we confine our attention to the risk that the shotgun will go off by accident while in someone's possession? Or do we also consider the possibility that the person possessing the shotgun will later use it to commit a crime? The inclusion of burglary and extortion among the enumerated offenses suggests that a crime may qualify under the residual clause even if the physical injury is remote from the criminal act. But how remote is too remote? Once again, the residual clause yields no answers.

This Court is not the only one that has had trouble making sense of the residual clause. The clause has "created numerous splits among the lower federal courts," where it has proved "nearly impossible to apply consistently." *Chambers*, 555 U. S., at 133 (ALITO, J., concurring in judgment). The most telling feature of the lower courts' decisions is not division about whether the residual clause covers this or that crime (even clear laws produce close cases); it is, rather, pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider. Some judges have concluded that deciding whether conspiracy is a violent felony requires evaluating only the dangers posed by the "simple act of agreeing [to commit a crime]," *United States* v. *Whitson*, 597 F. 3d 1218, 1222 (CA11 2010) (*per curiam*); others have also considered the probability that the agreement will be carried out, *United States* v. *White*, 571 F. 3d 365, 370–371 (CA4 2009). Some judges have assumed that the battery of a police officer (defined to include the slightest touching) could "explode into violence

and result in physical injury," *United States* v. *Williams*, 559 F. 3d 1143, 1149 (CA10 2009); others have felt that it "do[es] a great disservice to law enforcement officers" to assume that they would "explod[e] into violence" rather than "rely on their training and experience to determine the best method of responding," *United States* v. *Carthorne*, 726 F. 3d 503, 514 (CA4 2013). Some judges considering whether statutory rape qualifies as a violent felony have concentrated on cases involving a perpetrator much older than the victim, *United States* v. *Daye*, 571 F. 3d 225, 230–231 (CA2 2009); others have tried to account for the possibility that "the perpetrator and the victim [might be] close in age," *United States* v. *McDonald*, 592 F. 3d 808, 815 (CA7 2010). Disagreements like these go well beyond disputes over matters of degree.

It has been said that the life of the law is experience. Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise. Each of the uncertainties in the residual clause may be tolerable in isolation, but "their sum makes a task for us which at best could be only guesswork." *United States* v. *Evans*, 333 U. S. 483, 495 (1948). Invoking so shapeless a provision to condemn someone to prison for 15 years to life does not comport with the Constitution's guarantee of due process.

## B

The Government and the dissent claim that there will be straightforward cases under the residual clause, because some crimes clearly pose a serious potential risk of physical injury to another. See *post,* at 14–15 (opinion of ALITO, J.). True enough, though we think many of the cases the Government and the dissent deem easy turn out not to be so easy after all. Consider just one of the Government's examples, Connecticut's offense of "rioting at a correctional institution." See *United States* v. *Johnson*,

616 F. 3d 85 (CA2 2010). That certainly sounds like a violent felony—until one realizes that Connecticut defines this offense to include taking part in "any disorder, disturbance, strike, riot or other organized disobedience to the rules and regulations" of the prison. Conn. Gen. Stat. §53a–179b(a) (2012). Who is to say which the ordinary "disorder" most closely resembles—a full-fledged prison riot, a food-fight in the prison cafeteria, or a "passive and nonviolent [act] such as disregarding an order to move," *Johnson*, 616 F. 3d, at 95 (Parker, J., dissenting)?

In all events, although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. *L. Cohen Grocery Co.*, 255 U. S., at 89. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by"—even though spitting in someone's face would surely be annoying. *Coates* v. *Cincinnati*, 402 U. S. 611 (1971). These decisions refute any suggestion that the existence of *some* obviously risky crimes establishes the residual clause's constitutionality.

Resisting the force of these decisions, the dissent insists that "a statute is void for vagueness only if it is vague in all its applications." *Post,* at 1. It claims that the prohibition of unjust or unreasonable rates in *L. Cohen Grocery* was "vague in all applications," even though one can easily envision rates so high that they are unreasonable by any measure. *Post,* at 16. It seems to us that the dissent's supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a

statute to be vague, it is vague in all its applications (and never mind the reality). If the existence of some clearly unreasonable rates would not save the law in *L. Cohen Grocery*, why should the existence of some clearly risky crimes save the residual clause?

The Government and the dissent next point out that dozens of federal and state criminal laws use terms like "substantial risk," "grave risk," and "unreasonable risk," suggesting that to hold the residual clause unconstitutional is to place these provisions in constitutional doubt. See *post,* at 7–8. Not at all. Almost none of the cited laws links a phrase such as "substantial risk" to a confusing list of examples. "The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue,* or colors that otherwise involve shades of red' assuredly does so." *James*, 550 U. S., at 230, n. 7 (SCALIA, J., dissenting). More importantly, almost all of the cited laws require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion*. As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct; "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree," *Nash* v. *United States*, 229 U. S. 373, 377 (1913). The residual clause, however, requires application of the "serious potential risk" standard to an idealized ordinary case of the crime. Because "the elements necessary to determine the imaginary ideal are uncertain both in nature and degree of effect," this abstract inquiry offers significantly less predictability than one "[t]hat deals with the actual, not with an imaginary condition other than the facts." *International Harvester Co. of America* v. *Kentucky*, 234 U. S. 216, 223 (1914).

Finally, the dissent urges us to save the residual clause

from vagueness by interpreting it to refer to the risk posed by the particular conduct in which the defendant engaged, not the risk posed by the ordinary case of the defendant's crime. See *post,* at 9–13. In other words, the dissent suggests that we jettison for the residual clause (though not for the enumerated crimes) the categorical approach adopted in *Taylor*, see 495 U. S., at 599–602, and reaffirmed in each of our four residual-clause cases, see *James*, 550 U. S., at 202; *Begay*, 553 U. S., at 141; *Chambers*, 555 U. S., at 125; *Sykes*, 564 U. S., ___ (slip op., at 5). We decline the dissent's invitation. In the first place, the Government has not asked us to abandon the categorical approach in residual-clause cases. In addition, *Taylor* had good reasons to adopt the categorical approach, reasons that apply no less to the residual clause than to the enumerated crimes. *Taylor* explained that the relevant part of the Armed Career Criminal Act "refers to 'a person who . . . has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." 495 U. S., at 600. This emphasis on convictions indicates that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Ibid. Taylor* also pointed out the utter impracticability of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that conviction. For example, if the original conviction rested on a guilty plea, no record of the underlying facts may be available. "[T]he only plausible interpretation" of the law, therefore, requires use of the categorical approach. *Id.,* at 602.

## C

That brings us to *stare decisis*. This is the first case in which the Court has received briefing and heard argument from the parties about whether the residual clause is void

for vagueness. In *James*, however, the Court stated in a footnote that it was "not persuaded by [the principal dissent's] suggestion . . . that the residual provision is unconstitutionally vague." 550 U. S., at 210, n. 6. In *Sykes*, the Court again rejected a dissenting opinion's claim of vagueness. 564 U. S., at ___–___ (slip op., at 13–14).

The doctrine of *stare decisis* allows us to revisit an earlier decision where experience with its application reveals that it is unworkable. *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). Experience is all the more instructive when the decision in question rejected a claim of unconstitutional vagueness. Unlike other judicial mistakes that need correction, the error of having rejected a vagueness challenge manifests itself precisely in subsequent judicial decisions: the inability of later opinions to impart the predictability that the earlier opinion forecast. Here, the experience of the federal courts leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause. Even after *Sykes* tried to clarify the residual clause's meaning, the provision remains a "judicial morass that defies systemic solution," "a black hole of confusion and uncertainty" that frustrates any effort to impart "some sense of order and direction." *United States* v. *Vann*, 660 F. 3d 771, 787 (CA4 2011) (Agee, J., concurring).

This Court's cases make plain that even decisions rendered after full adversarial presentation may have to yield to the lessons of subsequent experience. See, *e.g., United States* v. *Dixon*, 509 U. S. 688, 711 (1993); *Payne*, 501 U. S., at 828–830 (1991). But *James* and *Sykes* opined about vagueness without full briefing or argument on that issue—a circumstance that leaves us "less constrained to follow precedent," *Hohn* v. *United States*, 524 U. S. 236, 251 (1998). The brief discussions of vagueness in *James* and *Sykes* homed in on the imprecision of the phrase "serious potential risk"; neither opinion evaluated the

uncertainty introduced by the need to evaluate the riskiness of an abstract ordinary case of a crime. 550 U. S., at 210, n. 6; 564 U. S., at ___ (slip op., at 13–14). And departing from those decisions does not raise any concerns about upsetting private reliance interests.

Although it is a vital rule of judicial self-government, *stare decisis* does not matter for its own sake. It matters because it "promotes the evenhanded, predictable, and consistent development of legal principles." *Payne, supra,* at 827. Decisions under the residual clause have proved to be anything but evenhanded, predictable, or consistent. Standing by *James* and *Sykes* would undermine, rather than promote, the goals that *stare decisis* is meant to serve.

\*    \*    \*

We hold that imposing an increased sentence under the residual clause of the Armed Career Criminal Act violates the Constitution's guarantee of due process. Our contrary holdings in *James* and *Sykes* are overruled. Today's decision does not call into question application of the Act to the four enumerated offenses, or the remainder of the Act's definition of a violent felony.

We reverse the judgment of the Court of Appeals for the Eighth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

‾‾‾‾‾‾‾‾‾‾‾‾‾

No. 13–7120

‾‾‾‾‾‾‾‾‾‾‾‾‾

## SAMUEL JAMES JOHNSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE KENNEDY, concurring in the judgment.

In my view, and for the reasons well stated by JUSTICE ALITO in dissent, the residual clause of the Armed Career Criminal Act is not unconstitutionally vague under the categorical approach or a record-based approach. On the assumption that the categorical approach ought to still control, and for the reasons given by JUSTICE THOMAS in Part I of his opinion concurring in the judgment, Johnson's conviction for possession of a short-barreled shotgun does not qualify as a violent felony.

For these reasons, I concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–7120

_____

## SAMUEL JAMES JOHNSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court that Johnson's sentence cannot stand. But rather than use the Fifth Amendment's Due Process Clause to nullify an Act of Congress, I would resolve this case on more ordinary grounds. Under conventional principles of interpretation and our precedents, the offense of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under the residual clause of the Armed Career Criminal Act (ACCA).

The majority wants more. Not content to engage in the usual business of interpreting statutes, it holds this clause to be unconstitutionally vague, notwithstanding the fact that on four previous occasions we found it determinate enough for judicial application. As JUSTICE ALITO explains, that decision cannot be reconciled with our precedents concerning the vagueness doctrine. See *post,* at 13–17 (dissenting opinion). But even if it were a closer case under those decisions, I would be wary of holding the residual clause to be unconstitutionally vague. Although I have joined the Court in applying our modern vagueness doctrine in the past, see *FCC* v. *Fox Television Stations, Inc.,* 567 U. S. ___, ___–___ (2012) (slip op., at 16–17), I have become increasingly concerned about its origins and application. Simply put, our vagueness doctrine shares an uncomfortably similar history with substantive due pro-

cess, a judicially created doctrine lacking any basis in the Constitution.

## I

We could have easily disposed of this case without nullifying ACCA's residual clause. Under ordinary principles of statutory interpretation, the crime of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under ACCA. In relevant part, that Act defines a "violent felony" as a "crime punishable by imprisonment for a term exceeding one year" that either

> "(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> "(ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B).

The offense of unlawfully possessing a short-barreled shotgun neither satisfies the first clause of this definition nor falls within the enumerated offenses in the second. It therefore can constitute a violent felony only if it falls within ACCA's so-called "residual clause"—*i.e.*, if it "involves conduct that presents a serious potential risk of physical injury to another." §924(e)(2)(B)(ii).

To determine whether an offense falls within the residual clause, we consider "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James* v. *United States*, 550 U. S. 192, 208 (2007). The specific crimes listed in §924(e)(2)(B)(ii)—arson, extortion, burglary, and an offense involving the use of explosives—offer a "baseline against which to measure the degree of risk" a crime must present to fall within that clause. *Id.,* at 208. Those offenses do not provide a high threshold, see *id.*, at

203, 207–208, but the crime in question must still present a "'serious'"—a "'significant' or 'important'"—risk of physical injury to be deemed a violent felony, *Begay* v. *United States*, 553 U. S. 137, 156 (2008) (Alito, J., dissenting); accord, *Chambers* v. *United States*, 555 U. S. 122, 128 (2009).

To qualify as serious, the risk of injury generally must be closely related to the offense itself. Our precedents provide useful examples of the close relationship that must exist between the conduct of the offense and the risk presented. In *Sykes* v. *United States*, 564 U. S. 1 (2011), for instance, we held that the offense of intentional vehicular flight constitutes a violent felony because that conduct always triggers a dangerous confrontation, *id.*, at \_\_\_ (slip op., at 8). As we explained, vehicular flights "by definitional necessity occur when police are present" and are done "in defiance of their instructions . . . with a vehicle that can be used in a way to cause serious potential risk of physical injury to another." *Ibid.* In *James*, we likewise held that attempted burglary offenses "requir[ing] an overt act directed toward the entry of a structure" are violent felonies because the underlying conduct often results in a dangerous confrontation. 550 U. S., at 204, 206. But we distinguished those crimes from "the more attenuated conduct encompassed by" attempt offenses "that c[an] be satisfied by preparatory conduct that does not pose the same risk of violent confrontation," such as "'possessing burglary tools.'" *Id.*, at 205, 206, and n. 4. At some point, in other words, the risk of injury from the crime may be too attenuated for the conviction to fall within the residual clause, such as when an additional, voluntary act (*e.g.*, the *use* of burglary tools to enter a structure) is necessary to bring about the risk of physical injury to another.

In light of the elements of and reported convictions for the unlawful possession of a short-barreled shotgun, this

crime does not "involv[e] conduct that presents a serious potential risk of physical injury to another," §924(e) (2)(B)(ii). The acts that form the basis of this offense are simply too remote from a risk of physical injury to fall within the residual clause.

Standing alone, the elements of this offense—(1) unlawfully (2) possessing (3) a short-barreled shotgun—do not describe inherently dangerous conduct. As a conceptual matter, "simple possession [of a firearm], even by a felon, takes place in a variety of ways (*e.g.*, in a closet, in a storeroom, in a car, in a pocket) many, perhaps most, of which do not involve likely accompanying violence." *United States* v. *Doe*, 960 F. 2d 221, 225 (CA1 1992). These weapons also can be stored in a manner posing a danger to no one, such as unloaded, disassembled, or locked away. By themselves, the elements of this offense indicate that the ordinary commission of this crime is far less risky than ACCA's enumerated offenses.

Reported convictions support the conclusion that mere possession of a short-barreled shotgun does not, in the ordinary case, pose a serious risk of injury to others. A few examples suffice. In one case, officers found the sawed-off shotgun locked inside a gun cabinet in an empty home. *State* v. *Salyers*, 858 N. W. 2d 156, 157–158 (Minn. 2015). In another, the firearm was retrieved from the trunk of the defendant's car. *State* v. *Ellenberger*, 543 N. W. 2d 673, 674 (Minn. App. 1996). In still another, the weapon was found missing a firing pin. *State* v. *Johnson*, 171 Wis. 2d 175, 178, 491 N. W. 2d 110, 111 (App. 1992). In these instances and others, the offense threatened no one.

The Government's theory for why this crime should nonetheless qualify as a "violent felony" is unpersuasive. Although it does not dispute that the unlawful possession of a short-barreled shotgun can occur in a nondangerous manner, the Government contends that this offense poses

a serious risk of physical injury due to the connection between short-barreled shotguns and other serious crimes. As the Government explains, these firearms are "weapons not typically possessed by law-abiding citizens for lawful purposes," *District of Columbia* v. *Heller*, 554 U. S. 570, 625 (2008), but are instead primarily intended for use in criminal activity. In light of that intended use, the Government reasons that the ordinary case of this possession offense will involve the *use* of a short-barreled shotgun in a serious crime, a scenario obviously posing a serious risk of physical injury.

But even assuming that those who unlawfully possess these weapons typically intend to use them in a serious crime, the risk that the Government identifies arises not from the act of possessing the weapon, but from the act of using it. Unlike attempted burglary (at least of the type at issue in *James*) or intentional vehicular flight—conduct that by itself often or always invites a dangerous confrontation—possession of a short-barreled shotgun poses a threat *only* when an offender decides to engage in additional, voluntary conduct that is not included in the elements of the crime. Until this weapon is assembled, loaded, or used, for example, it poses no risk of injury to others in and of itself. The risk of injury to others from mere possession of this firearm is too attenuated to treat this offense as a violent felony. I would reverse the Court of Appeals on that basis.

## II

As the foregoing analysis demonstrates, ACCA's residual clause can be applied in a principled manner. One would have thought this proposition well established given that we have already decided four cases addressing this clause. The majority nonetheless concludes that the operation of this provision violates the Fifth Amendment's Due Process Clause.

JUSTICE ALITO shows why that analysis is wrong under our precedents. See *post,* at 13–17 (dissenting opinion). But I have some concerns about our modern vagueness doctrine itself. Whether that doctrine is defensible under the original meaning of "due process of law" is a difficult question I leave for the another day, but the doctrine's history should prompt us at least to examine its constitutional underpinnings more closely before we use it to nullify yet another duly enacted law.

### A

We have become accustomed to using the Due Process Clauses to invalidate laws on the ground of "vagueness." The doctrine we have developed is quite sweeping: "A statute can be impermissibly vague . . . if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill* v. *Colorado*, 530 U. S. 703, 732 (2000). Using this framework, we have nullified a wide range of enactments. We have struck down laws ranging from city ordinances, *Papachristou* v. *Jacksonville*, 405 U. S. 156, 165–171 (1972), to Acts of Congress, *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89–93 (1921). We have struck down laws whether they are penal, *Lanzetta* v. *New Jersey*, 306 U. S. 451, 452, 458 (1939), or not, *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589, 597–604 (1967).[1] We have struck down laws addressing

---

[1] By "penal," I mean laws "authoriz[ing] criminal punishment" as well as those "authorizing fines or forfeitures . . . [that] are enforced through civil rather than criminal process." Cf. C. Nelson, Statutory Interpretation 108 (2011) (discussing definition of "penal" for purposes of rule of lenity). A law requiring termination of employment from public institutions, for instance, is not penal. See *Keyishian*, 385 U. S., at 597–604. Nor is a law creating an "obligation to pay taxes." *Milwaukee County* v. *M. E. White Co.*, 296 U. S. 268, 271 (1935). Conversely, a law imposing a monetary exaction as a punishment for noncompliance with

subjects ranging from abortion, *Colautti* v. *Franklin*, 439 U. S. 379, 390 (1979), and obscenity, *Winters* v. *New York*, 333 U. S. 507, 517–520 (1948), to the minimum wage, *Connally* v. *General Constr. Co.*, 269 U. S. 385, 390–395 (1926), and antitrust, *Cline* v. *Frink Dairy Co.*, 274 U. S. 445, 453–465 (1927). We have even struck down a law using a term that has been used to describe criminal conduct in this country since before the Constitution was ratified. *Chicago* v. *Morales*, 527 U. S. 41, 51 (1999) (invalidating a "loitering" law); see *id.,* at 113, and n. 10 (THOMAS, J., dissenting) (discussing a 1764 Georgia law requiring the apprehension of "all able bodied persons . . . who shall be found loitering").

That we have repeatedly used a doctrine to invalidate laws does not make it legitimate. Cf., *e.g., Dred Scott* v. *Sandford*, 19 How. 393, 450–452 (1857) (stating that an Act of Congress prohibiting slavery in certain Federal Territories violated the substantive due process rights of slaveowners and was therefore void). This Court has a history of wielding doctrines purportedly rooted in "due process of law" to achieve its own policy goals, substantive due process being the poster child. See *McDonald* v. *Chicago*, 561 U. S. 742, 811 (2010) (THOMAS, J., concurring in part and concurring in judgment) ("The one theme that links the Court's substantive due process precedents together is their lack of a guiding principle to distinguish 'fundamental' rights that warrant protection from nonfundamental rights that do not"). Although our vagueness doctrine is distinct from substantive due process, their histories have disquieting parallels.

### 1

The problem of vague penal statutes is nothing new.

---

a regulatory mandate is penal. See *National Federation of Independent Business* v. *Sebelius*, 567 U. S. ___, ___–___ (2012) (SCALIA, KENNEDY, THOMAS, and ALITO, JJ., dissenting) (slip op., at 16–26).

The notion that such laws may be void under the Constitution's Due Process Clauses, however, is a more recent development.

Before the end of the 19th century, courts addressed vagueness through a rule of strict construction of penal statutes, not a rule of constitutional law. This rule of construction—better known today as the rule of lenity— first emerged in 16th-century England in reaction to Parliament's practice of making large swaths of crimes capital offenses, though it did not gain broad acceptance until the following century. See Hall, Strict or Liberal Construction of Penal Statutes, 48 Harv. L. Rev. 748, 749– 751 (1935); see also 1 L. Radzinowicz, A History of English Criminal Law and Its Administration From 1750, pp. 10– 11 (1948) (noting that some of the following crimes triggered the death penalty: "marking the edges of any current coin of the kingdom," "maliciously cutting any hopbinds growing on poles in any plantation of hops," and "being in the company of gypsies"). Courts relied on this rule of construction in refusing to apply vague capitaloffense statutes to prosecutions before them. As an example of this rule, William Blackstone described a notable instance in which an English statute imposing the death penalty on anyone convicted of "stealing sheep, *or other cattle*" was "held to extend to nothing but mere sheep" as "th[e] general words, 'or other cattle,' [were] looked upon as much too loose to create a capital offence." 1 Commentaries on the Laws of England 88 (1765).[2]

─────────

[2]At the time, the ordinary meaning of the word "cattle" was not limited to cows, but instead encompassed all "[b]easts of pasture; not wild nor domestick." 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773). Parliament responded to the judicial refusal to apply the provision to "cattle" by passing "another statute, 15 Geo. II. c. 34, extending the [law] to bulls, cows, oxen, steers, bullocks, heifers, calves, and lambs, by name." 1 Blackstone, Commentaries on the Laws of England, at 88.

Vague statutes surfaced on this side of the Atlantic as well. Shortly after the First Congress proposed the Bill of Rights, for instance, it passed a law providing "[t]hat every person who shall attempt to trade with the Indian tribes, or be found in the Indian country with such merchandise in his possession as are usually vended to the Indians, without a license," must forfeit the offending goods. Act of July 22, 1790, ch. 33, §3, 1 Stat. 137–138. At first glance, punishing the unlicensed possession of "merchandise . . . usually vended to the Indians," *ibid.*, would seem far more likely to "invit[e] arbitrary enforcement," *ante,* at 5, than does the residual clause.

But rather than strike down arguably vague laws under the Fifth Amendment Due Process Clause, antebellum American courts—like their English predecessors—simply refused to apply them in individual cases under the rule that penal statutes should be construed strictly. See, *e.g., United States* v. *Sharp*, 27 F. Cas. 1041 (No. 16,264) (CC Pa. 1815) (Washington, J.). In *Sharp,* for instance, several defendants charged with violating an Act rendering it a capital offense for "any seaman" to "make a revolt in [a] ship," Act of Apr. 30, 1790, §8, 1 Stat. 114, objected that "the offence of making a revolt, [wa]s not sufficiently defined by this law, or by any other standard, to which reference could be safely made; to warrant the court in passing a sentence upon [them]." 27 F. Cas., at 1043. Justice Washington, riding circuit, apparently agreed, observing that the common definitions for the phrase "make a revolt" were "so multifarious, and so different" that he could not "avoid feeling a natural repugnance, to selecting from this mass of definitions, one, which may fix a crime upon these men, and that too of a capital nature." *Ibid.* Remarking that "[l]aws which create crimes, ought to be so explicit in themselves, or by reference to some other standard, that all men, subject to their penalties, may know what acts it is their duty to avoid," he refused

to "recommend to the jury, to find the prisoners guilty of making, or endeavouring to make a revolt, however strong the evidence may be." *Ibid.*

Such analysis does not mean that federal courts believed they had the power to invalidate vague penal laws as unconstitutional. Indeed, there is good evidence that courts at the time understood judicial review to consist "of a refusal to give a statute effect as operative law in resolving a case," a notion quite distinct from our modern practice of "'strik[ing] down' legislation." Walsh, Partial Unconstitutionality, 85 N. Y. U. L. Rev. 738, 756 (2010). The process of refusing to apply such laws appeared to occur on a case-by-case basis. For instance, notwithstanding his doubts expressed in *Sharp*, Justice Washington, writing for this Court, later rejected the argument that lower courts could arrest a judgment under the same ship-revolt statute because it "does not define the offence of endeavouring to make a revolt." *United States* v. *Kelly*, 11 Wheat. 417, 418 (1826). The Court explained that "it is . . . competent to the Court to give a judicial definition" of "the offence of endeavouring to make a revolt," and that such definition "consists in the endeavour of the crew of a vessel, or any one or more of them, to overthrow the legitimate authority of her commander, with intent to remove him from his command, or against his will to take possession of the vessel by assuming the government and navigation of her, or by transferring their obedience from the lawful commander to some other person." *Id.,* at 418–419. In dealing with statutory indeterminacy, federal courts saw themselves engaged in construction, not judicial review as it is now understood. [3]

_____

[3] Early American state courts also sometimes refused to apply a law they found completely unintelligible, even outside of the penal context. In one antebellum decision, the Pennsylvania Supreme Court did not even attempt to apply a statute that gave the Pennsylvania state treasurer "'as many votes'" in state bank elections as "'were held by

2

Although vagueness concerns played a role in the strict construction of penal statutes from early on, there is little indication that anyone before the late 19th century believed that courts had the power under the Due Process Clauses to nullify statutes on that ground. Instead, our modern vagueness doctrine materialized after the rise of substantive due process. Following the ratification of the Fourteenth Amendment, corporations began to use that Amendment's Due Process Clause to challenge state laws that attached penalties to unauthorized commercial conduct. In addition to claiming that these laws violated their substantive due process rights, these litigants began—with some success—to contend that such laws were unconstitutionally indefinite. In one case, a railroad company challenged a Tennessee law authorizing penalties against any railroad that demanded "more than a just and reasonable compensation" or engaged in "unjust and unreasonable discrimination" in setting its rates. *Louisville & Nashville R. Co.* v. *Railroad Comm'n of Tenn.*, 19 F. 679, 690 (CC MD Tenn. 1884) (internal quotation marks deleted). Without specifying the constitutional authority for its holding, the Circuit Court concluded that "[n]o citizen . . . can be constitutionally subjected to penalties and despoiled of his property, in a criminal or quasi criminal proceeding, under and by force of such indefinite

─────────────

*individuals*'" without providing guidance as to which individuals it was referring. *Commonwealth* v. *Bank of Pennsylvania*, 3 Watts & Serg. 173, 177 (1842). Concluding that it had "seldom, if ever, found the language of legislation so devoid of certainty," the court withdrew the case. *Ibid.*; see also *Drake* v. *Drake*, 15 N. C. 110, 115 (1833) ("Whether a statute be a public or a private one, if the terms in which it is couched be so vague as to convey no definite meaning to those whose duty it is to execute it, either ministerially or judicially, it is necessarily inoperative"). This practice is distinct from our modern vagueness doctrine, which applies to laws that are intelligible but vague.

legislation." *Id.,* at 693 (emphasis deleted).

Justice Brewer—widely recognized as "a leading spokesman for 'substantized' due process," Gamer, Justice Brewer and Substantive Due Process: A Conservative Court Revisited, 18 Vand. L. Rev. 615, 627 (1965)—employed similar reasoning while riding circuit, though he did not identify the constitutional source of judicial authority to nullify vague laws. In reviewing an Iowa law authorizing fines against railroads for charging more than a "reasonable and just" rate, Justice Brewer mentioned in dictum that "no penal law can be sustained unless its mandates are so clearly expressed that any ordinary person can determine in advance what he may and what he may not do under it." *Chicago & N. W. R. Co.* v. *Dey*, 35 F. 866, 876 (CC SD Iowa 1888).

Constitutional vagueness challenges in this Court initially met with some resistance. Although the Court appeared to acknowledge the possibility of unconstitutionally indefinite enactments, it repeatedly rejected vagueness challenges to penal laws addressing railroad rates, *Railroad Comm'n Cases*, 116 U. S. 307, 336–337 (1886), liquor sales, *Ohio ex rel. Lloyd* v. *Dollison*, 194 U. S. 445, 450–451 (1904), and anticompetitive conduct, *Nash* v. *United States*, 229 U. S. 373, 376–378 (1913); *Waters-Pierce Oil Co.* v. *Texas (No. 1)*, 212 U. S. 86, 108–111 (1909).

In 1914, however, the Court nullified a law on vagueness grounds under the Due Process Clause for the first time. In *International Harvester Co. of America* v. *Kentucky*, 234 U. S. 216 (1914), a tobacco company brought a Fourteenth Amendment challenge against several Kentucky antitrust laws that had been construed to render unlawful "any combination [made] . . . for the purpose or with the effect of fixing a price that was greater or less than the real value of the article," *id.,* at 221. The company argued that by referring to "real value," the laws pro-

vided "no standard of conduct that it is possible to know." *Ibid.* The Court agreed. *Id.,* at 223–224. Although it did not specify in that case which portion of the Fourteenth Amendment served as the basis for its holding, *ibid.*, it explained in a related case that the lack of a knowable standard of conduct in the Kentucky statutes "violated the fundamental principles of justice embraced in the conception of due process of law." *Collins* v. *Kentucky*, 234 U. S. 634, 638 (1914).

### 3

Since that time, the Court's application of its vagueness doctrine has largely mirrored its application of substantive due process. During the *Lochner* era, a period marked by the use of substantive due process to strike down economic regulations, *e.g., Lochner* v. *New York*, 198 U. S. 45, 57 (1905), the Court frequently used the vagueness doctrine to invalidate economic regulations penalizing commercial activity.[4] Among the penal laws it found to be impermissibly vague were a state law regulating the production of crude oil, *Champlin Refining Co.* v. *Corporation Comm'n*

---

[4] During this time, the Court would apply its new vagueness doctrine outside of the penal context as well. In *A. B. Small Co.* v. *American Sugar Refining Co.*, 267 U. S. 233 (1925), a sugar dealer raised a defense to a breach-of-contract suit that the contracts themselves were unlawful under several provisions of the Lever Act, including one making it "'unlawful for any person . . . to make any unjust or unreasonable . . . charge in . . . dealing in or with any necessaries,' or to agree with another 'to exact excessive prices for any necessaries,'" *id.,* at 238. Applying *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81 (1921), which had held that provision to be unconstitutionally vague, the Court rejected the dealer's argument. 267 U. S.*,* at 238–239. The Court explained that "[i]t was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all." *Id.,* at 239. That doctrine thus applied to penalties as well as "[a]ny other means of exaction, such as declaring the transaction unlawful or stripping a participant of his rights under it." *Ibid.*

*of Okla.*, 286 U. S. 210, 242–243 (1932), a state antitrust law, *Cline*, 274 U. S., at 453–465, a state minimum-wage law, *Connally*, 269 U. S., at 390–395, and a federal price-control statute, *L. Cohen Grocery Co.*, 255 U. S., at 89–93.[5]

Around the time the Court began shifting the focus of its substantive due process (and equal protection) jurisprudence from economic interests to "discrete and insular minorities," see *United States* v. *Carolene Products Co.*, 304 U. S. 144, 153, n. 4 (1938), the target of its vagueness doctrine changed as well. The Court began to use the vagueness doctrine to invalidate noneconomic regulations, such as state statutes penalizing obscenity, *Winters*, 333 U. S., at 517–520, and membership in a gang, *Lanzetta*, 306 U. S., at 458.

Successful vagueness challenges to regulations penalizing commercial conduct, by contrast, largely fell by the wayside. The Court, for instance, upheld a federal regulation punishing the knowing violation of an order instructing drivers transporting dangerous chemicals to "'avoid, so far as practicable . . . driving into or through congested thoroughfares, places where crowds are assembled, street car tracks, tunnels, viaducts, and dangerous crossings,'" *Boyce Motor Lines, Inc.* v. *United States*, 342 U. S. 337,

---

[5]Vagueness challenges to laws regulating speech during this period were less successful. Among the laws the Court found to be sufficiently definite included a state law making it a misdemeanor to publish, among other things, materials "'which shall tend to encourage or advocate disrespect for law or for any court or courts of justice,'" *Fox* v. *Washington*, 236 U. S. 273, 275–277 (1915), a federal statute criminalizing candidate solicitation of contributions for "'any political purpose whatever,'" *United States* v. *Wurzbach*, 280 U. S. 396, 398–399 (1930), and a state prohibition on becoming a member of any organization that advocates using unlawful violence to effect "'any political change,'" *Whitney* v. *California*, 274 U. S. 357, 359–360, 368–369 (1927). But see *Stromberg* v. *California*, 283 U. S. 359, 369–370 (1931) (holding state statute punishing the use of any symbol "'of opposition to organized government'" to be impermissibly vague).

338–339, 343 (1952). And notwithstanding its earlier conclusion that an Oklahoma law requiring state employees and contractors to be paid "'not less than the current rate of per diem wages in the locality where the work is performed'" was unconstitutionally vague, *Connally, supra,* at 393, the Court found sufficiently definite a federal law forbidding radio broadcasting companies from attempting to compel by threat or duress a licensee to hire "'persons in excess of the number of employees needed by such licensee to perform actual services,'" *United States* v. *Petrillo*, 332 U. S. 1, 3, 6–7 (1947).

In more recent times, the Court's substantive due process jurisprudence has focused on abortions, and our vagueness doctrine has played a correspondingly significant role. In fact, our vagueness doctrine served as the basis for the first draft of the majority opinion in *Roe* v. *Wade*, 410 U. S. 113 (1973), on the theory that laws prohibiting all abortions save for those done "for the purpose of saving the life of the mother" forced abortionists to guess when this exception would apply on penalty of conviction. See B. Schwartz, The Unpublished Opinions of the Burger Court 116–118 (1988) (reprinting first draft of *Roe*). *Roe*, of course, turned out as a substantive due process opinion. See 410 U. S., at 164. But since then, the Court has repeatedly deployed the vagueness doctrine to nullify even mild regulations of the abortion industry. See *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 451–452 (1983) (nullifying law requiring "'that the remains of the unborn child [be] disposed of in a humane and sanitary manner'"); *Colautti*, 439 U. S., at 381 (nullifying law mandating abortionists adhere to a prescribed standard of care if "there is 'sufficient reason to believe that the fetus may be viable'").[6]

————————

[6]All the while, however, the Court has rejected vagueness challenges to laws punishing those on the other side of the abortion debate. When

In one of our most recent decisions nullifying a law on vagueness grounds, substantive due process was again lurking in the background. In *Morales*, a plurality of this Court insisted that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment," 527 U. S., at 53, a conclusion that colored its analysis that an ordinance prohibiting loitering was unconstitutionally indeterminate, see *id.,* at 55 ("When vagueness permeates the text of" a penal law "infring[ing] on constitutionally protected rights," "it is subject to facial attack").

I find this history unsettling. It has long been understood that one of the problems with holding a statute "void for 'indefiniteness'" is that "'indefiniteness' . . . is itself an indefinite concept," *Winters, supra*, at 524 (Frankfurter, J., dissenting), and we as a Court have a bad habit of using indefinite concepts—especially ones rooted in "due process"—to invalidate democratically enacted laws.

## B

It is also not clear that our vagueness doctrine can be reconciled with the original understanding of the term "due process of law." Our traditional justification for this doctrine has been the need for notice: "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited." *United States* v. *Williams*, 553 U. S. 285, 304 (2008); accord, *ante,* at 3. Presumably, that justification rests on the view expressed in

––––––––––
it comes to restricting the speech of abortion opponents, the Court has dismissed concerns about vagueness with the observation that "'we can never expect mathematical certainty from our language,'" *Hill* v. *Colorado*, 530 U. S. 703, 733 (2000), even though such restrictions are arguably "at least as imprecise as criminal prohibitions on speech the Court has declared void for vagueness in past decades," *id.,* at 774 (KENNEDY, J., dissenting).

*Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18
How. 272 (1856), that "due process of law" constrains the
legislative branch by guaranteeing "usages and modes of
proceeding existing in the common and statute law of
England, before the emigration of our ancestors, and
which are shown not to have been unsuited to their civil
and political condition by having been acted on by them
after the settlement of this country," *id.,* at 277. That
justification assumes further that providing "a person of
ordinary intelligence [with] fair notice of what is prohib-
ited," *Williams*, *supra,* at 304, is one such usage or mode.[7]

　To accept the vagueness doctrine as founded in our
Constitution, then, one must reject the possibility "that
the Due Process Clause requires only that our Govern-
ment must proceed according to the 'law of the land'—that
is, according to written constitutional and statutory provi-
sions," which may be all that the original meaning of this
provision demands. *Hamdi* v. *Rumsfeld*, 542 U. S. 507,
589 (2004) (Thomas, J., dissenting) (some internal quota-
tion marks omitted); accord, *Turner* v. *Rogers*, 564 U. S.

───────────

　[7] As a general matter, we should be cautious about relying on general
theories of "fair notice" in our due process jurisprudence, as they have
been exploited to achieve particular ends. In *BMW of North America,
Inc.* v. *Gore*, 517 U. S. 559 (1996), for instance, the Court held that the
Due Process Clause imposed limits on punitive damages because the
Clause guaranteed "that a person receive fair notice not only of the
conduct that will subject him to punishment, but also of the severity of
the penalty that a State may impose," *id.,* at 574. That was true even
though "when the Fourteenth Amendment was adopted, punitive
damages were undoubtedly an established part of the American com-
mon law of torts," and "no particular procedures were deemed neces-
sary to circumscribe a jury's discretion regarding the award of such
damages, or their amount." *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499
U. S. 1, 26–27 (1991) (Scalia, J., concurring in judgment). Even under
the view of the Due Process Clause articulated in *Murray's Lessee*,
then, we should not allow nebulous principles to supplant more specific,
historically grounded rules. See 499 U. S., at 37–38 (opinion of Scalia,
J.).

___, ___ (2011) (THOMAS, J., dissenting) (slip op., at 2). Although *Murray's Lessee* stated the contrary, 18 How., at 276, a number of scholars and jurists have concluded that "considerable historical evidence supports the position that 'due process of law' was a separation-of-powers concept designed as a safeguard against unlicensed executive action, forbidding only deprivations not authorized by legislation or common law." D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789– 1888, p. 272 (1985); see also, *e.g., In re Winship*, 397 U. S. 358, 378–382 (1970) (Black, J., dissenting). Others have disagreed. See, *e.g.,* Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1679 (2012) (arguing that, as originally understood, "the principle of due process" required, among other things, that "statutes that purported to empower the other branches to deprive persons of rights without adequate procedural guarantees [be] subject to judicial review").

I need not choose between these two understandings of "due process of law" in this case. JUSTICE ALITO explains why the majority's decision is wrong even under our precedents. See *post,* at 13–17 (dissenting opinion). And more generally, I adhere to the view that "'[i]f any fool would know that a particular category of conduct would be within the reach of the statute, if there is an unmistakable core that a reasonable person would know is forbidden by the law, the enactment is not unconstitutional on its face,'" *Morales*, *supra*, at 112 (THOMAS, J., dissenting), and there is no question that ACCA's residual clause meets that description, see *ante,* at 10 (agreeing with the Government that "there will be straightforward cases under the residual clause").

\*    \*    \*

I have no love for our residual clause jurisprudence: As I observed when we first got into this business, the Sixth

Amendment problem with allowing district courts to conduct factfinding to determine whether an offense is a "violent felony" made our attempt to construe the residual clause "'an unnecessary exercise.'" *James*, 550 U. S., at 231 (THOMAS, J., dissenting). But the Court rejected my argument, choosing instead to begin that unnecessary exercise. I see no principled way that, four cases later, the Court can now declare that the residual clause has become too indeterminate to apply. Having damaged the residual clause through our misguided jurisprudence, we have no right to send this provision back to Congress and ask for a new one. I cannot join the Court in using the Due Process Clause to nullify an Act of Congress that contains an unmistakable core of forbidden conduct, and I concur only in its judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–7120

_____

## SAMUEL JAMES JOHNSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 26, 2015]

JUSTICE ALITO, dissenting.

The Court is tired of the Armed Career Criminal Act of
1984 (ACCA) and in particular its residual clause. Anx-
ious to rid our docket of bothersome residual clause cases,
the Court is willing to do what it takes to get the job done.
So brushing aside *stare decisis*, the Court holds that the
residual clause is unconstitutionally vague even though
we have twice rejected that very argument within the last
eight years. The canons of interpretation get no greater
respect. Inverting the canon that a statute should be
construed if possible to avoid unconstitutionality, the
Court rejects a reasonable construction of the residual
clause that would avoid any vagueness problems, prefer-
ring an alternative that the Court finds to be unconstitu-
tionally vague. And the Court is not stopped by the well-
established rule that a statute is void for vagueness only if
it is vague in all its applications. While conceding that
some applications of the residual clause are straightfor-
ward, the Court holds that the clause is now void in its
entirety. The Court's determination to be done with re-
sidual clause cases, if not its fidelity to legal principles, is
impressive.

# I

## A

Petitioner Samuel Johnson (unlike his famous name-sake) has led a life of crime and violence. His presentence investigation report sets out a résumé of petty and serious crimes, beginning when he was 12 years old. Johnson's adult record includes convictions for, among other things, robbery, attempted robbery, illegal possession of a sawed-off shotgun, and a drug offense.

In 2010, the Federal Bureau of Investigation (FBI) began monitoring Johnson because of his involvement with the National Socialist Movement, a white-supremacist organization suspected of plotting acts of terrorism. In June of that year, Johnson left the group and formed his own radical organization, the Aryan Liberation Movement, which he planned to finance by counterfeiting United States currency. In the course of the Government's investigation, Johnson "disclosed to undercover FBI agents that he manufactured napalm, silencers, and other explosives for" his new organization. 526 Fed. Appx. 708, 709 (CA8 2013) (*per curiam*). He also showed the agents an AK–47 rifle, a semiautomatic rifle, a semiautomatic pistol, and a cache of approximately 1,100 rounds of ammunition. Later, Johnson told an undercover agent: "You know I'd love to assassinate some . . . hoodrats as much as the next guy, but I think we really got to stick with high priority targets." Revised Presentence Investigation Report (PSR) ¶15. Among the top targets that he mentioned were "the Mexican consulate," "progressive bookstores," and individuals he viewed as "liberals." PSR ¶16.

In April 2012, Johnson was arrested, and he was subsequently indicted on four counts of possession of a firearm by a felon and two counts of possession of ammunition by a felon, in violation of 18 U. S. C. §§922(g) and §924(e). He pleaded guilty to one of the firearms counts, and the Dis-

trict Court sentenced him to the statutory minimum of 15 years' imprisonment under ACCA, based on his prior felony convictions for robbery, attempted robbery, and illegal possession of a sawed-off shotgun.

## B

ACCA provides a mandatory minimum sentence for certain violations of §922(g), which prohibits the shipment, transportation, or possession of firearms or ammunition by convicted felons, persons previously committed to a mental institution, and certain others. Federal law normally provides a maximum sentence of 10 years' imprisonment for such crimes. See §924(a)(2). Under ACCA, however, if a defendant convicted under §922(g) has three prior convictions "for a violent felony or a serious drug offense," the sentencing court must impose a sentence of at least 15 years' imprisonment. §924(e)(1).

ACCA's definition of a "violent felony" has three parts. First, a felony qualifies if it "has as an element the use, attempted use, or threatened use of physical force against the person of another." §924(e)(2)(B)(i). Second, the Act specifically names four categories of qualifying felonies: burglary, arson, extortion, and offenses involving the use of explosives. See §924(e)(2)(B)(ii). Third, the Act contains what we have called a "residual clause," which reaches any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another." *Ibid.*

The present case concerns the residual clause. The sole question raised in Johnson's certiorari petition was whether possession of a sawed-off shotgun under Minnesota law qualifies as a violent felony under that clause. Although Johnson argued in the lower courts that the residual clause is unconstitutionally vague, he did not renew that argument here. Nevertheless, after oral argument, the Court raised the question of vagueness on its

own. The Court now holds that the residual clause is unconstitutionally vague in all its applications. I cannot agree.

## II

I begin with *stare decisis.* Eight years ago in *James* v. *United States*, 550 U. S. 192 (2007), JUSTICE SCALIA, the author of today's opinion for the Court, fired an opening shot at the residual clause. In dissent, he suggested that the residual clause is void for vagueness. *Id.*, at 230. The Court held otherwise, explaining that the standard in the residual clause "is not so indefinite as to prevent an ordinary person from understanding" its scope. *Id.*, at 210, n. 6.

Four years later, in *Sykes* v. *United States*, 564 U. S. 1 (2011), JUSTICE SCALIA fired another round. Dissenting once again, he argued that the residual clause is void for vagueness and rehearsed the same basic arguments that the Court now adopts. See *id., at ___–___* (slip op., at 7–8); see also *Derby* v. *United States*, 564 U. S. ___, ___–___ (2011) (SCALIA, J., dissenting from denial of certiorari) (slip op., at 4–5). As in *James*, the Court rejected his arguments. See *Sykes*, 564 U. S., at ___ (slip op., at 13–14). In fact, JUSTICE SCALIA was the *only* Member of the *Sykes* Court who took the position that the residual clause could not be intelligibly applied to the offense at issue. The opinion of the Court, which five Justices joined, expressly held that the residual clause "states an intelligible principle and provides guidance that allows a person to 'conform his or her conduct to the law.'" *Id.*, at ___–___ (slip op., at 13–14) (quoting *Chicago* v. *Morales*, 527 U. S. 41, 58 (1999) (plurality opinion)). JUSTICE THOMAS's concurrence, while disagreeing in part with the Court's interpretation of the residual clause, did not question its constitutionality. See *Sykes*, 564 U. S., at ___ (opinion concurring in judgment). And JUSTICE KAGAN's dissent,

which JUSTICE GINSBURG joined, argued that a proper application of the provision required a different result. See *id.,* at ___. Thus, eight Members of the Court found the statute capable of principled application.

It is, of course, true that "[s]*tare decisis* is not an inexorable command." *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991). But neither is it an empty Latin phrase. There must be good reasons for overruling a precedent, and there is none here. Nothing has changed since our decisions in *James* and *Sykes*—nothing, that is, except the Court's weariness with ACCA cases.

Reprising an argument that JUSTICE SCALIA made to no avail in *Sykes*, *supra*, at ___ (dissenting opinion) (slip op., at 7), the Court reasons that the residual clause must be unconstitutionally vague because we have had trouble settling on an interpretation. See *ante,* at 7. But disagreement about the meaning and application of the clause is not new. We were divided in *James* and in *Sykes* and in our intervening decisions in *Begay* v. *United States*, 553 U. S. 137 (2008), and *Chambers* v. *United States,* 555 U. S. 122 (2009). And that pattern is not unique to ACCA; we have been unable to come to an agreement on many recurring legal questions. The Confrontation Clause is one example that comes readily to mind. See, *e.g., Williams* v. *Illinois*, 567 U. S. ___ (2012); *Bullcoming* v. *New Mexico*, 564 U. S. ___ (2011); *Melendez-Diaz* v. *Massachusetts*, 557 U. S. 305 (2009). Our disagreements about the meaning of that provision do not prove that the Confrontation Clause has no ascertainable meaning. Likewise, our disagreements on the residual clause do not prove that it is unconstitutionally vague.

The Court also points to conflicts in the decisions of the lower courts as proof that the statute is unconstitutional. See *ante*, at 9–10. The Court overstates the degree of disagreement below. For many crimes, there is no dispute that the residual clause applies. And our certiorari docket

provides a skewed picture because the decisions that we are asked to review are usually those involving issues on which there is at least an arguable circuit conflict. But in any event, it has never been thought that conflicting interpretations of a statute justify judicial elimination of the statute. One of our chief responsibilities is to resolve those disagreements, see Supreme Court Rule 10, not to strike down the laws that create this work.

The Court may not relish the task of resolving residual clause questions on which the Circuits disagree, but the provision has not placed a crushing burden on our docket. In the eight years since *James*, we have decided all of three cases involving the residual clause. See *Begay*, *supra*; *Chambers*, *supra*; *Sykes*, *supra*. Nevertheless, faced with the unappealing prospect of resolving more circuit splits on various residual clause issues, see *ante,* at 9, six Members of the Court have thrown in the towel. That is not responsible.

## III

Even if we put *stare decisis* aside, the Court's decision remains indefensible. The residual clause is not unconstitutionally vague.

## A

The Fifth Amendment prohibits the enforcement of vague criminal laws, but the threshold for declaring a law void for vagueness is high. "The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States* v. *National Dairy Products Corp.*, 372 U. S. 29, 32 (1963). Rather, it is sufficient if a statute sets out an "ascertainable standard." *United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81, 89

(1921). A statute is thus void for vagueness only if it wholly "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States* v. *Williams*, 553 U. S. 285, 304 (2008).

The bar is even higher for sentencing provisions. The fair notice concerns that inform our vagueness doctrine are aimed at ensuring that a "'person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly.'" *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 498 (1982) (quoting *Grayned* v. *City of Rockford*, 408 U. S. 104, 108 (1972)). The fear is that vague laws will "'trap the innocent.'" 455 U. S., at 498. These concerns have less force when it comes to sentencing provisions, which come into play only after the defendant has been found guilty of the crime in question. Due process does not require, as Johnson oddly suggests, that a "prospective criminal" be able to calculate the precise penalty that a conviction would bring. Supp. Brief for Petitioner 5; see *Chapman* v. *United States*, 500 U. S. 453, 467–468 (1991) (concluding that a vagueness challenge was "particularly weak "since whatever debate there is would center around the appropriate sentence and not the criminality of the conduct").

## B

ACCA's residual clause unquestionably provides an ascertainable standard. It defines "violent felony" to include any offense that "involves conduct that presents a serious potential risk of physical injury to another." 18 U. S. C. §924(e)(2)(B)(ii). That language is by no means incomprehensible. Nor is it unusual. There are scores of federal and state laws that employ similar standards. The Solicitor General's brief contains a 99-page appendix

setting out some of these laws. See App. to Supp. Brief for
United States; see also *James, supra,* at 210, n. 6. If all
these laws are unconstitutionally vague, today's decision
is not a blast from a sawed-off shotgun; it is a nuclear
explosion.

Attempting to avoid such devastation, the Court distin-
guishes these laws primarily on the ground that almost all
of them "require gauging the riskiness of conduct in which
an individual defendant engages *on a particular occasion.*"
*Ante,* at 12 (emphasis in original). The Court thus admits
that, "[a]s a general matter, we do not doubt the constitu-
tionality of laws that call for the application of a qualita-
tive standard such as 'substantial risk' to real-world con-
duct." *Ibid.* Its complaint is that the residual clause
"requires application of the 'serious potential risk' stand-
ard to an *idealized ordinary case of the crime.*" *Ibid.* (em-
phasis added). Thus, according to the Court, ACCA's
residual clause is unconstitutionally vague because its
standard must be applied to "an idealized ordinary case of
the crime" and not, like the vast majority of the laws in
the Solicitor General's appendix, to "real-world conduct."

ACCA, however, makes no reference to "an idealized
ordinary case of the crime." That requirement was the
handiwork of this Court in *Taylor* v. *United States,* 495
U. S. 575 (1990). And as I will show, the residual clause
can reasonably be interpreted to refer to "real-world
conduct."[1]

---

[1] The Court also says that the residual clause's reference to the enu-
merated offenses is "confusing." *Ante,* at 12. But this is another
argument we rejected in *James* v. *United States,* 550 U. S. 192 (2007),
and *Sykes* v. *United States,* 564 U. S. 1 (2011), and it is no more per-
suasive now. Although the risk level varies among the enumerated
offenses, all four categories of offenses involve conduct that presents a
serious potential risk of harm to others. If the Court's concern is that
some of the enumerated offenses do not seem especially risky, all that
means is that the statute "sets a low baseline level for risk." *Id.,* at ___
(THOMAS, J., concurring in judgment) (slip op., at 2).

## C

When a statute's constitutionality is in doubt, we have an obligation to interpret the law, if possible, to avoid the constitutional problem. See, *e.g., Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988). As one treatise puts it, "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts §38, p. 247 (2012). This canon applies fully when considering vagueness challenges. In cases like this one, "our task is not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations." *Civil Service Comm'n* v. *Letter Carriers,* 413 U. S. 548, 571 (1973); see also *Skilling* v. *United States*, 561 U. S. 358, 403 (2010). Indeed, "'[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Id.,* at 406 (quoting *Hooper* v. *California*, 155 U. S. 648, 657 (1895); emphasis deleted); see also *Ex parte Randolph*, 20 F. Cas. 242, 254 (No. 11,558) (CC Va. 1833) (Marshall, C. J.).

The Court all but concedes that the residual clause would be constitutional if it applied to "real-world conduct." Whether that is the *best* interpretation of the residual clause is beside the point. What matters is whether it is a reasonable interpretation of the statute. And it surely is that.

First, this interpretation heeds the pointed distinction that ACCA draws between the "element[s]" of an offense and "conduct." Under §924(e)(2)(B)(i), a crime qualifies as a "violent felony" if one of its "element[s]" involves "the use, attempted use, or threatened use of physical force against the person of another." But the residual clause, which appears in the very next subsection, §924(e)(2)(B)(ii), focuses on "conduct"—specifically, "con-

duct that presents a serious potential risk of physical injury to another." The use of these two different terms in §924(e) indicates that "conduct" refers to things done during the commission of an offense that are not part of the elements needed for conviction. Because those extra actions vary from case to case, it is natural to interpret "conduct" to mean real-world conduct, not the conduct involved in some Platonic ideal of the offense.

Second, as the Court points out, standards like the one in the residual clause almost always appear in laws that call for application by a trier of fact. This strongly suggests that the residual clause calls for the same sort of application.

Third, if the Court is correct that the residual clause is nearly incomprehensible when interpreted as applying to an "idealized ordinary case of the crime," then that is telling evidence that this is not what Congress intended. When another interpretation is ready at hand, why should we assume that Congress gave the clause a meaning that is impossible—or even, exceedingly difficult—to apply?

## D

Not only does the "real-world conduct" interpretation fit the terms of the residual clause, but the reasons that persuaded the Court to adopt the categorical approach in *Taylor* either do not apply or have much less force in residual clause cases.

In *Taylor*, the question before the Court concerned the meaning of "burglary," one of ACCA's enumerated offenses. The Court gave three reasons for holding that a judge making an ACCA determination should generally look only at the elements of the offense of conviction and not to other things that the defendant did during the commission of the offense. First, the Court thought that ACCA's use of the term "convictions" pointed to the categorical approach. The Court wrote: "Section 924(e)(1) refers to 'a person who

. . . has three previous convictions' for—not a person who has committed—three previous violent felonies or drug offenses." 495 U. S., at 600. Second, the Court relied on legislative history, noting that ACCA had previously contained a generic definition of burglary and that "the deletion of [this] definition . . . may have been an inadvertent casualty of a complex drafting process." *Id.*, at 589–590, 601. Third, the Court felt that "the practical difficulties and potential unfairness of a factual approach [were] daunting." *Id.*, at 601.

None of these three grounds dictates that the categorical approach must be used in residual clause cases. The second ground, which concerned the deletion of a generic definition of burglary, obviously has no application to the residual clause. And the first ground has much less force in residual clause cases. In *Taylor*, the Court reasoned that a defendant has a "conviction" for burglary only if burglary is the offense set out in the judgment of conviction. For instance, if a defendant commits a burglary but pleads guilty, under a plea bargain, to possession of burglar's tools, the *Taylor* Court thought that it would be unnatural to say that the defendant had a *conviction* for burglary. Now consider a case in which a gang member is convicted of illegal possession of a sawed-off shotgun and the evidence shows that he concealed the weapon under his coat, while searching for a rival gang member who had just killed his brother. In that situation, it is not at all unnatural to say that the defendant had a conviction for a crime that "involve[d] *conduct* that present[ed] a serious potential risk of physical injury to another." §924(e)(2)(B)(ii) (emphasis added). At the very least, it would be a reasonable way to describe the defendant's conviction.

The *Taylor* Court's remaining reasons for adopting the categorical approach cannot justify an interpretation that renders the residual clause unconstitutional. While the

*Taylor* Court feared that a conduct-specific approach would unduly burden the courts, experience has shown that application of the categorical approach has not always been easy. Indeed, the Court's main argument for overturning the statute is that this approach is unmanageable in residual clause cases.

As for the notion that the categorical approach is more forgiving to defendants, there is a strong argument that the opposite is true, at least with respect to the residual clause. Consider two criminal laws: Injury occurs in 10% of cases involving the violation of statute A, but in 90% of cases involving the violation of statute B. Under the categorical approach, a truly dangerous crime under statute A might not qualify as a violent felony, while a crime with no measurable risk of harm under statute B would count against the defendant. Under a conduct-specific inquiry, on the other hand, a defendant's actual conduct would determine whether ACCA's mandatory penalty applies.

It is also significant that the allocation of the burden of proof protects defendants. The prosecution bears the burden of proving that a defendant has convictions that qualify for sentencing under ACCA. If evidentiary deficiencies, poor recordkeeping, or anything else prevents the prosecution from discharging that burden under the conduct-specific approach, a defendant would not receive an ACCA sentence.

Nor would a conduct-specific inquiry raise constitutional problems of its own. It is questionable whether the Sixth Amendment creates a right to a jury trial in this situation. See *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998). But if it does, the issue could be tried to a jury, and the prosecution could bear the burden of proving beyond a reasonable doubt that a defendant's prior crimes involved conduct that presented a serious potential risk of injury to another. I would adopt this alternative interpre-

tation and hold that the residual clause requires an exam-
ination of real-world conduct.

The Court's only reason for refusing to consider this
interpretation is that "the Government has not asked us to
abandon the categorical approach in residual-clause cases."
*Ante,* at 13. But the Court cites no case in which we
have suggested that a saving interpretation may be adopted
only if it is proposed by one of the parties. Nor does the
Court cite any secondary authorities advocating this rule.
Cf. Scalia, Reading Law §38 (stating the canon with no
such limitation). On the contrary, we have long recog-
nized that it is "our plain duty to adopt that construction
which will save [a] statute from constitutional infirmity,"
where fairly possible. *United States ex rel. Attorney Gen-
eral* v. *Delaware & Hudson Co.*, 213 U. S. 366, 407 (1909).
It would be strange if we could fulfill that "plain duty"
only when a party asks us to do so. And the Court's re-
fusal to consider a saving interpretation not advocated by
the Government is hard to square with the Court's adop-
tion of an argument that petitioner chose not to raise. As
noted, Johnson did not ask us to hold that the residual
clause is unconstitutionally vague, but the Court inter-
jected that issue into the case, requested supplemental
briefing on the question, and heard reargument. The
Court's refusal to look beyond the arguments of the parties
apparently applies only to arguments that the Court does
not want to hear.

### E

Even if the categorical approach is used in residual
clause cases, however, the clause is still not void for
vagueness. "It is well established that vagueness chal-
lenges to statutes which do not involve First Amendment
freedoms must be examined" on an as-applied basis.
*United States* v. *Mazurie*, 419 U. S. 544, 550 (1975). "Ob-
jections to vagueness under the Due Process Clause rest

on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard* v. *Cartwright*, 486 U. S. 356, 361 (1988). Thus, in a due process vagueness case, we will hold that a law is facially invalid "only if the enactment is impermissibly vague in *all* of its applications." *Hoffman Estates*, 455 U. S., at 494–495 (emphasis added); see also *Chapman*, 500 U. S., at 467.[2]

In concluding that the residual clause is facially void for vagueness, the Court flatly contravenes this rule. The Court admits "that there will be straightforward cases under the residual clause." *Ante,* at 10. But rather than exercising the restraint that our vagueness cases prescribe, the Court holds that the residual clause is unconstitutionally vague even when its application is clear.

The Court's treatment of this issue is startling. Its facial invalidation precludes a sentencing court that is applying ACCA from counting convictions for even those specific offenses that this Court previously found to fall within the residual clause. See *James*, 550 U. S., at 203–209 (attempted burglary); *Sykes*, 564 U. S., at \_\_\_–\_\_\_ (slip op., at 5–9) (flight from law enforcement in a vehicle).

———————

[2]This rule is simply an application of the broader rule that, except in First Amendment cases, we will hold that a statute is facially unconstitutional only if "no set of circumstances exists under which the Act would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987). A void-for-vagueness challenge is a facial challenge. See *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 494–495, and nn. 5, 6, 7 (1982); *Chicago* v. *Morales*, 527 U. S. 41, 79 (1999) (SCALIA, J., dissenting). Consequently, there is no reason why the no-set-of-circumstances rule should not apply in this context. I assume that the Court does not mean to abrogate the no-set-of-circumstances rule in its entirety, but the Court provides no justification for its refusal to apply that rule here. Perhaps the Court has concluded, for some undisclosed reason, that void-for-vagueness claims are different from all other facial challenges not based on the First Amendment. Or perhaps the Court has simply created an ACCA exception.

Still worse, the Court holds that vagueness bars the use of the residual clause in other cases in which its applicability can hardly be questioned. Attempted rape is an example. See, *e.g., Dawson* v. *United States*, 702 F. 3d 347, 351–352 (CA6 2012). Can there be any doubt that "an idealized ordinary case of th[is] crime" "involves conduct that presents a serious potential risk of physical injury to another"? How about attempted arson,[3] attempted kidnapping,[4] solicitation to commit aggravated assault,[5] possession of a loaded weapon with the intent to use it unlawfully against another person,[6] possession of a weapon in prison,[7] or compelling a person to act as a prostitute?[8] Is there much doubt that those offenses "involve conduct that presents a serious potential risk of physical injury to another"?

Transforming vagueness doctrine, the Court claims that we have never actually *held* that a statue may be voided for vagueness only when it is vague in all its applications. But that is simply wrong. In *Hoffman Estates*, we reversed a Seventh Circuit decision that voided an ordinance prohibiting the sale of certain items. See 455 U. S., at 491. The Seventh Circuit struck down the ordinance because it was "unclear in *some* of its applications," but we reversed and emphasized that a law is void for vagueness "only if [it] is impermissibly vague in all of its applications." *Id.,* at 494–495; see also *id.,* at 495, n. 7 (collecting cases). Applying that principle, we held that the "facial

---

[3] *United States* v. *Rainey*, 362 F. 3d 733, 735–736 (CA11) (*per curiam*), cert. denied, 541 U. S. 1081 (2004).

[4] *United States* v. *Kaplansky*, 42 F. 3d 320, 323–324 (CA6 1994) (en banc).

[5] *United States* v. *Benton*, 639 F. 3d 723, 731–732 (CA6), cert. denied, 565 U. S. ___ (2011).

[6] *United States* v. *Lynch*, 518 F. 3d 164, 172–173 (CA2 2008), cert. denied, 555 U. S. 1177 (2009).

[7] *United States* v. *Boyce*, 633 F. 3d 708, 711–712 (CA8 2011), cert. denied, 565 U. S. ___ (2012).

[8] *United States* v. *Brown*, 273 F. 3d 747, 749–751 (CA7 2001).

challenge [wa]s unavailing" because "at least some of the items sold . . . [we]re covered" by the ordinance. *Id.,* at 500. These statements were not dicta. They were the holding of the case. Yet the Court does not even mention this binding precedent.

Instead, the Court says that the facts of two *earlier* cases support a broader application of the vagueness doctrine. See *ante,* at 11. That, too, is incorrect. Neither case remotely suggested that mere overbreadth is enough for facial invalidation under the Fifth Amendment.

In *Coates* v. *Cincinnati*, 402 U. S. 611, 612 (1971), we addressed an ordinance that restricted free assembly and association rights by prohibiting "annoying" conduct. Our analysis turned in large part on those First Amendment concerns. In fact, we specifically explained that the "vice of the ordinance lies not alone in its violation of the due process standard of vagueness." *Id.,* at 615. In the present case, by contrast, no First Amendment rights are at issue. Thus, *Coates* cannot support the Court's rejection of our repeated statements that "vagueness challenges to statutes which *do not involve First Amendment freedoms* must be examined in light of the facts . . . at hand." *Mazurie*, *supra*, at 550 (emphasis added).

Likewise, *L. Cohen Grocery Co.*, 255 U. S. 81, proves precisely the opposite of what the Court claims. In that case, we struck down a statute prohibiting "'unjust or unreasonable rate[s]'" because it provided no "ascertainable standard of guilt" and left open "the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *Id.,* at 89. The clear import of this language is that the law at issue was impermissibly vague in all applications. And in the years since, we have never adopted the majority's contradictory interpretation. On the contrary, we have characterized the case as involving a statute that could "not constitutionally be applied to any set of

facts." *United States* v. *Powell*, 423 U. S. 87, 92 (1975). Thus, our holdings and our dicta prohibit the Court's expansion of the vagueness doctrine. The Constitution does not allow us to hold a statute void for vagueness unless it is vague in all its applications.

## IV

Because I would not strike down ACCA's residual clause, it is necessary for me to address whether Johnson's conviction for possessing a sawed-off shotgun qualifies as a violent felony. Under either the categorical approach or a conduct-specific inquiry, it does.

### A

The categorical approach requires us to determine whether "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James*, 550 U. S., at 208. This is an "inherently probabilistic" determination that considers the circumstances and conduct that ordinarily attend the offense. *Id.,* at 207. The mere fact that a crime *could* be committed without a risk of physical harm does not exclude it from the statute's reach. See *id.,* at 207–208. Instead, the residual clause speaks of "potential risk[s]," §924(e)(2)(B)(ii), a term suggesting "that Congress intended to encompass possibilities even more contingent or remote than a simple 'risk,' much less a certainty." *James*, *supra*, at 207–208.

Under these principles, unlawful possession of a sawed-off shotgun qualifies as a violent felony. As we recognized in *District of Columbia* v. *Heller*, 554 U. S. 570, 625 (2008), sawed-off shotguns are "not typically possessed by law-abiding citizens for lawful purposes." Instead, they are uniquely attractive to violent criminals. Much easier to conceal than long-barreled shotguns used for hunting and other lawful purposes, short-barreled shotguns can be

hidden under a coat, tucked into a bag, or stowed under a car seat. And like a handgun, they can be fired with one hand—except to more lethal effect. These weapons thus combine the deadly characteristics of conventional shotguns with the more convenient handling of handguns. Unlike those common firearms, however, they are not typically possessed for lawful purposes. And when a person illegally possesses a sawed-off shotgun during the commission of a crime, the risk of violence is seriously increased. The ordinary case of unlawful possession of a sawed-off shotgun therefore "presents a serious potential risk of physical injury to another." §922(e)(2)(B)(ii).

Congress' treatment of sawed-off shotguns confirms this judgment. As the Government's initial brief colorfully recounts, sawed-off shotguns were a weapon of choice for gangsters and bank robbers during the Prohibition Era. See Brief for United States 4.[9] In response, Congress enacted the National Firearms Act of 1934, which required individuals possessing certain especially dangerous weapons—including sawed-off shotguns—to register with the Federal Government and pay a special tax. 26 U. S. C. §§5845(a)(1)–(2). The Act was passed on the understanding that "while there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone

————————

[9]Al Capone's south-side Chicago henchmen used sawed-off shotguns when they executed their rivals from Bugs Moran's north-side gang during the infamous Saint Valentine's Day Massacre of 1929. See 7 Chicago Gangsters Slain by Firing Squad of Rivals, Some in Police Uniforms, N. Y. Times, Feb. 15, 1929, p. A1. Wild Bill Rooney was gunned down in Chicago by a "sawed-off shotgun [that] was pointed through a rear window" of a passing automobile. Union Boss Slain by Gang in Chicago, N. Y. Times, Mar. 20, 1931, p. 52. And when the infamous outlaws Bonnie and Clyde were killed by the police in 1934, Clyde was found "clutching a sawed-off shotgun in one hand." Barrow and Woman are Slain by Police in Louisiana Trap, N. Y. Times, May 24, 1934, p. A1.

except a law officer should have a . . . sawed-off shotgun."
H. R. Rep. No. 1780, 73d Cong., 2d Sess., 1 (1934).  As
amended, the Act imposes strict registration requirements
for any individual wishing to possess a covered shotgun,
see, *e.g.,* §§5822, 5841(b), and illegal possession of such a
weapon is punishable by imprisonment for up to 10 years.
See §§5861(b)–(d), 5871.  It is telling that this penalty
exceeds that prescribed by federal law for quintessential
violent felonies.[10]  It thus seems perfectly clear that Con-
gress has long regarded the illegal possession of a sawed-
off shotgun as a crime that poses a serious risk of harm to
others.

   The majority of States agree.  The Government informs
the Court, and Johnson does not dispute, that 28 States
have followed Congress' lead by making it a crime to
possess an unregistered sawed-off shotgun, and 11 other
States and the District of Columbia prohibit private pos-
session of sawed-off shotguns entirely.   See Brief for
United States 8–9 (collecting statutes).   Minnesota, where
petitioner was convicted, has adopted a blanket ban, based
on its judgment that "[t]he sawed-off shotgun has no
legitimate use in the society whatsoever."   *State* v. *Ellen-
berger*, 543 N. W. 2d 673, 676 (Minn. App. 1996) (internal
quotation marks and citation omitted).   Possession of a
sawed-off shotgun in Minnesota is thus an inherently
criminal act.   It is fanciful to assume that a person who
chooses to break the law and risk the heavy criminal
penalty incurred by possessing a notoriously dangerous

_____

   [10]See, *e.g.,* 18 U. S. C. §111(a) (physical assault on federal officer
punishable by not more than eight years' imprisonment); §113(a)(7)
(assault within maritime or territorial jurisdiction resulting in substan-
tial bodily injury to an individual under the age of 16 punishable by up
to five years' imprisonment); §117(a) ("assault, sexual abuse, or serious
violent felony against a spouse or intimate partner" by a habitual
offender within maritime or territorial jurisdiction punishable by up to
five years' imprisonment, except in cases of "substantial bodily injury").

weapon is unlikely to use that weapon in violent ways.

## B

If we were to abandon the categorical approach, the facts of Johnson's offense would satisfy the residual clause as well. According to the record in this case, Johnson possessed his sawed-off shotgun while dealing drugs. When police responded to reports of drug activity in a parking lot, they were told by two people that "Johnson and another individual had approached them and offered to sell drugs." PSR ¶45. The police then searched the vehicle where Johnson was seated as a passenger, and they found a sawed-off shotgun and five bags of marijuana. Johnson admitted that the gun was his.

Understood in this context, Johnson's conduct posed an acute risk of physical injury to another. Drugs and guns are never a safe combination. If one of his drug deals had gone bad or if a rival dealer had arrived on the scene, Johnson's deadly weapon was close at hand. The sawed-off nature of the gun elevated the risk of collateral damage beyond any intended targets. And the location of the crime—a public parking lot—significantly increased the chance that innocent bystanders might be caught up in the carnage. This is not a case of "mere possession" as Johnson suggests. Brief for Petitioner i. He was not storing the gun in a safe, nor was it a family heirloom or collector's item. He illegally possessed the weapon in case he needed to use it during another crime. A judge or jury could thus conclude that Johnson's offense qualified as a violent felony.

There should be no doubt that Samuel Johnson was an armed career criminal. His record includes a number of serious felonies. And he has been caught with dangerous weapons on numerous occasions. That this case has led to the residual clause's demise is confounding. I only hope that Congress can take the Court at its word that either

amending the list of enumerated offenses or abandoning the categorical approach would solve the problem that the Court perceives.